UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

RUSSELL H. DAWSON, Personal
Representative of the Estate of Damaris
Rodriguez; REYNALDO GIL; JOSE MARTE;
A.G.; I.G.; S.G.; D.G.;

                Plaintiffs,

    vs.

SOUTH CORRECTIONAL ENTITY
("SCORE"), a Governmental Administrative
Agency; PENNY BARTLEY; JIM KELLY;
TODD BARKER; BRITTNEY PALMORE;
BRANDON HEATH; PEDRO SANTOS;
MANDI JARAMILLO; WILLIAM WOO;
BENDA SCOTT a/k/a BRENDA SCOTT;
ETHAN GLOVER; CHRISTOPHER FOY;
JANE DORE; COLMINTON ALLEN; AARON
SEIPP; SCORE JOHN DOES 1-10;
NAPHCARE, INC., an Alabama Corporation;
REBECCA VILLACORTA; HENRY TAMBE;
NANCY WHITNEY; BILLIE STOCKTON;
BRITTANY MARTIN; JESSICA LOTHROP;
BROOKE WALLACE; SALLY MUKWANA;
JOAN KOSANKE; RITA WHITMAN;
VIRGINIA RICHARDSON; NAPHCARE
JOHN DOES 1-10; KING COUNTY, a political
subdivision of the State of Washington; RAUL
ADAMS; LELAND ADAMS; ALAN TAG;

                Defendants.

NO. 2:19-cv-01987

**FIRST AMENDED COMPLAINT
FOR DAMAGES**

**JURY DEMAND**

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

COME NOW the Plaintiffs, by and through their undersigned attorneys, and allege as follows:

## I.  INTRODUCTION

1.      This action arises out of the inhumane confinement of, and deprivation of adequate medical care for, Damaris Rodriguez.  Damaris's death followed four days of inexcusable neglect and appalling conditions at the South Correctional Entity Jail ("SCORE") that can only be described as torturous.

2.      On December 30, 2017, Damaris suffered from a mental health episode while at her home in SeaTac.  Damaris's husband, Reynaldo, called 911 and specifically requested medical assistance.  However, the police arrived before an ambulance.  This fact set in motion a tragic series of events that led Damaris to SCORE and to her eventual death.

3.      When the King County Sheriff's Deputies arrived, they incited a confrontation and then arrested Damaris.  And despite her apparent medical problems, they took her directly to SCORE instead of a hospital.  SCORE's only medical personnel were provided by NaphCare, a for-profit, in-custody, medical contractor.  None of NaphCare's medical staff at SCORE were medical doctors.

4.      Damaris spent the next four days alone in a cell, naked, surrounded by her own urine and vomit, and fighting both mentally and physically against her own hallucinations.  SCORE corrections officers and non-physician medical staff covered the window of her cell so they did not need to look at her, put towels in front of the door so her vomit would not leak into the hallway, and then ignored her.  She did not eat.  She barely slept.  She never saw a doctor and was never taken to a hospital.  She was never arraigned for—let alone convicted of—a crime.  She was never even taken to court.

5.      Starvation and sleep deprivation eventually took their toll and Damaris developed an easily diagnosable and treatable metabolic condition called ketoacidosis.  One of the most common symptoms of ketoacidosis is insatiable thirst ("polydipsia") and excessive water intake.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

Left unchecked, excessive water intake causes fatally low sodium levels ("water intoxication" or "hyponatremia.")

6.     Corrections officers and medical staff were aware of the dangers of water intoxication.  In fact, they even discussed and made notes about their concern that Damaris would experience water intoxication.  However, they did not help her.  All they did was move her to a different cell without a sink and left her alone.  There she died from water intoxication.

7.     Despite the known danger of water intoxication, the corrections officers did not conduct proper welfare checks.  There were numerous entries on welfare check logs that corrections officers signed off on even though they never occurred.  The welfare checks that did actually occur were conducted in an indifferent and ineffectual manner.  For example, a corrections officer initialed a log entry claiming that Damaris was offered and refused water almost an hour after she had stopped breathing.

8.     For Damaris, these four days were painful, confusing, and terrifying.  What happened in these four days was also easily preventable.  Ketone test strips are available over the counter at almost any drug store and a ketone test is one of the routine lab tests any hospital would have conducted.  And the cure for ketoacidosis—a bottle of Gatorade—was likely available in SCORE's lunchroom.

9.     Although ketoacidosis and water intoxication were the physiological mechanisms that shut her body down, the root cause of Damaris's death was a system that did not care about her.  Hers was one of numerous recent in-custody deaths connected to SCORE and NaphCare.  The ever-growing list of dead SCORE inmates has also developed a disturbing demographic trend.  People of color, such as Damaris, have died at a disproportionately high rate.  Of the seven most recent in custody decedents at SCORE for whom Plaintiffs were able to determine a racial identity, five were people of color.[1]

---

[1] The term "racial identity" is used herein as a cultural, rather than biological, concept.  Most modern biologists and anthropologists do not recognize "race" as a biologically valid classification.  However, the concept of "race" is commonly used by most Americans to classify people based on subjective and culturally mandated criteria.  Because the subjective classifications affect the biases of individuals, the concept of "race" is of practical and causal importance to this lawsuit.

FIRST AMENDED COMPLAINT FOR DAMAGES - 3

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

10.    NaphCare and SCORE are in the business of cut-rate incarceration.  NaphCare is a for-profit corporation that provides medical services to jails and prisons nationwide and markets itself as a cheaper alternative to in-house medical departments.  Although SCORE is technically a governmental administrative agency, it provides contract jail services to numerous municipalities in a manner akin to a for-profit business.  As a result, SCORE and NaphCare operate under the perverse economic incentives of a for-profit jail.  SCORE and NaphCare cut corners and make staffing policies and medical decisions based on their financial interests—not the health of their inmates.

11.    Plaintiffs bring this action under 42 U.S.C. §1983 for violations of the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution and the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq*.  Plaintiffs also bring various state and common law claims.

## II.  JURISDICTION AND VENUE

12.    This Court has jurisdiction over Plaintiffs' claims under the Fourteenth Amendment of the U.S. Constitution, the Americans With Disabilities Act, 42 U.S.C. §§§1983 and 1988, and 28 U.S.C. §§1331,1343, et seq.

13.    Plaintiffs' state and federal claims arise from a common nucleus of operative facts.  Therefore, this court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367.

14.    Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this district.

15.    Assignment to the Seattle Courthouse is proper under LCR 3(d) because a substantial part of the event and omissions giving rise to the claim occurred in King County.

## III.  PARTIES

**A.    Plaintiffs and beneficiaries.**

16.    Plaintiff Russell H. Dawson is the duly appointed and acting Personal

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

Representative of the Estate of Damaris Rodriguez.  This appointment was made in King County on July 3, 2018.  Damaris was an individual who was a resident of SeaTac, King County, Washington.  Damaris was pronounced dead on January 4, 2018.  Plaintiff Dawson brings this action as Personal Representative for the benefit of Damaris Rodriguez's estate and all beneficiaries and persons entitled to recovery pursuant to wrongful death, survival and personal injury laws of the State of Washington, including but not limited to, RCW 4.20.010, 4.20.020, 4.20.046, and 4.20.060, or under any body of foreign law of damages the Court rules applicable to these claims.

17.     Plaintiff Reynaldo Gil is an individual who is a resident of SeaTac, King County, Washington.  Reynaldo was married to Damaris at all relevant times.

18.     Plaintiff Jose Marte is an individual who is a resident of New York City, New York County, New York State.  Jose is the natural child of Damaris.

19.     Plaintiff A.G. is an individual who is a resident of SeaTac, King County, Washington.  A.G. is the natural child of Damaris.  A.G. is a minor and is therefore referred to by her initials under Fed. R. Civ. P. 5.2.

20.     Plaintiff I.G. is an individual who is a resident of SeaTac, King County, Washington.  I.G. is the natural child of Damaris.  I.G. is a minor and is therefore referred to by his initials under Fed. R. Civ. P. 5.2.

21.     Plaintiff S.G. is an individual who is a resident of SeaTac, King County, Washington.  S.G. is the natural child of Damaris.  S.G. is a minor and is therefore referred to by her initials under Fed. R. Civ. P. 5.2.

22.     Plaintiff D.G. is an individual who is a resident of SeaTac, King County, Washington.  D.G. is the natural child of Damaris.  D.G. is a minor and is therefore referred to by his initials under Fed. R. Civ. P. 5.2.

**B.    Defendant SCORE.**

23.     Defendant South Correctional Entity ("SCORE") is a governmental

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1   administrative agency established pursuant to RCW 39.34.030(3).

2      24.   SCORE's primary purpose is operating a jail in Des Moines, Washington.

3   SCORE provides correctional services to its member cities, which include Auburn, Burien, Des

4   Moines, Federal Way, Renton, SeaTac, and Tukwila, as well as providing contract services to

5   numerous other governmental entities and agencies.

6      25.   SCORE's jail-for-hire model leads to a perverse financial incentive where cost-

7   savings are prioritized over human life.  Even though SCORE's ownership group is technically

8   comprised of government entities, these financial incentives are akin to those present in the for-

9   profit correctional facility model.

10     26.   Under the doctrine of *respondeat superior*, SCORE is liable for the conduct of its

11  employees, which at all relevant times was within the course and scope of their employment.

12     27.   At all relevant times, SCORE held persons in custody under the color of state law.

13  **C.   SCORE Employee Defendants.**

14     28.   The individuals listed in paragraphs 29-35 are collectively referred to as "SCORE

15  Employee Defendants."  All are sued in their individual capacity.

16     29.   Defendant Penny Bartley is an individual who is a resident of Oro Valley,

17  Arizona.  Ms. Bartley was the Executive Director and Chief Executive Officer of SCORE, at all

18  relevant times.  Ms. Bartley was ultimately responsible for the day-to-day operations of the

19  facility, including but not limited to the provision of medical care.  Her responsibilities included,

20  but were not limited to, personally reviewing or designating another individual to review the

21  observation cell policy annually to assure observation cells are not being used punitively or as a

22  substitute for treatment; assuring that inmates receive the appropriate meal service; coordinating

23  procedures to reasonably accommodate inmates with disabilities, selecting the Health Authority

24  that will be responsible for handling and developing policies and procedures related to all clinical

25  issues within the jail; selecting the Health Services Administrator; frequently and regularly

26  communicating with the Health Services Administrator to assure the delivery of effective health

27

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1   care; reviewing statistical reports provided by the Health Services Administrator and

2   Responsible Physician; establishing written agreements with outside specialty health care

3   services for emergency and urgent care that is not available within the facility; establishing a

4   written transportation procedure that ensures inmates are transported securely and in a timely

5   manner for medical and mental health care; developing plans and procedures for providing

6   emergency medical care; notifying an inmate's next of kin in cases of serious illness and injury;

7   establishing protocols for use by medical staff during medical screening; developing medical

8   screening forms; oversee the transfer of inmates for medical treatment;  and consulting with the

9   Health Services Administrator regarding accommodations for special needs inmates.

10          30.     Defendant Jim Kelly is an individual who is a resident of Washington State.  Mr.

11  Kelly is the Deputy Executive Director of SCORE, who is primarily responsible for providing

12  general management and had general management control over the jail.  Mr. Kelly is responsible

13  for selecting training topics; establishing a training committee; determining when employees

14  should be terminated or suspended; reviewing in-custody deaths; and managing the Operations

15  Division.  The Operations Division is responsible for investigations, medical/mental health

16  services, and transportation.

17          31.     Defendant SCORE John Doe 1 is an individual who is believed and therefore

18  alleged to be a resident of Washington State.  SCORE John Doe 1 is the Training Lieutenant for

19  SCORE.  SCORE John Doe 1's responsibilities include, but are not limited to, ensuring that all

20  staff members are properly trained to perform all duties and responsibilities and maintaining

21  training records.

22          32.     Defendant SCORE John Doe 2 is an individual who is believed and therefore

23  alleged to be a resident of Washington State.  SCORE John Doe 2 is the Command Duty Officer

24  on call while Damaris was at SCORE. As the Command Duty Officer, SCORE John Doe 2 was

25  continuously available to ensure an adequate level of assistance and direction for on-shift

26  supervisors.

27          33.     Defendants Sergeant ("Sgt.") Todd Barker, Correctional Officer ("CO") Brittney

FIRST AMENDED COMPLAINT FOR DAMAGES - 7

1  Palmore, Sgt. Brandon Heath, Sgt. Pedro Santos, CO Mandi Jaramillo, CO William Woo, Sgt.

2  Benda Scott a/k/a Brenda Scott, CO Ethan Glover, CO Christopher Foy, CO Jane Dore, CO

3  Colminton Allen, CO Aaron Seipp and SCORE John Does 1-10 are individuals residing in

4  Washington State and employed by SCORE, at all relevant times.

5      34.    At all relevant times, the SCORE Employee Defendants were employed by

6  SCORE and acting within the course and scope of their employment and under color of state

7  law.

8      35.    Defendants SCORE John Does 3-10 are individuals employed by SCORE to

9  administer, operate, and/or manage SCORE's jail facility.  At all relevant times, they were acting

10  within the course and scope of their employment and under color of state law.

11  **D.    Defendant NaphCare.**

12      36.    Defendant NaphCare, Inc. ("NaphCare") is a foreign corporation existing under

13  the laws of the State of Alabama with its principle place of business in Vestavia Hills, Alabama.

14  NaphCare is registered to do business in the State of Washington.

15      37.    NaphCare does substantial and continuous business in the State of Washington,

16  including King County.

17      38.    During all times material to this lawsuit, SCORE contracted with NaphCare to

18  provide all facets of medical care, dental care, and mental health care for detainees.  This

19  included off-site hospital/physician network development, medical scheduling, and medical

20  record keeping.

21      39.    In providing medical and mental health care for inmates, NaphCare was acting

22  under the color of state law.

23      40.    Under the doctrine of *respondeat superior*, NaphCare is liable for the conduct of

24  its employees, which at all relevant times was within the course and scope of their employment.

25  **E.    NaphCare Employee Defendants.**

26      41.    The defendants listed in paragraphs 42-54 are collectively referred to as

27

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

"NaphCare Employee Defendants."  All are sued in their individual capacity.

42.    Defendant NaphCare John Doe 1 is an individual who is a resident of Washington State.  NaphCare John Doe 1 was NaphCare's "Responsible Physician" assigned to SCORE, at all relevant times.  As the Responsible Physician, NaphCare John Doe 1 was ultimately responsible for all of NaphCare's services at SCORE.  NaphCare John Doe 1's duties included, but were not limited to, updating and reviewing NaphCare policies, conducting an annual audit of NaphCare's healthcare services at SCORE, holding regular meetings with SCORE's Executive Director, overseeing monthly statistical reports, maintaining NaphCare's health services manual, drafting an appropriate staffing plan for medical personnel, overseeing the admission of psychotropic medication, and being generally available to address all medical or mental health issues that were beyond the capacity of the NaphCare employees on staff at SCORE.

43.    Defendant Registered Nurse Rebecca Villacorta ("RN Villacorta") is an individual who is a resident of Washington State.  RN Villacorta was NaphCare's Health Services Administrator at all relevant times.  RN Villacorta was the top NaphCare administrator at SCORE.  RN Villacorta was responsible for directing, managing, evaluating operations to ensure that contractual obligations and client expectations are met; assuring all operations are in compliance with contract requirements, National Commission on Correctional Health Care ("NCCHC"), American Correctional Association, National Clinical Practice Guidelines, and professional nursing standards; screening, hiring, and training NaphCare staff at SCORE; coordinating volunteer activities at SCORE; determining which inmates need to be held in solitary confinement or observation cells for medical and/or mental health reasons; establishing protocols for the immediate assessment of inmates transferred into specialized housing (including observation cells); conducting administrative reviews of in custody deaths; reviewing the observation cell policy annually to assure observation cells are not being used punitively or as a substitute for treatment; assuring that inmates receive the appropriate meal service; coordinating procedures to reasonably accommodate inmates with disabilities; regularly meeting

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1   with the Executive Director and shift captains and submitting reports regarding the effectiveness

2   of NaphCare's health care; prioritizing health care services and making triage decisions;

3   determining and facilitating specialty and emergency health care that is beyond the resources

4   available at SCORE; notifying an inmate's next of kin in cases of serious illness and injury;

5   overseeing inmate screening procedures and decisions; overseeing initial health appraisals;

6   developing medical screening forms; deciding whether adequate mental health services are

7   available to inmates at SCORE or if they need to be transferred to obtain additional treatment;

8   developing and maintaining nursing protocols; and developing and maintaining an infirmary

9   manual.

10          44.     Defendant Director of Nursing Henry Tambe ("DON Tambe") is an individual

11  who is a resident of Washington State. DON Tambe is NaphCare's Director of Nursing at

12  SCORE. He reports directly to the Health Services Administrator and is responsible for

13  supervising all nursing care provided by NaphCare at SCORE.

14          45.     Defendant Mental Health Provider Nancy Whitney ("MHP Whitney") is an

15  individual who is a resident of Seattle, King County, Washington. MHP Whitney is employed

16  by Naphcare and is the Director of Mental Health Services at SCORE. MHP Whitney is

17  responsible for developing, coordinating, and administering behavioral health services at

18  SCORE. Although MHP Whitney is not a medical provider, she provides medical advice that is

19  relied upon by SCORE. At all relevant times, she was acting within the course and scope of her

20  employment and under color of state law.

21          46.     Defendant Mental Health Provider Billie Stockton ("MHP Stockton") is an

22  individual who is a resident of Washington State. MHP Stockton is a mental health professional

23  employed by Naphcare and assigned to SCORE. At all relevant times, she was acting within the

24  course and scope of her employment and under color of state law.

25          47.     Defendant Registered Nurse Brittany Martin ("RN Martin") is an individual who

26  is a resident of Washington State. RN Martin is a nurse employed by Naphcare and assigned to

27  SCORE. At all relevant times, she was acting within the course and scope of her employment

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1    and under color of state law.

2    48.    Defendant Mental Health Provider Jessica Lothrop ("MHP Lothrop") is an

3    individual who is a resident of Washington State. MHP Lothrop is a mental health professional

4    employed by Naphcare and assigned to SCORE. At all relevant times, she was acting within the

5    course and scope of her employment and under color of state law.

6    49.    Defendant Registered Nurse Brooke Wallace ("RN Wallace) is an individual who

7    is a resident of Washington State. RN Wallace is a nurse employed by Naphcare and assigned to

8    SCORE. At all relevant times, she was acting within the course and scope of her employment

9    and under color of state law.

10    50.    Defendant Registered Nurse Sally Mukwana ("RN Mukwana") is an individual

11    who is a resident of Washington State. RN Mukwana is a nurse employed by Naphcare and

12    assigned to SCORE. At all relevant times, she was acting within the course and scope of her

13    employment and under color of state law.

14    51.    Defendant Registered Nurse Joan Kosanke ("RN Kosane") is an individual who is

15    a resident of Washington State. RN Kosanke is a nurse employed by Naphcare and assigned to

16    SCORE. At all relevant times, she was acting within the course and scope of her employment

17    and under color of state law.

18    52.    Defendant Rita Whitman ("ARNP Whitman") is an individual who is a resident of

19    Washington State. ARNP Whitman is an Advanced Registered Nurse Practitioner employed by

20    NaphCare and assigned to SCORE. At all relevant times, she was acting within the course and

21    scope of her employment and under color of state law.

22    53.    Defendant Virginia Richardson ("ARNP Richardson") is an individual who is a

23    resident of Washington State. ARNP Richardson is an Advanced Registered Nurse Practitioner

24    employed by NaphCare and assigned to SCORE. At all relevant times, she was acting within the

25    course and scope of her employment and under color of state law.

26    54.    Defendants NaphCare John Does 2-10 are individuals employed by NaphCare to

27    provide, design, or manage medical and/or mental health services to at SCORE. At all relevant

FIRST AMENDED COMPLAINT FOR DAMAGES - 11

times, they were acting within the course and scope of their employment and under color of state law.

**F.     Defendant King County.**

55.     Defendant King County is a political subdivision of the State of Washington organized under the laws of the Washington, including Title 36 of the Revised Code of Washington.  King County Sheriff's Office ("KCSO") is a division of King County and is a police agency that provides law enforcement for all unincorporated areas of King County and numerous cities on a contract basis.  One of these contract cities is SeaTac, Washington.  KCSO deputies serving SeaTac use insignia and vehicle markings unique to SeaTac.  Under the doctrine of *respondeat superior*, KCSO is liable for the conduct of its employees, which at all relevant times was within the course and scope of their employment.

**G.     King County Employee Defendants.**

56.     The Defendants listed in paragraphs 57-59 are collectively referred to as "King County Employee Defendants."  All are sued in their individual capacity.

57.     Defendant King County Sheriff's Deputy Raul Adams ("Deputy R. Adams") is an individual who is a resident of Washington State.  He is a deputy sheriff for KCSO.  At all relevant times, he was assigned to SeaTac and acting under color of state law.

58.     Defendant King County Sheriff's Leland Adams ("Deputy L. Adams") is an individual who is a resident of Washington State.  He is a deputy sheriff for KCSO.  At all relevant times, he was assigned to SeaTac and acting under color of state law.

59.     Defendant King County Sheriff's Deputy Alan Tag ("DRE Tag") is an individual who is a resident of Washington State.  He is a deputy sheriff for KCSO.  At all relevant times, he was assigned to SeaTac and acting under color of state law.  Deputy Tag is a "Drug Recognition Expert" ("DRE"), trained to identify people who are impaired by drugs and alcohol and differentiate them from people suffering from mental health problems.  Based on information and belief, he has previously been qualified as an "expert" on this subject in

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1    Washington courts.

2    **H.      General Allegations Regarding Parties.**

3           60.     The true names and identities of "John Doe" Defendants, whether individual,

4    corporate, or otherwise, are unknown to Plaintiffs at this time.  Plaintiffs will amend this

5    complaint to allege the true names and identities of said defendants, and the basis for said

6    Defendants' liability to Plaintiffs, when this information is ascertained.

7           61.     All pronouns and other indications of gender are meant to be nonspecific and

8    interchangeable.

9                                       **IV.  FACTS**

10   **A.      Damaris's arrest.**

11          62.     On December 30, 2017, Damaris was suffering from the symptoms of a medical

12   and mental health disorder, while inside her home in SeaTac, Washington.  She was confused,

13   abnormally confrontational, and hallucinating.

14          63.     Damaris had previously suffered from bipolar disorder, but Damaris and her

15   medical providers were able to manage the condition and Damaris's symptoms had been latent

16   for some time.  Around December 2017, Damaris developed a metabolic disorder.  The

17   metabolic disorder caused psychosis symptoms, which acted synergistically with her bipolar

18   disorder on December 30, 2017.

19          64.     On the afternoon of December 30, 2017, Damaris's husband, Reynaldo, called

20   911 and requested medical assistance due to Damaris's obvious mental health and medical

21   problems.

22          65.     Reynaldo's first language is Spanish and he has trouble communicating about

23   complex topics in English.

24          66.     Damaris was fluent in both Spanish and English.

25          67.     The 911 operator used a "Language Line" interpreter to communicate with

26   Reynaldo.  With the assistance of the interpreter, Reynaldo was able to communicate that

27

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

Damaris was having a mental health crisis and that she needed a "physician." He was not calling to report a crime.

68.     Firefighter/EMTs and KCSO deputies were both dispatched. The KCSO deputies showed up first—a fact that would eventually prove fatal to Damaris.

69.     Deputy R. Adams and Deputy L. Adams were the first KCSO deputies to arrive at the Rodriguez-Gil residence. The deputies entered the house and spoke with Reynaldo.

70.     Deputy R. Adams and Deputy L. Adams attempted to communicate with Reynaldo primarily in English and did not use an interpreter service.

71.     In broken English, Reynaldo did his best to tell the deputies that Damaris was having a mental health crisis and needed a medical doctor. He told them that she was responding to voices in her head, becoming abnormally agitated, experiencing extreme anxiety and paranoia, and was failing to take care of her own basic needs.

72.     Rather than help facilitate medical treatment, Deputy R. Adams and Deputy L. Adams assumed domestic violence had occurred and directed their efforts towards attempting to prove a crime. Upon specifically directed questioning, the deputies learned that at some undefined point in time Damaris had flailed her arms and made contact with Reynaldo. Reynaldo explained that the contact was not intentional, harmful, or offensive. Despite some communication issues, he made clear that he was not attempting to report a crime. Instead, he was attempting to get his wife medical help.

73.     While Reynaldo was speaking with the Deputy R. Adams, Deputy L. Adams was "keeping an eye on" Damaris while she laid on her bed. At one point, Damaris became agitated and started yelling and making gestures that Deputy L. Adams claims to have perceived as threatening. Deputy L. Adams and Deputy R. Adams took Damaris to the ground and detained her. While pinning her to the ground, one of the deputies called for backup. DRE Alan Tag arrived shortly thereafter and assisted with Damaris's transport.

74.     Deputy R. Adams noted in his report: "I spoke with [Reynaldo] after [Damaris] was taken outside the apartment and he stated he did not want to assist in the prosecution but

FIRST AMENDED COMPLAINT FOR DAMAGES - 14

wanted [Damaris] to get help for her condition.  [Reynaldo] stated he does not think his wife

meant to hit him but she needs to be seen by a mental health facility."

75.    Deputy L. Adams took photos of Reynaldo to confirm he had no injuries.

76.    The KCSO deputies asked firefighters from the Puget Sound Regional Fire

Authority ("fire department") to do a brief medical evaluation of Damaris.  They noted

"Behavioral/psychiatric episode," "Paranoid Schizophrenia," "Behavior/Emotional State –

Delusional disorders," and that there were no reports of alcohol or drugs.  Fire department

records also show that Damaris was known to have been vomiting on the day of the incident.

Although the firefighters cleared Damaris for transport, the firefighters did so based on the

understanding that she would be receiving medical treatment in the near future.

**B.    KCSO deputies transport Damaris to SCORE.**

77.    Instead of taking her to a hospital, Deputy L. Adams transported Damaris directly

to the SCORE jail facility in the back of his SeaTac Police vehicle.

78.    Taking an arrestee to a jail is much faster, easier, and requires less paperwork than

taking an arrestee to a hospital.

79.    Deputy L. Adams arrived with Damaris at SCORE at approximately 2:30 pm.

80.    Sgt. Scott, CO Palmore, and CO Bryant met the Deputy L. Adams and Damaris in

the "Sally Port" area of SCORE and attempted to escort her from the vehicle into the jail.

81.    Sgt. Scott, CO Palmore, and CO Bryant attempted to walk with Damaris, but

shortly after getting out of the vehicle, she stumbled and fell, and her body went limp.  Sgt.

Scott, CO Palmore, and CO Bryant then carried Damaris's body—face down—from the vehicle

into the jail and placed her face down on the floor in a small room resembling a shower stall,

with no furnishings and a grate in the floor.  Deputy L. Adams watched from the doorway of the

cell.

82.    Sgt. Scott, CO Palmore, and CO Bryant left Damaris face down in the cell with

her hands restrained behind her back.  Damaris made no attempt to stand or sit up.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

83.     Approximately sixteen minutes later, Sgt. Scott and CO Palmore returned to the cell.  They each grabbed one of Damaris's wrists, twisting her shoulders into to a painful position, and dragged her out of the cell.  As they dragged her, Damaris's body was limp, her head was slouched forwards, and her feet dangled behind her.

84.     Sgt. Scott and CO Palmore did not give Damaris an opportunity to walk under her own power or check to see if there was a medical reason that made her unable to walk before they twisted her shoulders and dragged her.

85.     During the aforementioned booking process, Sgt. Scott, CO Palmore, CO Bryant, and CO Moses observed Damaris displaying obvious mental and physical problems, including but not limited to being unresponsive to verbal communication and being unable to walk.

86.     Sgt. Scott is believed, and therefore alleged, to have supervised Damaris's booking.

**C.     Damaris is held in Cell B-05 from 3:05 pm on December 30, 2017 to 9:11 pm on December 31, 2017.**

87.     Sgt. Scott and CO Palmore dragged Damaris through a hallway and into cell "B-05."  CO Moses walked into cell B-05 and observed Sgt. Scott and CO Palmore stand over and remove the handcuffs from Damaris's still limp body, lying face down on the floor.

88.     After remaining face down for a period of time, Damaris eventually stood up and proceeded to unsteadily stumble in circles, dance, pull her dress above her waist, and eventually remove all of her clothing.  During this time period, Damaris was conversing with hallucinations and experiencing other psychosis symptoms.  CO Jennings visually observed Damaris through a window while this was occurring.  Sgt. Scott observed Damaris on a video monitor while this was occurring.

89.     Sgt. Scott reviewed paperwork provided by KCSO that explicitly stated that Reynaldo reported that Damaris had mental health problems.

90.     At or before 3:26 pm on 12/30/2017, Sgt. Scott made a note in SCORE's jail log that he asked MHP Stockton evaluate Damaris in the booking area.  MHP Stockton does not

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

recall receiving any such message and has no record of receiving any such message.

91.     RN Martin looked into Damaris's cell at approximately 3:55 pm on 12/30/2017, but did not enter the cell or attempt to communicate with Damaris.  RN Martin and RN Kosanke looked into Damaris's cell together at 6:11 pm but did not enter the cell or attempt to communicate with Damaris.  No medical personnel or NaphCare employee made any attempt to communicate with Damaris on 12/30/2017.

92.     Damaris did not sleep for any appreciable amount of time while she was in cell B-05, due in part to the fact that cell B-05 does not have a bed or any other furniture that is suitable for sleeping and there were bright lights on the entire night.

93.     Damaris did not eat dinner on the evening of 12/30/2017.  Instead, she threw the meal around the cell and in the toilet as a result of her medical and mental health problems.

94.     Damaris did not eat breakfast on the morning of 12/31/2017.  Instead, she threw the meal around the room and in the toilet as a result of her medical and mental health problems.

95.     On the morning of 12/31/2017, DON Henry Tambe observed a note on the door of Damaris's cell stating that she was naked.  He knocked and called Damaris's name, but she responded with unintelligible yelling.

96.     On the morning of 12/31/2017, RN Brittany Martin and CO Gaud-Feliciano made a brief attempt to speak to Damaris through the cell window.  During this attempt, Damaris sat on the toilet, danced, conversed with hallucinations, and pounded on the cell door.

97.     On the morning of 12/31/2017, Sgt. F. Thomas became aware of Damaris's condition, including but not limited to the facts that she was naked and screaming unintelligibly.  Despite the fact that she had been in SCORE almost an entire day and that her husband, the arresting sheriff's deputies, and other Naphcare and SCORE personnel noted medical and mental health concerns, Sgt. F. Thomas speculated that Damaris was simply under the influence of drugs.  Sgt. F. Thomas contacted MHP Lothrop.

98.     Damaris did not eat lunch on 12/31/2017.  Instead, she threw the meal around the room.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

99.     At 11:57 am on 12/31/2017, after Damaris had been naked for a number of hours, CO Guad-Feliciano offered Damaris a uniform, which she did not put on.

100.     At approximately 1:26 pm on 12/31/2017, MHP Lothrop became aware of Damaris's state of psychosis and additional information, including but not limited to the facts that: Damaris was talking to herself, singing and dancing at inappropriate times, attempting to flirt at inappropriate times, responding to attempts at conversation with "oral fart noises," and touching her pubic area.  Despite the fact that she had been in SCORE almost an entire day and that her husband, the arresting sheriff's deputies, and other NaphCare and SCORE personnel noted medical and mental health concerns, MHP Lothrop assumed that Damaris was experiencing withdrawal from substance use.  No meaningful medical or mental health assessment had occurred yet and MHP Lothrop had not yet attempted contact with Damaris. MHP Lothrop also advised RN Wallace and CO Woo about these concerns.

101.     At approximately 4:36 pm on 12/31/2017, SCORE and NaphCare personnel explicitly recognized and discussed the dangerous nature of Damaris's medical and mental health problems and her need for treatment.  However, Damaris was not transported to a hospital and no attempts were made to have Damaris seen by a physician or nurse practitioner.  In recognition of Damaris's medical need, SCORE and NaphCare personnel attempted to transfer Damaris out of her booking cell and into an "observation cell."  SCORE did not have any observation cells available, so Damaris remained in the booking cell—and without any enhanced observation—for the time being.

102.     The terms "observation cell" and "medical cell" are used interchangeably at SCORE.  In spite of the name, Damaris was not provided with any medical treatment when she was eventually moved to an observation/medical cell.

103.     Damaris did not eat dinner on 12/31/2017 as a result of her medical and mental health problems.

104.     On the evening of 12/31/2017, RN Martin and RN Sally Mukwana briefly attempted to speak with Damaris through the cell window.  At this time, Damaris was crying

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

hysterically and conversing with hallucinations.  No conversation or meaningful interaction took place between Damaris and RN Martin and RN Sally Mukwana.

105.    On the evening of 12/31/2017, CO Dore attempted to converse with Damaris through the window of the cell and then entered cell B-05.  CO Dore was the first person to enter the cell since Damaris was placed there the day before.  CO Dore attempted to speak with Damaris, but Damaris was unaware that CO Dore was trying to speak with her.  At the time, Damaris was naked and talking and chanting into the toilet bowl—where she had previously been vomiting and had, more recently, thrown a number of items.  CO Dore and CO Daumit then stood outside the cell and watched as Damaris picked up the food strewn about her cell and threw it at the ceiling.

106.    Later in the evening on 12/31/2017, CO Dore entered Damaris's cell again and kicked all of the discarded food and other items on the floor of Damaris's cell out into the hallway and grabbed Damaris's jail uniform from the sink then removed it from the cell— leaving Damaris completely naked and without access to clothing for over 40 minutes.  During the time CO Dore was in the cell, Damaris was lying on her back, rubbing her midriff and chest. It was obvious that she was mentally unwell.

107.    While she was in cell B-05, Damaris experienced the following symptoms and behavior that clearly indicated medical and mental health problems: vomiting and/or "dry heaving," unintelligibly yelling, responding to and conversing with hallucinations, dancing with herself, touching her genitalia and breasts in view of jail staff, stumbling in circles, grabbing her buttocks, lying on her face, standing in the corner of the room, hitting the door, not eating, throwing food around the cell and in the toilet, removing food from the toilet and throwing it again, spontaneously smiling, putting her head on the floor, staring at and striking a mirror, throwing her underwear, spinning around in circles, throwing toilet paper around her cell, rubbing food on her face, talking to the toilet, crying hysterically, throwing clothing in the sink, staring down the drain in the floor, pounding her chest, and other erratic behavior.  The following individuals observed Damaris doing some or all of the above-mentioned activities—or

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

otherwise became aware of fact Damaris was doing some or all of the above mentioned activities

via conversations with other NaphCare and/or SCORE staff and/or audio/video surveillance

and/or written documents—and did not facilitate mental health or medical treatment: CO Bryant,

CO Palmore, CO Timm, Sgt. Burdulis, CO Cedillo, CO Orlando, CO Charboneau, CO Fields,

CO Fayant, CO Westgaard, CO McDonough, CO Saeturn, CO Allen, CO Jaramillo, CO Marken,

CO Gaud-Feliciano, CO Brown, CO Welch, CO Olson, CO Mossberg, CO Lester, CO Zeine,

CO Dore, CO Daumit, CO Jovanovich, CO Hansen, CO Bishop, Sgt. Thomas, DON Tambe, RN

Martin, MHP Lothrop, RN Wallace, and RN Mukwana.  Each of these individuals had actual or

constructive knowledge that Damaris had not been yet been screened for medical or mental

health problems and had not yet received treatment.

**D.    Damaris is held in Cell M-17 from 9:11 pm on December 31, 2017 to 1:00 pm on January 2, 2018.**

108.    At 9:11 pm on 12/31/2017, CO Dore and CO Allen approached cell B-05.  At this

time, Damaris was completely naked and kneeling in front of the toilet, clapping her hands

together.  CO Dore approached the window with a jail uniform.  Damaris—who had now been

naked and without access to clothing for over 40 minutes—eagerly gestured for the clothing and

said she was thirsty.  When CO Dore threw a shirt at Damaris, Damaris caught it and

immediately put it on.  When CO Dore threw the pants to her, the pants fell to the floor.

Damaris picked the pants up and attempted to put them on.  Damaris was hunched over and

unsteady on her feet and was physically unable to put the pants on.  Damaris became visibly

frustrated threw them on the floor, before falling to her knees, picking the pants up, and

eventually getting them on.

109.    After putting the pants on, CO Dore directed Damaris to get on the floor.

Damaris complied and got onto her hands and knees.  Despite Damaris's compliance, CO Dore

rushed into the cell, grabbed Damaris by her arm and the back of her shirt, and yanked her up

and to the side and nearly missed hitting her head on the wall.  CO Allen (a man who is

physically large in stature) then rushed into the cell and Damaris put her hand out in a defensive

FIRST AMENDED COMPLAINT FOR DAMAGES - 20

manner.  CO Dore violently pulled Damaris onto her back and then CO Dore and CO Allen both flipped Damaris onto her chest and shoved her face into the cell floor and stood over her as they restrained her hands behind her back.  CO Dore and CO Allen then lifted Damaris by her restrained arms and walked her out of the cell.

110.    RN Mukwana watched the events described in the preceding paragraph from the hallway.

111.    After removing her from cell B-05, CO Dore and CO Allen moved Damaris to "Medical Cell" 17 ("MC-17") and placed her face down on a bed platform with no mattress.  CO Dore straddled Damaris on top of the platform for an extended period of time while she waited for another corrections officer to bring her a key to the handcuffs.  CO Bishop eventually brought a key.

112.    RN Armenta observed the events described in the preceding paragraph.

113.    Despite its nominal status as a medical cell, no medical treatment would be provided to Damaris in cell M-17.  The only appreciable difference between cell B-05 and M-17 is that M-17 had a bed platform and a shower.

114.    Damaris was never evaluated for medical or mental health problems at intake or before her transfer to the medical cell because SCORE and NaphCare personnel deemed her to be "uncooperative" during the booking process due the medical and mental health symptoms she was suffering from.  Sgt. Barker approved Damaris's transfer to the medical cell, even though such transfer without a medical evaluation violated SCORE's policies and reasonably prudent correctional practices.

115.    In response to Damaris's previous statements about being thirsty, shortly after she was placed in M-17, CO Bishop threw an empty cup on to the floor of M-17.

116.    At approximately 10:38 pm on 12/31/2017, Damaris curled up in the fetal position on a mattress on the floor of cell M-17.  She was not wearing a shirt and was not using a blanket, but Damaris attempted to sleep for approximately 20 minutes for the first time since her incarceration began a day and a half prior.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

117.    Damaris spent the rest of that evening (New Year's Eve), alternating between hunching over with her head down and sobbing, dancing around her cell, and banging on the window.  She was unclothed for much of the night.

118.    Damaris did not eat breakfast on 1/1/2018.  Instead, she threw the food in the toilet as a result of her medical and mental health problems.  CO Woo, CO Van Dick, and Sgt. Summers were in the immediate vicinity and either watched Damaris throw her food in the toilet or otherwise were made aware of that fact shortly after it occurred.

119.    Damaris did not eat lunch on 1/1/2018 as a result of her medical and mental health problems.  Instead she placed the tray on top of the toilet and later handed it back through the cuffport in the door, untouched.

120.    At approximately 11:49 am on 1/1/2018, MHP Kilpatrick had a brief conversation with Damaris through the window.

121.    At or before approximately 2:36 pm on 1/1/2018, Damaris was naked and again requested a clean uniform.  A new uniform was not provided until later that day.

122.    Damaris did not eat dinner on 1/1/2018.  Instead, she threw it on the floor as a result of her medical and mental health problems. Although she picked up some of the food and looked at it, Damaris did not actually eat anything.

123.    At some point before 3:36 pm on 1/1/2018, MHP Klipatrick became aware of Damaris's state of psychosis and additional information, including but not limited to, the following: Damaris's cell was wet and messy with food and debris on the floor, Damaris was smiling and gesturing incoherently, and Damaris was repeating nonsensical information.  At the same time, MHP Klipatrick also expressed an understanding that Damaris was suffering from serious mental health or medical problems.  MHP Klipatrick was aware that Damaris had not been diagnosed or treated yet and made no efforts to facilitate treatment.

124.    At or before approximately 6:11 pm on 1/1/2018, MHP Brooke Wallace, MHP Sally Mukwana, and MHP Brittany Martin became aware of Damaris's state of psychosis and additional pertinent information, including but not limited to, the following: Damaris spent much

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

of the day naked, rattling the door of her cell, yelling, singing, and conversing loudly in the absence of external stimuli.

125.    At 10:37 pm on 1/1/2018, CO Carlin filed an "Inmate Disciplinary Problem" report, saying that Damaris been pounding on the door and screaming since 6:30 pm. What CO Carlin considered "discipline problems" were actually symptoms of physical and mental illness.

126.    During the night of 1/1/2018 and the early morning of 1/2/2018, corrections officers repeatedly went to the window of cell M-17 and told Damaris to stop kicking the door.

127.    Damaris did not eat breakfast on 1/2/2018 as a result of her medical and mental health problems.

128.    At or before 5:51 am on 1/2/2018, RN Rivas noted that Damaris asked for clothing and blankets because she was cold, that she was awake all night, and that her concerning behavior continued, including: repetitively and incoherently yelling in Spanish, making sexually explicit gestures, praying, pacing in the cell, kicking the door, hitting the walls, yelling into the toilet and drain, turning water on and off, and screaming in a high pitched voice.

129.    MHP Weaver attempted to speak with Damaris through the cell window. Damaris was not fully clothed, her cell was trashed and had food everywhere, she did not understand who MHP Weaver was, and she did not understand why she was at SCORE.

130.    On the morning of 1/2/2018, CO Chastain became aware of and noted that Damaris was in her underwear and did not understand CO Chastain's direction to put clothes on. Because Damaris was not fully clothed, CO Chastain did not attempt to interview her. CO Chastain was aware that no medical or mental health assessment had occurred yet.

131.    At 10:26 am on 1/2/2018, CO Palmore, MHP Whitney and RN Wallace talked to Damaris through the window in the cell. Food was spread around the room and Damaris was not fully clothed. CO Palmore, MHP Whitney, and RN Wallace suspected that Damaris had been using drugs and instructed her to urinate in a cup so they could test for drugs. Damaris stood on the bed platform and urinated into the cup and onto the bed platform.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

132.    There are no commonly used drugs that could have conceivably caused Damaris to be under the influence for the nearly three days she had spent in custody.

133.    The drug test given to Damaris on 1/2/2018 was negative for all substances tested, further proving that Damaris was suffering from mental health and medical problems, not intoxication or withdrawal.

134.    Despite the negative drug test—and the other obvious factors making voluntary impairment impossible such as her extended solitary confinement—nobody conducted any other tests on Damaris's urine or made any other attempts at a medical assessment.  A routine test of the urine that had already been collected would have shown dangerously high levels of ketones and salt.  At this point, Damaris was in desperate need of emergency medical treatment.  However, no other diagnostic efforts were made.

135.    On 1/2/2018, CO Woo was responsible for providing inmates in the Medical Cells, including Damaris, with lunch.  When CO Woo pushed the lunch cart by Damaris's cell, she was sitting on the bed platform with her head down.  Her cell was covered in discarded food, urine, and other debris.  Damaris wagged her finger at CO Woo.  CO Woo was aware that Damaris was incapable of coherently interacting with other people, but still chose not to give her a lunch tray.

136.    While she was in cell M-17, Damaris experienced the following symptoms and behavior that clearly indicated medical and mental health problems: vomiting and/or "dry heaving," unintelligibly yelling, responding to and conversing with hallucinations, dancing with herself, touching her genitalia and breasts in view of jail staff, stumbling in circles, grabbing her buttocks, lying on her face, standing in the corner of the room, hitting the door, not eating, throwing food around the cell and in the toilet, removing food from the toilet and throwing it again, spontaneously smiling, putting her head on the floor, staring at and striking a mirror, throwing her underwear, spinning around in circles, throwing toilet paper around her cell, rubbing food on her face, talking to the toilet, crying hysterically, throwing clothing in the sink, staring down the drain in the floor, pounding her chest, and other erratic behavior.  The

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

following individuals observed Damaris doing some or all of the above-mentioned activities—or otherwise became aware of fact Damaris was doing some or all of the above mentioned activities via conversations with other NaphCare and/or SCORE staff and/or audio/video surveillance and/or written documents—and did not facilitate mental health or medical treatment: CO Dore, CO Bishop, CO Summers, CO Grasty, CO Zeine, CO Woo, CO Rojanaparpai, CO Miller, CO Boisture, CO Turner, Sgt. Thomas, CO Palmore, CO Lambert, RN Rivas, RN Wallace, MHP Stockton, LPN Sperry, RN Nassenstein, RN Whitman, and MHP Weaver.  Each of these individuals had actual or constructive knowledge that Damaris had not yet been screened for medical or mental health problems and had not yet received treatment.

**E.    Damaris is held in Cell M-16 from 1:00 pm on January 2, 2018 to 2:45 pm on January 3, 2018.**

137.    At approximately 1:00 pm on 1/2/2018, CO Woo, CO Pratt, and CO Van Dick moved Damaris from cell M-17 to cell M-16.  Cell M-16 was similar to M-17 but did not have a mattress available to put on the bed platform.

138.    Around this time, Damaris's demeanor started becoming lethargic, evidencing the fact that her body was beginning to shut down.  Her behavior continued to be obviously indicative of severe medical and mental health problems.  This behavior included, but was not limited to: dry heaving and/or vomiting constantly, hunching over in pain and/or discomfort, yelling, having conversations in the absence of external stimuli, dancing, taking her clothes off, urinating on the floor, not eating, punching one hand with the other fist, and choking herself until she passed out and struck her head on the unpadded bed platform.

139.    On the afternoon of 1/2/2018, RN Wallace and CO Rojanparpal talked to Damaris through the window in the cell.  Both became aware of Damaris's lethargic demeanor.  They offered Damaris clothing, but Damaris did not put it on even though she complained about being cold.  RN Wallace and CO Rojanparpal were aware that she had been dry heaving into the toilet.

140.    On 1/2/2018, CO Woo was responsible for providing inmates in the Medical Cells, including Damaris, with dinner.  When CO Woo passed by Damaris's cell, he looked in

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

and saw that Damaris was lying on the bed platform asleep or unconscious.  CO Woo chose not to leave Damaris with dinner.  This was the second meal in a row that this CO did not offer.

141.    On 1/2/2018, RN Wallace and CO Woo both watched in person as Damaris dry heaved or vomited into the toilet.  Neither RN Wallace nor CO Woo took any steps to procure medical or mental health treatment for Damaris.

142.    Sgt. Heath received a message from the previous Sergeant on duty—believed to be and therefore alleged to be Sgt. Santos—that informed him of the symptoms of Damaris's medical and mental health problems.  Neither Sgt. Santos nor Sgt. Heath took any steps to procure medical or mental health treatment for Damaris.  Instead, the sergeants endeavored to keep her cell window covered so Damaris did not bother other inmates and staff.

143.    On 1/3/2018, CO Foy was responsible for providing inmates in the medical cells, including Damaris, with breakfast.  When CO Foy passed by Damaris's cell, CO Foy saw that Damaris was on the floor and in the fetal position, either unconscious or asleep.  Although CO Foy asked Damaris if she wanted breakfast, Damaris was unable to and did not respond in any meaningful way and CO Foy made a note stating that Damaris could not understand what CO Foy was saying.  CO Foy chose not to leave breakfast for Damaris.  This was the third consecutive meal that Damaris was not offered.  It had now been approximately 24 hours since Damaris last had the opportunity to eat.

144.    Later in the morning on 1/3/2018, CO Foy and MHP Whitney conversed with Damaris through the door.

145.    CO Glover observed Damaris vomiting and or dry heaving and screaming for approximately 15 minutes.  He did not obtain medical assistance.

146.    On 1/3/2018, CO Foy was responsible for providing inmates in the Medical Cells, including Damaris, with lunch.  CO Foy handed Damaris a lunch tray through the cuff port.  She accepted the tray, dumped the contents in the toilet, and then proceeded to hunch over at the waist with her head down in obvious discomfort.  CO Foy did not take any steps to procure medical or mental health treatment for Damaris.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

147.    Although Damaris had vomited and/or dry heaved frequently since the time of her arrest, at some point between noon and 1:00 pm on 1/3/2018, Damaris began vomiting profusely and continuously.  CO Foy put towels under the door to prevent vomit from spilling out into the hallway, at approximately 2:17 pm.  CO Mossberg, CO Bettis, CO Foy, CO Seipp, CO Ridgeway, Sgt. Heath, RN Kosanke, MHP Whitney all directly observed Damaris while she was vomiting on the afternoon of 1/3/2018 but did not provide any medical aid.

148.    While she was in cell M-16, Damaris experienced the following symptoms and behavior that clearly indicated medical and mental health problems: vomiting and/or "dry heaving," unintelligibly yelling, responding to and conversing with hallucinations, dancing with herself, touching her genitalia and breasts in view of jail staff, stumbling in circles, grabbing her buttocks, lying on her face, standing in the corner of the room, hitting the door, not eating, throwing food around the cell and in the toilet, removing food from the toilet and throwing it again, spontaneously smiling, putting her head on the floor, staring at and striking a mirror, throwing her underwear, spinning around in circles, throwing toilet paper around her cell, rubbing food on her face, talking to the toilet, crying hysterically, throwing clothing in the sink, staring down the drain in the floor, pounding her chest, and other erratic behavior.  The following individuals observed Damaris doing some or all of the above-mentioned activities—or otherwise became aware of fact Damaris was doing some or all of the above mentioned activities via conversations with other NaphCare and/or SCORE staff and/or audio/video surveillance and/or written documents—and did not facilitate mental health or medical treatment: CO Woo, CO Pratt, CO Van Dick, CO Rojanaparpal, CO Carlin, CO Fenske, Sgt. Santos, CO Jeffs, Sgt. Heath, CO Foy, CO Bettis, CO Glover, RN Brooke Wallace, MHP Nancy Whitney, LPN Sperry, RN Wallace, RN Kosanke.  Each of these individuals had actual or constructive knowledge that Damaris had not been yet been screened for medical or mental health problems and had not yet received treatment.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

**F.    Damaris is moved to "dry" cell M-14 at 2:45 pm on January 3, 2018 and dies in custody on the evening of January 3 or morning of January 4, 2018.**

149.    Because Damaris was continuously vomiting and drinking water, MHP Whitney recommended that Damaris be moved into a cell where she did not have free access to water.

150.    Moving a patient into a cell without water and then ignoring her is not a form of medical or mental health treatment.  To the extent it was considered to be treatment, it violated the standard of care for every LPN, RN, MHP, ARNP, MD, DO, and any other medical personnel involved.

151.    At 2:45 pm, CO Foy, CO Seipp, CO Ridgeway moved Damaris from cell M-17 to cell M-14.  MHP Whitney and RN Kosanke observed this transfer occur.

152.    RN Kosanke took Damaris's blood pressure, while Damaris's hands were still restrained behind her back and her head was slumped forward.  RN Kosanke did not record the blood pressure results anywhere.  Even if RN Kosanke did record the blood pressure results, she was not qualified to determine what qualified as "normal" and what diagnostic significance those numbers had in relation to Damaris's other symptoms.  Nobody made any other diagnostic attempts, rendered any sort of medical aid, or contacted a medical doctor.

153.    CO Foy then stood Damaris up and roughly pushed her into the wall.  CO Seipp shoved Damaris's face into the wall and the two officers pinned her against the wall for a period of time, for no apparent reason.  Although they acted as if they may remove her handcuffs, they did not do so at this time.

154.    After CO Foy, CO Seipp, and CO Ridgeway exited cell M-14, they removed Damaris's handcuffs through the cuff port.  This was the last human interaction Damaris had before her death.  After the cell door was closed, the three officers then casually looked at each other, smiled and exchanged pleasantries with each other, and walked away.

155.    MHP Whitney explained to CO Foy that Damaris could be suffering from "water intoxication" and was at risk of seizures.  MHP Whitney made a chart note claiming that she advised the medical and mental health Advanced Registered Nurse Practitioners about her

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

concern for Damaris's health.  The ARNPs on staff at the time were ARNP Whitman and ARNP Richardson.

156.    One of the following problems occurred with MHP Whitney's notification:

    a.    Neither MHP Whitney nor any other medical or corrections personnel sufficiently explained the emergency nature of Damaris's medical condition to ARNP Whitman or ARNP Richardson.

    b.    The ARNPs recklessly ignored MHP Whitney's notification.

    c.    MHP Whitney never actually notified any ARNP and her chart note was inaccurate.

157.    MHP Whitney was a social worker, who was not qualified to make medical decisions.  MHP Whitney and RN Kosanke also failed to provide an adequate medical diagnosis or render treatment themselves.

158.    MHP Whitney and RN Kosanke also chose not to initiate treatment pursuant to the Involuntary Treatment Act.  MHP Whitney and RN Kosanke rationalized their decision not to provide or facilitate medical treatment based on their mistaken belief that Damaris had been eating and drinking regularly.  In fact, Damaris had now gone four full days without eating anything and was vomiting up all of the water she drank.  The erroneous assumption that Damaris had been eating and drinking regularly was reckless, or in the alternative, malicious.

159.    SCORE employees are believed and therefore alleged to have participated in MHP Whitney's and RN Kosanke's decision to not obtain additional treatment for Damaris.

160.    MHP Whitney expressed an intention to continue to monitor Damaris due to her obvious medical and mental health problems.  She did not do so.

161.    Damaris spent most of that afternoon and evening lying unconscious in the fetal position on the unpadded bed platform, occasionally sitting up to dry heave or writhe in pain.

162.    At 10:03 pm on 1/3/2018, Damais's breathing slowed and eventually stopped. She died shortly thereafter.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

163.    Nobody actually checked on Damaris in any meaningful way between approximately 2:48 pm and when her body was discovered at approximately 11:48 pm.

164.    Before her death, Damaris was not regularly offered water.  Multiple corrections officers filled out a "water signoff form," indicating that they offered Damaris water and that she refused water.  Numerous entries on this form were erroneous.  They were entered recklessly or they were explicitly forged.  For example, CO Jaramillo claimed on the form the she offered Damaris water and she refused water at 22:57, **almost an hour after she completely stopped breathing.**  There were also other entries on the welfare check log claiming to document welfare checks that never occurred.

165.    Damaris's body was only found because a new corrections officer, CO Nader, took over observation duties in the medical unit shortly before Damaris's body was discovered, and unlike his processors, actually attempted to check on her.  Once he did so, it was obvious to him that she was not breathing.

166.    While she was in cell M-14, Damaris experienced the following symptoms and behavior that clearly indicated medical and mental health problems: vomiting and/or "dry heaving," unintelligibly yelling, responding to and conversing with hallucinations, stumbling in circles, lying on her face, not eating, crying hysterically, and other erratic behavior.  The following individuals observed Damaris doing some or all of the above-mentioned activities—or otherwise became aware of the fact Damaris was doing some or all of the above mentioned activities via conversations with other NaphCare and/or SCORE staff and/or audio/video surveillance and/or written documents—and did not facilitate mental health or medical treatment: CO Foy, CO Jaramillo, CO Seipp, CO Ridgeway, RN Abdulsamad, LPN Molberg, RN Kosanke, MHP Whitney.  Each of these individuals had actual or constructive knowledge that Damaris had not been yet been screened for medical or mental health problems and had not yet received treatment.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

**G.    General allegations regarding Damaris's time in custody.**

167.    Damaris did not eat while in custody.

168.    Damaris was never transported to court and was never seen or arraigned by a judge.

169.    If Damaris had been transported to court, the judge would have released her without bail, imposed a modest amount of bail that she could have posted, or ordered a competency evaluation, pursuant to RCW Chapter 10.77.

170.    While Damaris was in jail, Reynaldo was frantically attempting to convey to the appropriate authorities that Damaris needed medical help.  Unfortunately, due to his limited language skills and unfamiliarity with the criminal justice system, he did not understand the complex web of entities standing between him and his wife.  Reynaldo talked to a victim advocate with the SeaTac Prosecutor's Office numerous times, who Reynaldo believed would be able to convey his concerns to SCORE.  SCORE and NaphCare personnel never made any attempt to speak with Reynaldo or the victim advocate.

171.    Reynaldo, A.G., I.G., S.G., and D.G. did not hear anything from Damaris the entire time she was in custody.  At 4:36 am on 1/5/2018—over a day after she had died—Deputy R. Adams—the deputy that initially arrested Damaris—finally contacted Reynaldo.  Deputy R. Adams himself did not fully understand what had happened, so he cryptically told Reynaldo to "call the medical examiner" about his wife.

**H.    KCSO policies regarding responding to persons in behavioral crisis.**

172.    KCSO deputies regularly engage with individuals in the community who are having behavioral crises, caused by mental health disorders and other issues.  The challenges related to crisis intervention and the need for adequate training related to crisis intervention are obvious and have been recognized explicitly and regularly by present King County Sheriff Mitzi Johanknecht and previous King County Sheriff John Urquhart (in office at the time of Damaris's arrest and death).

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

173.    Former Sheriff Urquhart also recognized publicly that the KCSO deputies needed additional implicit bias training.

174.    The KCSO also has notice that the risk of constitutional violations makes the need for adequate policies, procedures, and training on crisis intervention and implicit bias clear.  This notice is based on the obviousness of the issue and prior incidents.   For example, in 2017 alone, KCSO deputies shot and killed at least two minority individuals in behavioral crisis situations, under highly controversial and constitutionally-violative circumstances.  Renee Davis was a 23-year-old pregnant woman that a KCSO deputy shot and killed in front of her two children during a "wellness check" at her home.  Ms. Davis was a Muckleshoot tribal member and of American Indian descent.  Tommy Le was a high school student—of Vietnamese descent—who a KCSO deputy shot and killed after neighbors reported that he was acting erratically.  Mr. Le was 120 pounds and had a Bic pen in his hand.

175.    Despite the recognized need, not all KCSO Officers have crisis intervention training.  The King County Council and former Sheriff Urquhart acknowledged that additional crisis and implicit bias training programs were inadequate at the time of this incident.

176.    The KCSO has several general policies and procedures related to appropriately handling situations with individuals involving persons having behavioral crises, including, but not limited to General Orders Manual Chapter 5.08.

177.    Where a non-felony crime has occurred, the KCSO recognizes that alternatives to incarceration are preferred and that, wherever feasible, individuals with behavioral health disorders should not be booked into jail.  The Crisis Solution Center and Crisis Clinic are both available and appropriate in these circumstances.  *See* KCSO General Orders Manual §5.08.025.

178.    Despite the recognized need, the KCSO does not have an adequate policy, procedure, or custom and does not adequately train its employees to address suspects and arrestees who are having a behavioral crisis or other mental health or medical problems.  The KCSO's omissions constitute negligence, gross negligence, and deliberate indifference towards affected individuals.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

179.    The KCSO does not have an adequate policy, procedure, or custom and does not adequately train its employees to address communicating with suspects and witnesses who do not speak English.  The KCSO's omissions constitute negligence, gross negligence, and deliberate indifference towards the rights of affected inmates.

180.    The above described errors and omission materially contributed to the errors and omissions of Deputy L. Adams, Deputy R. Adams, and DRE Tag.

**I.    KCSO and KCSO employees failed to adequately respond to Damaris's behavioral crisis.**

181.    The KCSO and KCSO defendants were aware of and ignored the obvious symptoms and other information provided to them relating to Damaris's medical needs and took her to SCORE, rather than taking her to a hospital or commencing Involuntary Treatment Act proceedings.  The KCSO and KCSO defendants also failed to adequately convey their knowledge about Damaris's medical needs to SCORE and NaphCare.

182.    It is believed, and therefore, alleged that one or all of Deputy L. Adams, Deputy R. Adams, and DRE Tag did not undergo crisis intervention training before the incident.

183.    Reynaldo conveyed facts to Deputy L. Adams, Deputy R. Adams, and DRE Tag from which they should have understood or reasonably inferred that Damaris was a danger to herself and suffered from a grave disability causing her to be unable to care for her basic health and safety.

184.    Deputy L. Adams, Deputy R. Adams, and DRE Tag did not have probable cause to arrest Damaris for Assault in the Fourth Degree because the alleged physical contact was unintentional, Reynaldo did not find it harmful or offensive, and the deputies did not have any information about where or when the alleged physical contact occurred.

185.    In the alternative, if probable cause for arrest did exist, the mandatory arrest statute did not apply because the deputies had no evidence that the alleged assault occurred within the last four hours, the assault was not felonious, the alleged assault did not result in bodily injury (as confirmed by Deputy L. Adams' photographs), and the alleged assault was not

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

intended to and did not cause Reynaldo to fear imminent serious bodily injury or death.

186.    It is believed and therefore alleged that Deputy L. Adams, Deputy R. Adams, and DRE Tag are not proficient in Spanish.

187.    Inadequate communication based on language barriers prevented Deputy L. Adams, Deputy R. Adams, and DRE Tag from fully understanding Damaris's condition and the facts of the alleged assault.  The misunderstanding was caused by inadequate policies, procedures, and training, and also negligence, gross negligence, recklessness, and malice of the individuals.

188.    Deputy L. Adams, Deputy R. Adams, and DRE Tag were not aware of, chose not to follow, and/or were improperly trained on the KCSO's existing policies and procedures related to crisis intervention and alternatives to arrest.

**J.    SCORE, SCORE Employee Defendants, NaphCare, and NaphCare Employee Defendants' failed to provide treatment for Damaris.**

189.    SCORE, SCORE Employee Defendants, NaphCare, and NaphCare Employee Defendants never evaluated whether Damaris needed a new prescription for psychiatric medication.

190.    SCORE, SCORE Employee Defendants, NaphCare, and NaphCare Employee Defendants never screened or evaluated Damaris for medical or mental health problems, even though they had adequate time to do so and reason to believe that she suffered from both.  As a result, no individualized treatment plan—or any treatment plan, whatsoever—was developed for Damaris.

191.    SCORE, SCORE Employee Defendants, NaphCare, and NaphCare Employee Defendants never conducted an adequate clinical assessment or provided any therapy.

192.    SCORE, SCORE Employee Defendants, NaphCare, and NaphCare Employee Defendants never met with Damaris in a clinical setting or provided for such a meeting.

193.    Damaris clearly suffered from mental illness and was in solitary confinement for the entirety of her stay at SCORE.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

194. Damaris needed acute inpatient-level psychiatric and medical care. SCORE and NaphCare were unable to provide that care and she was not transferred to an adequate medical facility.

195. SCORE Employee Defendants and NaphCare Employee Defendants were not aware of, chose not to follow, and/or were improperly trained on SCORE's and NaphCare's existing policies and procedures. These omissions are described in further detail below.

**K. SCORE's and NaphCare's policies, procedures, customs, and training are inadequate.**

196. SCORE and NaphCare failed to implement policies, practices, and training to assure that adequate mental health and medical assessments occurred promptly. Even though SCORE and Naphcare had some written policies addressing this subject, the policies were not followed in practice.

197. SCORE and NaphCare failed to implement policies, practices, and training to adequately address inmates that are too mentally ill for a medical and/or mental health assessment. These errors and omissions materially contributed to the errors and omissions of SCORE's and NaphCare's employees.

198. Even though SCORE and NaphCare had written policies requiring the Health Services Administrator and Executive Director to establish adequate protocols for medical and mental health screening, those policies were not followed in practice.

199. The duties of SCORE and NaphCare personnel were poorly defined, resulting in unqualified personnel making life or death medical decisions. Even though SCORE and NaphCare had written polices requiring the Health Services Administrator to define the duties of medical personnel, those policies were not followed in practice.

200. SCORE and NaphCare failed to implement policies, practices, and training to adequately address inmates that are unable to eat.

201. SCORE and NaphCare failed to implement policies, practices, and training to assure that inmates receive adequate medical and mental health treatment in observable

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

emergency situations or extreme distress.

202.    SCORE and NaphCare failed to implement policies, practices, and training related to the keeping of medical records and other records related to inmate wellbeing.

203.    SCORE and NaphCare failed to implement policies, practices, and training related to water offers and welfare checks. Even though SCORE had written policies requiring welfare checks, the policies did not require frequent enough welfare checks. Furthermore, in practice these policies were not followed.

204.    SCORE and NaphCare failed to implement policies, practices, and training to adequately provide for basic hygiene and other minimum necessities of civilized life for inmates with medical and/or mental health problems.

205.    SCORE and NaphCare failed to implement policies, practices, and training to initiate involuntary treatment proceedings for inmates that have medical and mental health disorders, where such treatment is essential for their health and safety.

206.    The above-mentioned policies, procedures, practices, and training deficiencies materially contributed to the errors and omissions of SCORE's and NaphCare's employees. SCORE and NaphCare's deficiencies constitute negligence, gross negligence, and deliberate indifference towards the constitutional rights of affected inmates.

**L.    SCORE and NaphCare were on notice of the potential harm caused by their deficient medical and mental health treatment practices.**

207.    SCORE and NaphCare were on notice at the time of Damaris's death of the potential for constitutional violations enabled by their deficient practices, training, and supervision, due to previous specific incidents involving SCORE and/or NaphCare, including but not limited to the following:

a.    The organization Disability Rights Washington ("DRW") is an independent protection and advocacy organization that has a federal mandate to monitor the conditions of people with disabilities. DRW used its authority to conduct Amplifying Voices of Inmates with Disabilities

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1    ("AVID") project, which focused on addressing disability-related concerns

2    in Washington State jails and prisons.  DRW completed the AVID project

3    in August 2016.  The AVID project revealed that SCORE had a vacancy

4    for a psychiatric provider with prescribing authority and that there was a

5    high turnover in Mental Health Provider ("MHP") staff.  The AVID

6    project revealed significant delays in mental health assessments and delays

7    in providing psychiatric medications to inmates.  The AVID project

8    revealed that many inmates did not receive timely metal health screenings.

9    The AVID project revealed that many inmates did not have documentation

10   of individualized mental health treatment plans in their health records.

11   The AVID project revealed that SCORE's mental health system primarily

12   consisted of psychiatric medication management; weekly MHP rounds in

13   the segregated units; and quick, cell-front assessments.  The AVID project

14   revealed that there was little or no individual counseling or group

15   therapeutic programming for inmates with mental illness.  The AVID

16   project revealed that a significant portion of inmates were kept in solitary

17   confinement, including inmates with reported diagnoses of serious mental

18   illness or significant functional impairment.  These inmates did not have

19   access to acute care.  The AVID project put SCORE and NaphCare on

20   notice that continuing the above-mentioned acts and omissions violated

21   their duties of care to inmates and would lead to constitutional violations.

22   b.    The issue of high turnover rate of medical and mental health staff noted in

23         the AVID project was confirmed and acknowledged by DON Tambe and

24         RN Villacorta in a 2017 interview.

25   c.    A 2017 NCCHC Resources, Inc. ("NRI") audit of the Washoe County jail

26         in Nevada identified numerous problems with the manner in which

27         NaphCare conducts intake assessments for medical and mental health

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

issues.  These problems included the manner in which the assessments were conducted, the time it took to conduct assessments, and the sufficiency of training related to diagnosing mental health issues.  The NRI audit revealed many of the same NaphCare staffing issues present at SCORE, which contributed to or caused the deprivation of Damaris's constitutional rights.

208.    Previous similar incidents involving NaphCare and Score include but are not limited to the following:

a.    In 2016, Bryan Monnin was booked into the Spokane County Jail with a broken arm.  Due to NaphCare's internal protocols meant to cut costs, Mr. Monnin went over a month before receiving appropriate treatment.  Similar cost-cutting incentives—related to increased costs that SCORE/NaphCare would bear if Damaris was transported to an outside facility—also delayed Damaris's treatment and contributed to constitutional violations.

b.    In 2017, Inmate Layla Abdus Salaam suffered a critical medical issue that SCORE staff did not notice for over an hour.  A nurse also falsified treatment records, which deprived Ms. Salaam of needed medicine and contributed to her death.  NaphCare's death report for Ms. Salaam also points out the poor communication and slow booking process (arrived at 16:32 on 7/31/17 and booked at 09:25 on 8/1/17) and poor communication between medical staff and problems that led to Ms. Salaam's death.  The nurse in questions also implicitly acknowledged that inadequate staffing and management affected her performance.  Poor communication, falsified records, inadequate staffing, and a slow booking process also contributed to SCORE's and NaphCare's employees' deliberate indifference to Damaris's serious medical need.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

c.  In 2015, Travis Stark suffered what appeared to be a seizure in the video courtroom area of SCORE.  Travis Stark was seen by SCORE's nurses, but he was never seen by a doctor or transported to a hospital for evaluation.  He never received medical treatment and died alone in his cell approximately five hours later.  Poor monitoring and the failure to obtain specialized medical treatment also contributed to SCORE's and NaphCare's employees' deliberate indifference to Damaris's serious medical need.

d.  Inmate Daniel Siddal dove off a bunk and laid bloody and injured on the floor for approximately an hour.  Mr. Siddal was in an obvious state of psychosis and SCORE should have conducted welfare checks on a regular basis.  The elapsed time between Mr. Siddal's injuries and his discovery evidence the fact that SCORE's actual customs differ from the written policies on welfare checks.  Deficiencies in training and customs relating to welfare checks also contributed to SCORE's and NaphCare's employees' deliberate indifference to Damaris's serious medical need.

e.  In 2015, Matthew Smith died from complications related to Crohn's disease in Pierce County, Washington, under NaphCare's care.  Mr. Smith suffered from continuous diarrhea and vomiting for an extended period of time, and then was found lying on the floor in obvious medical distress.  Despite understanding the severity of the situation, NaphCare did not facilitate transport to a hospital for approximately seven hours.  As a result of the delay, he suffered and died.  NaphCare had insufficient policies and procedures in place to facilitate emergency medical treatment.  Similar to Damaris's case, NaphCare understood the dire nature of the situation but took no urgent action.  Poor communication procedures and deficiencies in training and customs related to the provision of emergency medical

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

treatment contributed to SCORE's and NaphCare's employees' deliberate indifference to Damaris's serious medical need.

f.  In 2014, Ricky Hopfner died after jumping off a balcony at SCORE.  Mr. Hopfner was booked into general population and not monitored or given medication, even though he was suffering from withdrawal, needed his prescriptions, and told other inmates that he was "not feeling right."  Even though other inmates without medical training thought his mental and physical issues were obvious, he never received any treatment.  Deficient training and customs related to intake screening also contributed to SCORE's and NaphCare's employees' deliberate indifference to Damaris's serious medical need.

g.  In 2015, Jamycheal Mitchell died from starvation and neglect in Hampton Roads, Virginia, under NaphCare's care.  Mr. Mitchell suffered from severe mental health problems and was unable to care for himself as a result of his mental health problems.  He was routinely not fed or did not eat and lost significant weight before succumbing to medical complications related to starvation.  Despite the fact that NaphCare personnel regularly observed Mr. Mitchell wasting away, insufficient policies and procedures were in place to address inmates who were unwilling or unable to eat.  NaphCare also lacked sufficient policies and procedures to address Mr. Mitchell's inability to engage in medical treatment.  As a result, the treatment never occurred.  The United States Department of Justice issued a report that addressed Mr. Michtell's inhumane confinement.  Deficient training and customs related to the tracking and provision of food to disabled inmates also contributed to SCORE's and NaphCare's employees' deliberate indifference to Damaris's serious medical need and also the depravation of the minimum

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1    necessities of civilized life.

2    h.    In 2011, Gregory Cheek died of an untreated bacterial infection in Nuces

3    County, Texas, under NaphCare's care.  Mr. Cheek suffered from mental

4    health problems, including acute psychosis, that prevented him from

5    expressing his medical needs, so NaphCare employees simply ignored the

6    obvious medical conditions that eventually proved fatal.  Deficient

7    training and customs related to internal communication and providing

8    emergency medical treatment to mentally ill inmates also contributed to

9    SCORE's and NaphCare's employees' deliberate indifference to

10   Damaris's serious medical need.

11   i.    In 2011, Justin Stark died from complications from mononucleosis in

12   Hamilton County, Ohio, under the NaphCare's care.  Mr. Stark suffered

13   from obviously apparent physical symptoms—including vomiting—but

14   due in part to NaphCare's insufficient policies and procedures, his

15   symptoms became fatal.  Deficiencies in training and customs relating to

16   welfare checks and emergency treatment also contributed to SCORE's and

17   NaphCare's employees' deliberate indifference to Damaris's serious

18   medical need.

19   j.    In 2016, Calvin Clark died while supposedly under medical supervision

20   while in custody at SCORE.  Mr. Clark was elderly and a known diabetic.

21   Other inmates observed that he was obviously unwell and possibly going

22   through alcohol withdrawal.  One inmate described him as "hurting" and

23   "suffering" before the medical event that led to his death. Deficiencies in

24   training and customs relating to welfare checks and emergency treatment

25   also contributed to SCORE's and NaphCare's employees' deliberate

26   indifference to Damaris's serious medical need.

27   k.    In April of 2019, Daniel Khan died while in solitary confinement at

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1   SCORE.  Mr. Khan was experienced severe withdrawal symptoms,

2   complained of abdominal pain, and laid naked on the floor for an extended

3   period of time before he stopped breathing and died.  Deficiencies in

4   training and customs relating to welfare checks and emergency treatment

5   also contributed to SCORE's and NaphCare's employees' deliberate

6   indifference to Damaris's serious medical need.

7   l.    In September of 2019, a female inmate died while in solitary confinement

8   at SCORE.  It is believed, and therefore alleged, that this female inmate

9   was either mentally ill or suffering from withdrawal symptoms and died

10  due to a lack of medical attention. Deficiencies in training and customs

11  relating to welfare checks and emergency treatment also contributed to

12  SCORE's and NaphCare's employees' deliberate indifference to

13  Damaris's serious medical need.

14  209.    Based on the above described incidents, and others, SCORE and NaphCare were

15  well aware of numerous deficiencies in the manner in which they provided medical care,

16  including but not limited to: inadequate staffing levels, delayed and inadequate medical and

17  mental health evaluations, inhumane conditions of confinement for medically and mentally ill

18  inmates, the failure to staff qualified medical providers (physicians and nurse practitioners), and

19  the tendency of employees to retroactively forge records for treatment that did not actually occur.

20  Damaris's death was caused in part by materially similar omissions.

21  **M.    SCORE's deficient response to the Estate's public records requests.**

22  210.    On or about April 27, 2018, counsel for the Estate make a public records request

23  to SCORE, pursuant to RCW 42.56 *et seq.*, for all records of inmate deaths between 4/26/1998

24  and present day.

25  211.    SCORE produced records related to two other prior deaths at SCORE.  The Estate

26  corresponded with SCORE numerous times in a good faith attempt to assist SCORE in

27

FIRST AMENDED COMPLAINT FOR DAMAGES - 42

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

narrowing its production to relevant documents and also to inquire about documents related to other incidents that were not disclosed. Although the Estate explicitly requested documents related to other inmate deaths, none were disclosed.

212.    After its initial request, the Estate independently became aware of other deaths at the SCORE facility, regarding which no responsive documents were produced. For example, in 2016, SCORE inmate Calvin Thomas Clark died on the premises at SCORE and his body was kept in a room near the medical area of the jail while law enforcement investigated.

213.    It is believed and therefore alleged that in a circumstance such as Mr. Clark's, where an individual dies on jail premises and then his body is kept there, that SCORE would generate related documents that are responsive to the Estate's public records request.

214.    On or about April 27, 2018, counsel for the Estate made a public records request to SCORE, pursuant to RCW 42.56 *et seq.*, for all surveillance video from SCORE's jail facility between 12/29/17 and 1/4/18.

215.    SCORE initially produced a number of responsive videos but needed to make redactions before it was able to produce others. The Estate agreed to limit the scope of its request a shorter time period for two specific different cameras showing the hallway directly outside Ms. Rodriguez's cell.

216.    SCORE required that the Estate pay for a third-party vendor to redact the required sections. The Estate promptly tendered payment and SCORE produced some of the videos from the narrowed time period.

217.    Upon viewing the responsive videos, the Estate discovered that there were many missing portions, including but not limited to:

    a.    Both the N and S videos skip from 16:05 to 16:55

    b.    N video skips from 19:10 to 19:16

    c.    S video goes black from 21:55:43 to 21:56:53

    d.    S video goes black from 21:57:28 to 21:59:39

    e.    N video skips from 21:50 to 22:03:43

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

f.  S video goes black from 22:00:07 to 22:04:49

g.  S video goes black from22:05:17 to 22:07:03

h.  S video goes black from 22:08:59 to 22:10:09

i.  N video skips from 22:09:12 to 22:09:24

j.  N video skips from 22:49:48 to 22:52:19

k.  S video goes black from 22:53:05 to 22:53:35

l.  N video goes black from 22:59:30 to 22:59:49

218.  The Estate brought the missing video clips to SCORE's attention, but SCORE did not produce any more video footage.

219.  It is believed and therefore alleged that SCORE is in possession of a substantial volume of responsive video footage—during the voluntarily narrowed time period—that has not yet been produced.

220.  Some of the missing video clips are for the time period around when Ms. Rodriguez stopped breathing.  Others are for time periods during which SCORE employees claim to have conducted welfare checks.

## V.  LIABILITY
### GENERAL ALLEGATIONS REGARDING THE DUTIES OF CORRECTIONS OFFICERS

221.  Where a corrections officer observes another corrections officer using excessive force or engaging in some other act or omission that is physically dangerous or constitutionally violative, each and every law enforcement officer has an independent legal—and moral—duty to intervene, regardless of the chain of command.

### GENERAL ALLEGATIONS REGARDING SCORE AND NAPHCARE'S DUTIES TO PROVIDE MEDICAL AND MENTAL HEALTH CARE TO INMATES

222.  Delays and disruptions in the provision of psychiatric medication subjects inmates to a risk of serious harm, including deterioration in physical and mental health.  If an inmate is booked without a current prescription for psychiatric medication and is in need of such

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

mediation, SCORE, SCORE Employee Defendants, NaphCare, and NaphCare Employee Defendants have a duty to evaluate the inmate for a new prescription without delay.

223.    The professional standard of care for psychiatric services requires the development of individualized treatment plans for each patient.  Therefore, SCORE, SCORE Employee Defendants, NaphCare, and NaphCare Employee Defendants have a duty to maintain a systematic program for screening and evaluating inmates in order to timely identify those who require mental health treatment.

224.    Mental health therapy is also an essential component of mental health treatment. It is a generally accepted standard of care that psychiatric medication alone is not sufficient for treating people with mental illness.  Without mental health therapy services—including out-of-cell programming to address symptoms, reduce isolation, and promote compliance with treatment—inmates with serious mental health conditions are placed at serious risk of deterioration. Clinical assessments and therapy should not be conducted during mental health rounds and cell-front interviews, but instead in a clinical setting with adequate privacy.

225.    Correctional facilities like SCORE must refrain from keeping inmates with serious mental illness in conditions of confinement that risk or cause serious harm.  Researchers have long agreed that solitary confinement has significant negative effects on individuals, and especially on individuals with mental illness.  Many professional groups—including the American Bar Association, the American Psychiatric Association, the Society for Correctional Physicians, and the National Commission on Correctional Health Care (NCCHC)—recognize this harm and support vastly limiting the use of solitary confinement for those with serious mental illness.  The NCCHC, which has accredited SCORE, recommends excluding inmates with mental illness from solitary confinement for any duration.

226.    An inmate must have access to acute inpatient-level psychiatric care during incarceration.  Jails that are not able to provide that level of care must facilitate the transfer of inmates in acute psychiatric crisis to inpatient facilities.

FIRST AMENDED COMPLAINT FOR DAMAGES - 45

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1
2

## FIRST CLAIM FOR RELIEF
### Common Law Negligence
*Against All Defendants*

3

227.     Plaintiffs allege a common law negligence claim against all Defendants.  All

4

Defendants had a duty of reasonable care to Damaris, breached that duty, and proximately

5

caused Plaintiff's damages.  Additional allegations regarding individual Defendants are included

6

in the subsections below.

7

## SECOND CLAIM FOR RELIEF
### Common Law Negligence
*Against SCORE, SCORE Employee Defendants, NaphCare, and
NaphCare Employee Defendants*

8
9

10

228.     Damaris was held in custody by SCORE and the SCORE Employee Defendants

11

with the contractual assistance of NaphCare and NaphCare Employee Defendants.  Once

12

Damaris was in SCORE custody—and therefore deprived of liberty and the ability to care for

13

herself—a special relationship existed and SCORE, SCORE Employee Defendants, NaphCare,

14

and NaphCare Employee Defendants had an affirmative duty to protect Damaris and facilitate or

15

provide her with adequate medical care, mental health care, and/or nursing care.  This duty was

16

non-delegable and applicable to both SCORE and NaphCare while Damaris was in the custody

17

of SCORE.

18

229.     SCORE, SCORE Employee Defendants, NaphCare, and NaphCare Employee

19

Defendants were negligently, deliberately, and recklessly indifferent to Damaris's serious

20

medical needs.

21

230.     The nursing, medical, and mental health care provided by NaphCare and

22

NaphCare Employee Defendants while at SCORE—or the lack thereof—was below the standard

23

of care expected of the average, competent, provider in the class that the providers belonged and

24

in the same or similar circumstances.

25

231.     SCORE and NaphCare failed to institute policies, procedures, and training that

26

was necessary to assure the safety of its inmates.  These omissions materially contributed to the

27

errors and omissions of SCORE's and NaphCare's employees.

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

232.    SCORE and NaphCare failed to train its employees in a manner necessary to assure the safety of its inmates, and SCORE and NaphCare had notice that their deficient training could have potentially catastrophic effects for inmates.  These omissions materially contributed to the errors and omissions of SCORE's and NaphCare's employees.

233.    The above described actions and omissions were negligent, grossly negligent, reckless, and malicious and breached SCORE's, SCORE Employee Defendants', NaphCare's, and NaphCare Employee Defendants' duties to Damaris.

234.    SCORE had actual or constructive notice of NaphCare's history of substandard medical care, in custody deaths, and constitutional violations and was negligent in its hiring of NaphCare.

235.    The above described actions and omissions proximately caused Plaintiffs' damages.

### THIRD CLAIM FOR RELIEF
**Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay, and Withholding of Medical Care**
*Against SCORE Employee Defendants*

236.    42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment.  The Fourteenth Amendment also provides pretrial detainees rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including the deprivation of minimal civilized necessities.

237.    SCORE Employee Defendants were deliberately and recklessly indifferent to Damaris's serious medical needs in violation of Damaris's Fourteenth Amendment rights.

238.    These acts and omissions conducted by SCORE Employee Defendants were conducted within the scope of their employment with SCORE and under the color of law.

### FOURTH CLAIM FOR RELIEF
**Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay, and Withholding of Medical Care**
*Against SCORE*

239.    42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

pretrial detainees from punishment. The Fourteenth Amendment also provides pretrial detainees rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including the deprivation of minimal civilized necessities.

240.    SCORE's insufficient policies, procedures, and training constitute deliberate indifference to the rights of SCORE inmates.

241.    These acts and omissions were conducted under the color of law.

**FIFTH CLAIM FOR RELIEF**
**Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay,**
**and Witholding of Medical Care**
*Against NaphCare Employee Defendants*

242.    42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment. The Fourteenth Amendment also provides pretrial detainees rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including the deprivation of minimal civilized necessities.

243.    NaphCare Employee Defendants were deliberately and recklessly indifferent to Damaris's serious medical needs in violation of Damaris's Fourteenth Amendment rights and deprived her of minimal civilized necessities.

244.    These acts and omissions conducted by NaphCare Employee defendants were conducted within the scope of their employment with NaphCare and under the color of law.

**SIXTH CLAIM FOR RELIEF**
**Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay,**
**and Witholding Of Medical Care**
*Against NaphCare*

245.    42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment. The Fourteenth Amendment also provides pretrial detainees rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including the deprivation of minimal civilized necessities.

246.    NaphCare's insufficient policies, procedures, and training constitute deliberate indifference to the rights of SCORE inmates.

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

247.     These acts and omissions were conducted under the color of law.

## SEVENTH CLAIM FOR RELIEF
### Civil Rights Claim for Deprivation of Familial Relationship
*Against All Defendants*

248.     The Fourteenth Amendment guarantees Reynaldo, Jose, A.G., I.G., S.G., and D.G.  the right to be free from the deprivation of their liberty interests in a familial relationship with their Mother/Wife without due process of law. Such a deprivation occurred under the fact pattern described in this complaint.

## EIGHTH CLAIM FOR RELIEF
### Civil Rights Claim for Physical Abuse and Excessive Use of Force
*Against Defendants Dore, Allen, Foy, and Seipp*

249.     42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment.  The Fourteenth Amendment also provides pretrial detainees rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including physical abuse and excessive force.

250.     CO Dore, CO Allen, CO Foy, and CO Seipp intentionally, or in the alternative, recklessly physically abused and used excessive force against Damaris in violation of Damaris's Fourteenth Amendment rights.

251.     These acts and omissions conducted by CO Dore, CO Allen, CO Foy, and CO Seipp were conducted within the scope of their employment with SCORE and under the color of law.

## NINTH CLAIM FOR RELIEF
### Assault and Battery
*Against Defendants Dore, Allen, Foy, and Seipp*

252.     The above described incident in which CO Dore and CO Allen pinned Damaris to the floor was intentional, nonconsensual, and harmful and/or offensive.  This incident occurred during CO Dore and CO Allen's transport of Damaris while she was in custody at SCORE, and therefore was done in relation to CO Dore and CO Allen's employment.  Therefore, CO Dore, CO Allen, and SCORE are liable for the intentional torts of assault and battery.

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

253.    The above described incident in which CO Foy and CO Seipp pinned Damaris to the floor was intentional, nonconsensual, and harmful and/or offensive.  This incident occurred during CO Foy and CO Seipp's transport of Damaris while she was in custody at SCORE, and therefore was done in relation to CO Foy and CO Seipp's employment.  Therefore, CO Foy, CO Seipp, and SCORE are liable for the intentional torts of assault and battery.

## TENTH CLAIM FOR RELIEF
### Civil Rights Claim for Failure to Provide Reasonable Accommodations
### *Against SCORE and NaphCare*

254.    The Americans with Disabilities Act ("ADA") provides in its relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A failure to reasonably accommodate a person's disability is an act of discrimination under the ADA. 28 C.F.R. §35.130(b)(7): "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

255.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 et seq., also requires the recipients of federal funds to reasonably accommodate persons with disabilities.  SCORE is believed and therefore alleged to receive federal funds.

256.    Although NaphCare is a private entity, it operated at SCORE under contract with SCORE, and therefore is subject to Title II of the ADA.

257.    SCORE and NaphCare failed to institute adequate policies and procedure or train its employees on how to accommodate individuals with disabilities, such as Damaris.

## ELEVENTH CLAIM FOR RELIEF
### Civil Rights Claim for False Imprisonment
### *Against SCORE and SCORE Employee Defendants*

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

258.    Under State Law and the court rules, an inmate is to be arraigned no later than 48 hours following arrest.

259.    SCORE did not transfer Damaris to court for her arraignment.  As a result, her continued imprisonment was unlawful.

### TWELFTH CLAIM FOR RELIEF
### Civil Rights Claim for Denial of Right to a Speedy Trial
*Against SCORE and SCORE Employee Defendants*

260.    42 U.S. §1983 and the Sixth Amendment to the U.S. Constitution guarantee the criminally accused the right to a speedy trial.

261.    SCORE's continued detention of Damaris without taking her to court for arraignment violated her Sixth Amendment rights.

### THIRTEENTH CLAIM FOR RELIEF
### Civil Rights Claim for Pretrial Punishment
*Against SCORE*

262.    42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment.

263.    SCORE's indefinite detention and failure to transfer her to court to be arraigned constituted a detention that was punitive in nature and violated her Fourteenth Amendment rights.

### FOURTEENTH CLAIM FOR RELIEF
### Violation of Washington's Public Records Act
*Against SCORE*

264.    SCORE failed to meet its burden to promptly produce all public records requested, in violation of RCW 42.56 *et seq*.

### FIFTEENTH CLAIM FOR RELIEF
### Common Law Negligence
*Against King County and KCSO Defendants*

265.    Damaris was seized and placed into custody by the KCSO and KCSO Defendants. Once Damaris was in KCSO custody—and therefore deprived of liberty and the ability to care for herself—a special relationship existed and the KCSO and KCSO Employee Defendants had

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1    an affirmative duty to protect Damaris and facilitate or provide her with adequate medical care.

2    This duty was non-delegable while Damaris was in the custody of the KCSO and KCSO

3    Employee Defendants.

4    266.    The KCSO and KCSO Employee Defendants were aware of and ignored the

5    obvious symptoms and other information provided to them relating to Damaris's medical needs,

6    the KCSO transported her to SCORE, rather than taking her to a hospital or commencing

7    Involuntary Treatment Act proceedings.  The KCSO and KCSO Employee Defendants also

8    failed to adequately convey their knowledge about Damaris's medical needs to SCORE and

9    NaphCare.

10    267.    The KCSO failed to institute policies, procedures, and training that was necessary

11    to assure the safety of its suspects/arrestees.  These omissions materially contributed to the errors

12    and omissions of KCSO Employee Defendants.

13    268.    The KCSO failed to train its employees in a manner necessary to assure the safety

14    of its suspects/arrestees, and the KCSO had notice that its deficient training could have

15    potentially catastrophic effects in the field.  These omissions materially contributed to the errors

16    and omissions of KCSO Employee Defendants.

17    269.    These actions and omissions were negligent, grossly negligent, reckless, and

18    malicious and breached the KCSO and KCSO Employee Defendants' duties to Damaris.

19              **SIXTEENTH CLAIM FOR RELIEF**
       **Civil Rights Claim for Denial, Delay, and Withholding of Medical Care**
20                 *Against KCSO Employee Defendants*

21    270.    42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect

22    pretrial detainees from punishment.  The Fourteenth Amendment also provides pretrial detainees

23    rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free

24    from cruel and unusual punishment.

25    271.    KCSO Employee Defendants were deliberately and recklessly indifferent to

26    Damaris's serious medical needs in violation of Damaris's Fourteenth Amendment rights.

27

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

272.    These acts and omissions conducted by the KCSO Employee Defendants were conducted within the scope of their employment with the KCSO and under the color of law.

## SEVENTEENTH CLAIM FOR RELIEF
### Civil Rights Claim for Denial, Delay, and Withholding of Medical Care
### *Against King County*

273.    42 U.S. §1983 and the Fourteenth Amendment to the U.S. Constitution protect pretrial detainees from punishment.  The Fourteenth Amendment also provides pretrial detainees rights equal to or greater than the rights afforded under the Eighth Amendment's right to be free from cruel and unusual punishment, including the deprivation of minimal civilized necessities.

274.    The KCSO failed to implement policies, practices, and training regarding individuals having behavioral crises.  This omission constitutes deliberate indifference to the rights of suspects and arrestees having behavioral crises.  These errors and omissions materially contributed to the errors and omissions of Deputy L. Adams, Deputy R. Adams, and DRE Tag.

275.    These acts and omissions were conducted under the color of law.

## EIGHTEENTH CLAIM FOR RELIEF
### Civil Rights Claim for Failure to Provide Reasonable Accommodations
### *Against King County*

276.    The Americans with Disabilities Act ("ADA") provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A failure to reasonably accommodate a person's disability is an act of discrimination under the ADA. 28 C.F.R. §35.130(b)(7): "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

277.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 et seq., also requires the recipients of federal funds to reasonably accommodate persons with disabilities.  King County

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1    and the KCSO receive federal funds.

2    278.    The arrest of Damaris was unlawful, under the ADA, because KCSO deputies

3    arrested Damaris based on her disability and not criminal activity.  Based on Reynaldo's

4    description of the incident that the KCSO deputies believed constituted an assault, it is clear that

5    Damaris's conduct was unintentional and caused by her disabilities, which Reynaldo also

6    informed them of.  Therefore, Damaris lacked the requisite *mens rea* for assault.

7    279.    The decision to arrest Damaris for assault and transport her to SCORE occurred

8    after the scene was secured and there was no imminent risk to the arresting deputies or any other

9    individuals.

10    280.    In the alternative, the KCSO failed to reasonably accommodate Damaris by

11    failing to reasonably accommodate her disability during her arrest, which caused her to suffer

12    greater injury and/or indignity than other arrestees.  Rather than taking Damaris to jail—a place

13    unfit for her medical and mental conditions—the deputies should have taken her to a hospital.

14    281.    The KCSO failed to institute adequate policies and procedure or train its

15    employees on how to accommodate individuals with disabilities, such as Damaris.

16    ### NINETEENTH CLAIM FOR RELIEF
17    **State Law Claim for False Arrest/Imprisonment**
*Against King County and KCSO Employee Defendants*

18    282.    The KCSO and KCSO Employee Defendants arrested Damaris without probable

19    cause and are therefore liable for false arrest and false imprisonment under state law.

20    ### TWENTIETH CLAIM FOR RELIEF
21    **Civil Rights Claim for False Arrest/Imprisonment**
*Against KCSO Employee Defendants*

22    283.    42 U.S. §1983 and the Fourth Amendment to the U.S. Constitution protect

23    individuals from search or seizure without probable cause.

24    284.    The KCSO and KCSO Employee Defendants arrested Damaris without probable

25    cause, which constitutes an unreasonable seizure and violated Damaris's Fourth Amendment

26    rights.

27

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

## VI.  JOINT LIABILITY

285.    Damaris is without fault for the incidents that form the basis for this lawsuit and therefore Defendants are jointly and severally liable to Plaintiffs for their conduct.   Further, Defendants were acting in concert and/or acting as agents or servants of each other.

## VII.  DAMAGES

286.    The above described actions and omissions proximately caused Plaintiffs' damages, and entitle Plaintiffs to monetary relief including compensatory damages, punitive damages, and attorneys' fees and costs.

287.    This action is brought for the wrongful death of Damaris Rodriguez, and for the Estate of Damaris Rodriguez, and for the losses of all wrongful death beneficiaries pursuant to Washington state law, including damages for mental and physical emotional distress, anguish, anxiety and loss of Damaris Rodriguez's love, care, comfort, society, and companionship and for services and support; and for Damaris Rodriguez's general damages including anxiety and fear arising out of the peril to which Damaris Rodriguez was subjected, and Damaris Rodriguez's awareness of her impending death, along with her mental and physical pain and suffering arising from the impact and severe trauma experienced by her; and for the destruction of Damaris Rodriguez's earning capacity and financial loss to her estate and the beneficiaries; funeral expenses and loss of  personal property; and for the losses to her surviving beneficiaries, Reynaldo Gil, Jose Marte, A.G., I.G., S.G., D.G.  and all other wrongful death beneficiaries, all pursuant to the Wrongful Death and General and Special Survival Statutes of the State of Washington and any other wrongful death and survival damages available under any other applicable law.

288.    This action is brought pursuant to 42 U.S.C. §1983 and §1988, and Plaintiffs are therefore entitled to all compensatory damages, punitive damages, costs, and attorneys' fees allowed under federal and state law.

289.    The public records cause of action is brought under RCW 42.56 et seq., so the Estate is entitled to reasonable attorneys' fees and costs under and $100 per day for each record

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1  improperly withheld, pursuant to RCW 42.56.550(4).

## VIII.  JURY DEMAND

3  290.    Plaintiffs hereby request a jury trial in this matter.

## IX.  COMPLIANCE WITH CLAIM FILING STATUTES

5  291.    Plaintiffs and their counsel have fully complied with RCW Ch. 4.92, as

6  applicable, to bring this action.  More than 60 days have elapsed since filing of the claims, which

7  have not been accepted by the applicable Defendants.

## X.  PRAYER FOR RELIEF

9  WHEREFORE, Plaintiffs having stated their cases, pray for judgment against the above-

10  named Defendants, as follows:

11  A.    For special damages in an amount to be proven at the time of trial for loss of

12  support of all beneficiaries of the Estate of Damaris Rodriguez occasioned by the wrongful death

13  of Damaris Rodriguez;

14  B.    For special damages for destroyed income and earning capacity of Damaris

15  Rodriguez occasioned by his death and the economic loss to his estate caused by her premature

16  death;

17  C.    For general damages for all wrongful death beneficiaries of Damaris Rodriguez

18  for loss of love, care, comfort, society, companionship, loss of services and support, and family

19  guidance, past and future;

20  D.    For general damages for the pain and suffering preceding and occasioning the

21  death of Damaris Rodriguez, including her knowledge and awareness of impending doom;

22  E.    For the mental distress and grief suffered by Damaris Rodriguez's beneficiaries,

23  and for their loss of love, care, comfort, society, companionship, loss of services and support,

24  and family guidance, past and future occasioned by Damaris's death;

25  F.    For funeral and burial expenses;

26  G.    For punitive damages against Defendants sufficient to punish them and to deter

27  further wrongdoing;

**KRUTCH LINDELL BINGHAM JONES, P.S.**
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

H.  For all other general and special damages recoverable under Washington state law, or any other law deemed applicable by the Court;

I.  For pre- and post-judgment interest;

J.  The maximum amount of statutory damages allowed, pursuant to RCW 42.56.550(4);

K.  For costs, including reasonable attorney's fees allowed by law; and

L.  For such other further relief as the Court deems just and equitable.

//

//

//

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823

1

RESPECTFULLY SUBMITTED AND DATED this 13th day of March, 2020.

2

KRUTCH LINDELL BINGHAM JONES, P.S.

3

4

By: /s/ J. Nathan Bingham, WSBA #46325
        J. Nathan Bingham, WSBA #46325
        Email: jnb@krutchlindell.com

5

6

By: /s/ Jeffrey C. Jones, WSBA #7670
        Jeffrey C. Jones, WSBA #7670
        Email: jcj@krutchlindell.com

7

8

By: /s/ James T. Anderson, WSBA #40494
        James T. Anderson, WSBA #40494
        Email: jta@krutchlindell.com
        One Union Square
        600 University Street, Suite 1701
        Seattle, Washington 98101
        Telephone: (206) 682-1505
        Facsimile: (206) 467-1823

9

10

11

12

13

TERRELL MARSHALL LAW GROUP PLLC

14

By: /s/ Toby J. Marshall, WSBA #32726
        Toby J. Marshall, WSBA #32726
        Email: tmarshall@terrellmarshall.com

15

16

By: /s/ Maria Hoisington-Bingham, WSBA #51493
        Maria Hoisington-Bingham, WSBA #51493
        Email: mhoisington@terrellmarshall.com
        936 North 34th Street, Suite 300
        Seattle, Washington 98103-8869
        Telephone: (206) 816-6603
        Facsimile: (206) 319-5450

17

18

19

20

21

*Attorneys for Plaintiffs*

22

23

24

25

26

27

KRUTCH LINDELL BINGHAM JONES, P.S.
One Union Square
600 University Street, Suite 1701
Seattle, Washington 98101
TEL. 206.682.1505 • FAX 206.467.1823