The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RUSSELL H. DAWSON, et al

               Plaintiffs,

   vs.

SOUTH CORRECTIONAL ENTITY
("SCORE"), et al;

              Defendants.

NO. 2:19-cv-01987-RSM

PLAINTIFFS' PARTIAL MOTION FOR
SUMMARY JUDGMENT ON
NAPHCARE'S TORT LIABILITY

NOTE ON MOTION CALENDAR:
AUGUST 13, 2021

## I.     INTRODUCTION

This case arises out of the deprivation of medical care for Damaris Rodriguez at the

South Correctional Entity Jail ("SCORE"). Although Plaintiffs have brought numerous claims,

this motion relates strictly to Plaintiffs' state tort claims against medical contractor, NaphCare,

Inc. ("NaphCare").[1]

Plaintiffs first brought partial motions for summary judgment on NaphCare's tort

liability, SCORE's vicarious liability for NaphCare's torts, and comparative fault on January 28,

2021. Dkt. 81. The Court heard NaphCare's 56(d) motion telephonically on February 8, 2021,

and Plaintiffs withdrew the motion without prejudice. Dkt. 88. Plaintiffs refiled the motions

related to SCORE's vicarious liability and comparative fault on April 29, 2021, Dkt. 106, but

---

[1] This motion does not address Plaintiffs' constitutional claims against any defendant. Additionally, Plaintiffs do not
contend that NaphCare is solely liable for Damaris's death. Plaintiffs maintain their claims against the other named
defendants, but those claims are not included in this summary judgment motion.

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 1
2:19-cv-01987-RSM

1   waited until expert depositions were complete to readdress the tort claims against NaphCare.

2   Dkt. 106.

3       All parties having now completed expert depositions, Plaintiffs hereby move for a

4   summary judgment order finding NaphCare liable in tort for Damaris's suffering and death,

5   pursuant to Fed. R. Civ. P. 56.

6                   II.      STATEMENT OF FACTS

7       1.   Damaris did not receive timely access to medical care and was not properly assessed
            or monitored throughout her incarceration because she was "stuck in booking"

8       Damaris Rodriguez was booked into SCORE Jail on the afternoon of December 30, 2017.

9   When she arrived at the jail, she was clearly suffering from severe mental health issues and was

10  unable to engage with corrections staff or the employees of SCORE's medical contractor,

11  NaphCare. The arresting officers noted that Damaris's husband reported that Damaris was

12  experiencing mental health problems, so SCORE's booking sergeant provided this information to

13  NaphCare. Bingham Decl., Exh. A at 30:11-33:14 ("Scott Dep."). Despite Damaris's obvious

14  mental illness, NaphCare never conducted an intake screen. Bingham Decl., ¶3, Exh. B at 3

15  ("NaphCare Chart Notes") (chart note by Mental Health Professional ("MHP") Lothrop

16  explaining that Damaris did not go through booking process).

17      As an internal investigation would later reveal, NaphCare's failure to conduct an intake

18  was the result of a loophole in its policies and procedures. At the time of Damaris's

19  incarceration, there were no policies or procedures in place to account for inmates that were

20  unable to cooperate in the booking process due to mental illness. If an inmate's mental illness

21  made them uncooperative, they were generically deemed a "safety concern" and left until their

22  symptoms improved on their own. Bingham Decl., Exh. C at 130:1-135:13[2] ("Villacorta Dep.");

---

[2] Although summarized in RN Villacorta's deposition, the practical effects of this decision were apparent in many
other depositions. *See, e.g.* Bingham Decl., Exh. G at 78:22-83:10 ("Martin Dep.").

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

*see also* Dkt. 82-9 (NaphCare's answer to Interrogatory No. 7: "Assuming the inmate is cooperative…"); *id.,* Dkt. 82-10, Exh. J (Martin answer to Interrogatory No 6: intake screen not completed because Damaris was deemed "uncooperative."). Defendant Jessica Lothrop, a NaphCare Mental Health Professional, described this phenomenon as getting "stuck in booking." Bingham Decl., Exh. D at 16:24-17:5 "(Lothrop Dep.").

Being "stuck in booking" creates two major problems for an inmate. First, the conditions of confinement in booking are not appropriate for habitation. In the booking cells there are no beds, the lights are left on 24 hours a day, and the temperature is cold. Bingham Decl., Exh. E (SCORE Amended Responses to Plaintiffs First RFA); Scott Dep. at 42:2-23. Second, if an inmate is never booked, then a "treatment plan" is never created. According to NaphCare's Director of Nursing Henry Tambe, a treatment plan can only be created by a doctor or nurse practitioner. Bingham Decl., Exh. F at 169:19-170:8 ("Tambe Dep."). Treatment plans are vital to assuring an inmate's access to appropriate care, as they determine the frequency and nature of monitoring, *id.* at 90:17-20; and medical rounds, *id.* at 90:17-20, 93:3-7, 97:5. In other words, without an intake screen and treatment plan, there is no way to assure at-risk inmates are properly treated or even monitored for medical emergencies.

Because NaphCare never screened Damaris or created a treatment plan, NaphCare's monitoring over the next few days continued to be dangerously inadequate. NaphCare never properly took or recorded vital signs. Dkt. 83, ¶10(b)(1) (Luethly Decl.); Dkt. 84, ¶19.7.5 (Piel Decl.). Long periods of time—17 hours, 14 hours, and 12 hours—elapsed between clinical notations about Damaris's condition. Dkt. 82, ¶15 (Luethy Decl.).

Even without any meaningful conversation, intake screen, or physical assessment, Damaris's symptoms of mental illness still should have been obvious. NaphCare personnel made

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 3
2:19-cv-01987-RSM

numerous observations reflecting her mental and physical illnesses, some of which are

summarized below:

- December 31, 2017
  - "note on inmate's door states that she is naked." NaphCare Chart Notes at 4 (RN Tambe at 12/31/2017 late entry at 5:51am)
  - "does not appropriately answer questions…" *Id.* at 3 (MHP Lothrop at 12/31/2017 1:26pm)
  - "unable to do booking screening due to patient mental status." *Id.* at 3 (RN Mukwana at 12/31/2017 9:15pm)

- January 1, 2018:
  - "inmate naked…not communicating with words…inmate naked, disheveled, hair mess. Cell very wet and dirty with food and debris on the floor…" *Id.* at 3 (MHP Kilpatrick at 1/1/2018 3:34pm)
  - "inmate spent most of the day rattling door, yelling, singing, talking loudly in Spanish and in cell naked. No meds provided" *Id.* at 3 (RN Wallace at 1/1/2018 5:36pm)

- January 2, 2018:
  - [after the third night in custody] "inmate up all night again" *Id.* at 2 (RN Rivas at 1/2/2018 12:26am)
  - "inmate's cell was trashed with food particles everywhere, her smock was on the floor in a heap with what appeared to be food on it… seemed unable to understand questions put to her about how she was feeling… gave indications that she didn't know me and has no idea why I was there talking with her" *Id.* at 2 (MHP Weaver at 1/2/2018 10:26am)
  - "seen leaning over toilet, apparently gaging, but no emesis seen" *Id.* at 2 (RN Wallace at 1/2/2018 5:09pm)

- January 3, 2018
  - "inmate has been agitated today…MHP witnessed her throwing up copious amounts of water- just water. No food or color to it at all…RN and CO reported she ate lunch but vomited it up[3]…foul smell coming from her cell…potential water intoxication…" *Id.* at 1 (MHP Whitney at 1/3/2018 3:16pm)
  - "IM was naked during MHP rounds. No interaction was obtained form MHP efforts to make contact." *Id.* at 1 (MHP Weaver at 1/3/2018 4:45pm)
  - "IM attempting to induce vomiting several times today, yelling in Spanish and defecating on floor. MH observed vomiting large quantity of water, so moved to dry cell." *Id.* at 1 (RN Kosanke at 1/3/2018 7:06pm)

---

[3] This note is correct in that she was vomiting, but incorrect about her eating lunch. She did not eat lunch and was vomiting only water and bile. Bingham Decl., Exh. H at 30:2-22; 51:18-52:20 ("Foy Dep.") (clarifying notes related to distributing food).

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 4
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

Damaris died on the evening of January 3, 2018, having never seen a doctor or nurse practitioner. NaphCare Chart Notes; Bingham Decl., ¶10, Exh I ("SCORE Custody Log").[4]

2. <u>NaphCare failed to obtain medical treatment for Damaris even after realizing she was at a serious risk of harm due to the overconsumption of water</u>

Still never having been through an intake screen four days into her incarceration, Damaris's condition worsened and became critical. NaphCare staff witnessed her vomit an excessive amount for an extended period of time, but she was still not seen by a physician or nurse practitioner. Although a factual dispute exists about exactly whose fault it was that a physician or nurse practitioner failed to conduct a physical examination, all three of the key NaphCare witnesses agree that Damaris's physical presentation was concerning and she should have been physically examined.

Nancy Whitney was NaphCare's Director of Mental Health and was coincidentally working at the time Damaris took a turn for the worst. MHP Whitney, a social worker, acknowledged during her deposition that she witnessed Damaris in physical distress on the afternoon of January 3, 2018:

> So I came to the door and she was, as I recall, on the floor and she was clutching her neck and coughing, and then she started to vomit. And it looked to me like someone had turned on a garden hose. There was just a very full force of water that she vomited and it took her a few seconds to get it all out.

Bingham Decl., Exh. K at 48:15-21 ("Whitney Dep.").

MHP Whitney explained that the excessive vomiting was a physical concern because it evidenced excessive water consumption, which leads to chemical imbalances MHP Whitney refers to as water intoxication (a colloquial term for hyponatremia). *Id.* at 54:16-55:25. MHP

---

[4] CO Foy and CO Woo both made notes in the SCORE Custody Log that could be interpreted to mean Damaris ate. CO Woo admitted during his deposition that this note was inaccurate. Bingham Decl., Exh. J at 54:7-10 ("Woo Dep.") (Q: "Do you still agree with your prior testimony that you saw her take a bite before she dumped the food out? A: No. The video doesn't lie."). CO Foy admitted during his deposition that Damaris dumped the food in the toilet immediately after he handed it to her. Foy Dep. at 30:2-22; 51:18-52:20 (clarifying notes related to distributing food). Because the surveillance videos are clear and the corrections officers either admitted the inaccuracy of these notes or clarified them, Plaintiffs do not anticipate that Defendants will contend that there is any factual dispute related to food intake.

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 5
2:19-cv-01987-RSM

Krutch Lindell Bingham Jones, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

1   Whitney understood the severity of the situation in part because of previous patients suffering

2   from excessive thirst and water consumption (psychogenic polydipsia). *Id.* at 56:1-59:10.

3       NaphCare's Health Services Administrator (NaphCare's top administrator at SCORE)

4   Rebecca Villacorta, a registered nurse, was also on-site at the time. Although RN Villacorta

5   never actually saw Damaris, she spoke with MHP Whitney about MHP Whitney's observations

6   that Damaris was vomiting profusely and at risk of water intoxication. Villacorta Dep. at 145:16-

7   146:25. During her deposition, RN Villacorta agreed that Damaris needed to see a medical

8   provider immediately but was relying on MHP Whitney to make the notification. *Id*. at 156:21-

9   157:18; 203:22-205:11.

10      ARNP Rita Whitman was the on-site medical provider on the afternoon of January 3,

11  2018. ARNP Whitman never actually saw Damaris, but after reviewing the surveillance video of

12  the time period when MHP Whitney was watching Damaris, she unequivocally agreed that the

13  continuous vomiting constituted an immediate medical concern. Bingham Decl., Exh. L at 7:15-

14  8:1 ("Whitman Dep."). Because of her state of physical distress, ARNP Whitman also agreed

15  that Damaris needed an immediate physical assessment. *Id*. at 8:2-8:22.

16      Despite the recognized need for medical care, there appears to have been a

17  miscommunication amongst NaphCare staff because no nurse practitioner or doctor ever saw

18  Damaris or added her to their patient list. It will be for a jury to decide which individual was at

19  fault for this miscommunication—because this motion relates only to tort liability and the

20  doctrine of *respondeat superior* applies, the Court need not resolve this factual dispute at this

21  juncture. For the Court's information, however, it is summarized below.

22      MHP Whitney made a chart note stating that the ARNPs were notified, but there is no

23  other record consistent with the notification occurring. NaphCare Chart Notes at 1 (MHP

24  Whitney at 1/3/2018 3:16pm). MHP Whitney claims to have told ARNP Whitman that:

25
26      …I saw the patient vomiting up a lot of water, that it was too much water for a person,
        and that I didn't know if that was because she was obsessively compulsively drinking a
        lot of water.
27

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 6
2:19-cv-01987-RSM

I was concerned that she was at risk for water intoxication. I let them know that she had been moved to the dry cell and that there would be monitoring going forward.

Whitney Dep. at 62:21-62:8.

ARNP Whitman initially denied that the conversation took place at all. Bingham Decl., Exh. M. Whitman Responses to Plaintiffs' First Discovery Requests, signed March 3, 2020 ("…defendant Whitman responds that she has not discussed Damaris with anyone other than her attorney"). However, over the last year MHP Whitney had multiple suggestive conversations with ARNP Whitman to make sure ARNP Whitman "remembered" the conversation.[5] Whitman Dep. at 44:24-45:25. And then, after MHP Whitney's deposition, ARNP Whitman reversed course and amended her discovery responses to say that a conversation between MHP Whitney and ARNP Whitman did occur on January 3, 2018. Bingham Decl., Exh. N. Whitman Second Supplemental Responses to Plaintiff's First Discovery Requests signed May 28, 2021 ("…As I reflect further on the information provided by Ms. Whitney, at this time, I can state that I have a very vague recollection of Nancy Whitney stopping me in the medical unit…I am not confident that I was specifically told the inmate's name.")

Even with MHP Whitney's request that ARNP Whitman change her testimony to remember the January 3, 2018, conversation, ARNP Whitman denied being advised the level of detail that MHP Whitney claims to have provided. Whitman Dep. at 43:14-44:23. And of course, if that level of detail had actually been provided, ARNP Whitman would have conducted an immediate physical examination. Whitman Dep. at 7:15-8:22. In a refreshing display of honesty, ARNP Whitman acknowledged that she would not have been able to recall the January 3, 2018, conversation at all without the MHP Whitney's recent suggestive inquiries. Whitman Dep., at 45:22-25; 47:3-48:12.

The facts strongly indicate that MHP Whitney never actually had the January 3, 2018, conversation with ARNP Whitman, but the other plausible factual scenarios are just as

---

[5] Interestingly, one of a number of discovery violations committed by MHP Whitney was failing to disclose these suggestive conversations with ARNP Whitman, despite discovery requests and deposition questions directly on point. For reasons not yet disclosed to Plaintiffs, NaphCare also terminated MHP Whitney in April, 2021.

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 7
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

significant for the purposes of this motion. If the conversation did take place, then either MHP

Whitney failed to provide sufficient information to ARNP Whitman or ARNP Whitman was at

fault for failing to act after being provided with information related to Damaris's admittedly

serious medical need. Under any plausible factual iteration, some NaphCare employee made an

error or omission relating to the escalation of medical care on January 3, 2018.

3.  <u>NaphCare failed to notice that Damaris went four and a half days without eating</u>

As evidenced by the surveillance video, Damaris did not eat for four and a half days. Dkt.

85 at ¶17 (Wigren Decl.); Bingham Decl., Exh. O at 26:24-27:8; 29:2-19 ("Wigren Dep.").

NaphCare failed to institute sufficient policies or train employees on its existing policies related

to starvation, and as a result these policies were never triggered. NaphCare has a written "hunger

strike protocol," which requires careful monitoring once an inmate misses three meals in a row.

Dkt. 82-7 (NaphCare Hunger Strike Protocol). The need to monitor inmates who are not eating is

self-evident and underscored by the very existence of the policy itself. However, the protocol

was never implemented for Damaris due to a complete lack of training and the absence of a

method to track food consumption. Dkt. 82-8 (NaphCare response at Interrogatory No. 8)

(notably omitting any description of any actual training on inmates that are not eating; Dkt. 84,

¶19.6.5 (Piel Decl.).

4.  <u>Damaris died from metabolic conditions that were caused or exacerbated by her
    untreated mental illness, food restriction, and excessive water consumption</u>

Left untreated for four-and-a-half days at SCORE, interconnected psychological and

physiological pathologies caused extreme suffering and Damaris's eventual death. Although

numerous medical experts have provided opinions on, or tangentially related to, the cause of

Damaris's death, they are generally in agreement.

King County Medical Examiner Richard Harruff, MD, initially categorized Damaris's

death as "sudden death in excited delirium." However, after learning during his deposition that

the information provided to his office by SCORE was "inaccurate," Dr. Harruff no longer had

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 8
2:19-cv-01987-RSM

1  "any faith in any information" he was provided with and retracted his opinion about "sudden

2  death in excited delirium." Bingham Decl., Exh. P at 16:22-19:21 ("Harruff Dep."). Dr. Harruff

3  agreed to reconsider new information and amend his report accordingly. *Id*. at 19:22-20:21. With

4  the information presently available, Dr. Haruff was unable to determine a specific anatomic

5  cause of death but noted the metabolic derangements of hyponatremia and ketonemia, and

6  expressed a believe that Damaris's death could have been provoked by a heart arrhythmia. *Id.* at

7  33:17-37:9. Dr. Harruff implied that he may be able to determine a more specific anatomic

8  explanation with further detail about her incarceration, so Plaintiffs provided additional

9  information to Dr. Harruff relating to Damaris's food restriction; however, an amended report is

10  still pending. Bingham Decl. at ¶18, Exh. Q (Letter to Dr. Harruff).

11       The opinion of Plaintiffs' forensic pathologist Carl Wigren, MD, is more detailed and

12  definitive, but substantively consistent with Dr. Harruff's deposition testimony. Dr. Wigren

13  preserved tissue samples and made microscopic findings consistent with significantly elevated

14  ketone levels and profound hyponatremia caused by excessive water intake. Wigren Dep. at

15  33:21-38:8. The postmortem test relevant to ketones is beta-hydroxybutyrate. A level between

16  2.01 and 6 mmol/L is considered significantly elevated and frequently of concern, and a level

17  greater than 6 almost always indicates a life-threatening condition. Damaris's beta-

18  hydroxybutrate level was 5.46. Wigren Dep at 45:4-23. Hyponatremia is a sodium imbalance.

19  One known cause is excessive water intake without food, which essentially dilutes a patient's

20  blood. The normal range is between 135 and 145 mmol/L. A sodium level less than 125 mmol/L

21  is considered "profound." Damaris's sodium level was 123 mmol/L.

22       Plaintiffs' forensic psychiatrist Jennifer Piel, MD will not be offering testimony on the

23  anatomic cause of death, but her opinion gives context to the mental and physical issues Damaris

24  experienced. Although Damaris had an underlying mental illness, the metabolic abnormalities

25  explain how her mania escalated to delirium. Dkt. 84 at ¶18; Bingham Decl., Exh. R at 32:1-8

26  (Piel Dep.). Mental issues can cause and be caused by physical issues. For example, mental

27

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 9
2:19-cv-01987-RSM

1  illness can cause an individual to not eat. Fasting and malnutrition then lead to metabolic

2  abnormalities. Dkt 84 at ¶18.1. Metabolic abnormalities and mental illnesses can lead to

3  pathologically excessive thirst, which imbalances sodium and causes further metabolic

4  abnormalities. Wigren Dep. at 44:24-48:20.

5      This same principle was referenced—albeit explained differently—by a number of other

6  witnesses. For example, even while Damaris was still alive, MHP Whitney, NaphCare's former

7  director of mental health, flagged the risk that Damaris's excessive water consumption could

8  cause serious physical risks. Although she is a mental health and not a somatic provider, she

9  explained her familiarity with psychogenic polydipsia because it was a known physical risk of a

10  mental disorder. Whitney Dep. at 56:1-59:10. Even NaphCare's own experts acknowledged

11  Damaris's untreated mental illness led to her death. NaphCare Expert Gary Vilke, MD, explained

12  that being "metabolically revved up" for an extended period is physiologically dangerous and

13  can lead to cardiac arrest. Bingham Decl., Exh. S at 110:12-117:24 (Vilke Dep.). NaphCare

14  Expert Gregory Davis, MD, explained that even though he cannot pinpoint the precise

15  pathophysiological reason that her heart stopped that it was related to her extended state of

16  psychosis and adrenalin overstimulation. Bingham Decl., Exh. T at 12:25-15:14 (Davis Dep.).

17                         III.    ISSUES PRESENTED

18      Whether NaphCare is liable in tort for:

19          A.  NaphCare's corporate negligence in allowing a policy loophole in which mentally

20              ill inmates become "stuck in booking" without a treatment plan.

21          B.  NaphCare's employees' failure to provide access to medical care after observing

22              Damaris vomiting and in physical distress.

23                         IV.    EVIDENCE RELIED UPON

24      Declaration of J. Nathan Bingham in Support of Plaintiffs' Partial Motion for Summary

25  Judgment on Tort Liability (filed 7/20/2021); Declaration of J. Nathan Bingham in Support of

26  Plaintiffs' Motion for Summary Judgment on Tort Liability (previously filed as Dkt. 82 on

27

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 10
2:19-cv-01987-RSM

1    1/28/2021); Declaration of Carl Wigren, MD in Support of Plaintiffs' Motion for Summary

2    Judgment on Tort Liability (previously filed on 1/29/2021 as Dkt. 85); Declaration of Rebecca

3    Luethy in Support of Plaintiffs' Motion for Summary Judgment on Tort Liability (previously

4    filed on 1/29/2021 as Dkt. 83); Declaration of Jennifer Piel, MD in Support of Plaintiffs' Motion

5    for Summary Judgment on Tort Liability (previously filed on 1/29/2021 as Dkt. 84); Plaintiffs'

6    Complaint; Defendants' Answer; and the filings and records herein.

7                                   V. SUMMARY JUDGMENT STANDARD

8           Fed. R. Civ. P. 56(a) authorizes the Court to grant summary judgment on any claim or

9    part of any claim on which summary judgment as a matter of law is sought. The Court may

10   "enter an order stating any material fact—including an item of damages or other relief—that is

11   not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

12   Under the rules, "partial summary judgment or summary adjudication is appropriate as to

13   specific issues if it will narrow the issues for trial." *Nat'l Union Fire Ins. Co. v. Ready Pac.*

14   *Foods, Inc*., 782 F.Supp.2d 1047, 1052 (C.D. Calif. 2011). Entering partial summary judgment

15   "is merely a determination before the trial that certain issues shall be established in advance of

16   the trial." *Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n. 3 (9th Cir. 1981). Partial summary

17   judgment can "avoid a useless trial of facts and issues over which there was never really any

18   controversy." *Id.* A genuine issue of material fact only exists where there is sufficient evidence

19   for a reasonable factfinder to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477

20   U.S. 242, 248 (1986).

21          The initial burden is on the moving party to demonstrate the absence of an issue of

22   material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by

23   "showing" there is an absence of evidence supporting the nonmoving party's case. *Id.* at 326. The

24   moving party does not have a burden to produce evidence showing the absence of a genuine

25   issue of material fact. Rather, the moving party can meet its burden by pointing out to the court

26   the absence of evidence supporting the nonmoving party's case. *Id*. at 323.

27   PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
     JUDGMENT ON TORT LIABILITY, VICARIOUS
     LIABILITY, AND COMPARATIVE FAULT - 11
     2:19-cv-01987-RSM

VI.     AUTHORITY

**A. NaphCare is liable in tort for its policy omissions that allow mentally ill inmates to get "stuck in booking" or go days without eating without proper treatment or monitoring**

"The essential elements of actionable negligence are: (1) the existence of a duty owed to the complaining party; (2) a breach thereof; (3) a resulting injury; and (4) a proximate cause between the claimed breach and resulting injury." *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984) (citing *Hansen v. Washington Natural Gas Co.*, 95 Wn.2d 773, 776, 632 P.2d 504 (1981)).

The SCORE medical unit qualifies as a "hospital" under RCW 70.41.020. The doctrine of corporate negligence for "hospitals" was formally adopted in Washington in *Pedroza v. Bryant*, 101 Wn.2d at 233. The *Pedroza* court's reasoning was based in part on RCW Ch. 70.41's statutory requirements, which require medical facilities to adopt bylaws with respect to medical staff activities. *Id.* at 234. Accordingly, it bears reasoning that the *Pedroza* court intended to use the term "hospital", as it is defined in RCW 70.41.020:

> (7) "Hospital" means any institution, place, building, or agency which provides accommodations, facilities and services over a continuous period of twenty-four hours or more, for observation, diagnosis, or care, of two or more individuals not related to the operator who are suffering from illness, injury, deformity, or abnormality, or from any other condition for which obstetrical, medical, or surgical services would be appropriate for care or diagnosis…

SCORE's medical unit, operated by NaphCare, has numerous beds and houses individuals—such as Damaris—for the ostensible purpose of observation, diagnosis, and care for medical illnesses and injuries. Accordingly, the SCORE medical unit qualifies as a "hospital," and its operator (NaphCare) is subject to the doctrine of corporate negligence.

The doctrine of corporate negligence "imposes on a hospital a nondelegable duty owed directly to the patient, regardless of the details of the doctor-hospital relationship." *Ripley v. Lanzer*, 152 Wn. App. 296, 324, 215 P.3d 1020 (2009). There are four primary duties owed by a hospital under the doctrine of corporate negligence: (1) to use reasonable care in the maintenance of buildings and grounds for the protection of the hospital's invitees; (2) to furnish the patient

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 12
2:19-cv-01987-RSM

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

1   supplies and equipment free of defects; (3) to select its employees with reasonable care; and (4)

2   to supervise all persons who practice medicine within its walls. *Douglas v. Freeman*, 117 Wn.2d

3   242, 814 P.2d 1160 (1991). "The standard of care to which the hospital will be held is that of an

4   average, competent health care facility acting in the same or similar circumstances." *Ripley*, 152

5   Wn. App at 324.

6         1.   <u>NaphCare failed to adopt any policies or procedures to account for mentally ill</u>
    <u>inmates that are unable to comply with booking</u>

7         NaphCare's nurses failed to conduct an intake screen, which was required without

8   exception by the NCCHC Standard E-02, SCORE's written policy 722, and NaphCare's "Initial

9   Screening" policy. Dkt. 83, ¶23; Dkt. 82-12 (Initial Screening policy). NaphCare's Initial

10  Screening policy requires an intake screen "performed by health trained or qualified health care

11  professionals upon admission (as soon as possible) for all inmates to ensure that emergent and

12  urgent health and mental health needs are identified and met."  Dkt. 82-12 (Initial Screening

13  policy). An inmate that is "unconscious, semi-conscious, …**mentally unstable**, severely

14  intoxicated, in active drug or alcohol withdrawal, or otherwise urgently in need of immediate

15  medical attention will be immediately referred for appropriate care and medical clearance into

16  the facility." *Id* (emphasis added). If an inmate is referred to an emergency room at a hospital,

17  admission into the correctional institution cannot occur without written medical clearance from

18  the emergency room. *Id.*

19        Instead of conducting an intake screen pursuant to its own policy, NaphCare's nurses

20  decided that Damaris was too sick to even engage in an intake screen. But rather than complete

21  this screen—which would have required them to address Damaris's issues and facilitate further

22  treatment—NaphCare's nurses simply did nothing and hoped Damaris's symptoms would

23  resolve themselves. NaphCare's nurses breached the standard of care by failing to conduct an

24  intake screen and ignoring her symptoms.

25        Had a proper intake screen occurred, Damaris never would have been admitted into the

26  SCORE facility. An intake screen would have caused the screener to flag a number of the

27  

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 13
2:19-cv-01987-RSM

1   medical conditions that required a medical clearance under SCORE policy 722 and NaphCare's

2   Initial Screening policy. By failing to adopt policies and procedures relating to intake screens for

3   mentally ill inmates, NaphCare failed to meet its duty to properly supervise its personnel. The

4   importance of intake screens is obvious and recognized in NaphCare's internal policies, and the

5   NCCHC standards. Accordingly, NaphCare was negligent on a corporate level. NaphCare's

6   omissions related to its screening practices (particularly the failure to account for mentally ill

7   inmates) meant that Damaris was never screened and did not receive the healthcare that would

8   have saved her life. Had Damaris gone to the emergency room for medical clearance or even

9   been examined by an on-site nurse practitioner or doctor, such a medical provider would have

10  diagnosed and been able to treat Damaris's mental and physiological conditions. Dkt. 84., ¶20-

11  20.8 (Piel Decl.); Dkt. 85, ¶18-19 (Wigren Decl.); Wigren Dep., 29:2-32:15.

12          2.  NaphCare failed to train its employees on its policies related to starving inmates

13          NaphCare's policy related to inmates that are not eating, known as the "hunger strike

14  protocol," is not deficient on its face. It requires intensive monitoring for inmates that go a

15  requisite period of time without eating. However, NaphCare's complete failure to train or advise

16  its employees of the existence of the hunger strike policy is inexcusable. A protocol that nobody

17  knows about—and therefore nobody implements for a starving inmate—is useless.

18          Due to NaphCare's failure to train its employees on the hunger strike policy, NaphCare

19  personnel never even noticed that Damaris was not eating. As Dr. Wigren explains, this food

20  restriction (anorexia) contributed to the metabolic condition that caused her death. Dkt. 85, ¶18-

21  19 (Wigren Decl.).

22  **B.  NaphCare is liable in tort for its employees' failure to secure medical treatment
        despite her recognized medical need**

23          NaphCare's employees violated the standard of care by failing to secure treatment even

24  after they observed Damaris excessively consuming water and vomiting, which they recognized

25  as serious medical need. In claims against "health care providers," as defined by RCW

26  7.70.020(1), Plaintiffs must show that: "[t]he health care provider failed to exercise that degree

27

1  of care, skill, and learning expected of a reasonably prudent health care provider at that time in

2  the profession or class to which he belongs, in the state of Washington, acting in the same or

3  similar circumstances," and "[s]uch failure was a proximate cause of the injury complained of."

4  RCW 7.70.040(1), (2).

5       The plaintiff in a healthcare malpractice case must generally produce expert testimony to

6  establish the standard of care and most aspects of causation. *Harris v. Robert C. Groth, M.D.,*

7  *Inc.*, P.S., 99 Wn.2d 438, 448–49, 663 P.2d 113 (1983); *Seybold*, 105 Wn. App. at 676, 19 P.3d

8  1068. A practitioner licensed in another state may offer an admissible opinion if the defendant

9  violated a national standard of care. *Volk v. Demeerleer*, 184 Wn. App. 389, 431, 337 P.3d 372

10  (2014); *see also Eng v. Klein*, 127 Wn. App. 171, 180, 110 P.3d 844 (2005) (out-of-state expert

11  was qualified to testify about the standard of care for the diagnosis and treatment of meningitis

12  because there was a national standard.). A physician with a medical degree is qualified to express

13  an opinion on any sort of medical question, including questions in areas in which the physician is

14  not a specialist, so long as the physician has sufficient expertise to demonstrate familiarity with

15  the procedure or medical problem at issue in the medical malpractice action. *Hill v. Sacred Heart*

16  *Med. Ctr.*, 143 Wn.App. 438, 447, 177 P.3d 1152 (2008) (citing *Morton v. McFall*, 128 Wn.

17  App. 245, 253, 115 P.3d 1023 (2005)). If the breach of the standard of care is the standard of a

18  reasonable nurse, there is no reason why a nurse cannot offer an expert opinion. *Hill*, 143

19  Wn.App. at 446.

20       Social workers are not included in RCW 7.70.020's definition of "health care provider."

21  However, the precise duty of care owed by social worker Nancy Whitney to Damaris is

22  somewhat nebulous due to the fact that MHP Whitney acted beyond the bounds of her

23  qualifications by attempting to provide a medical diagnosis (water intoxication) and treatment

24  recommendations (solitary confinement in a room without water) for Damaris. Dkt. 83., ¶24

25  (Luethy Decl.); Bingham Decl., Exh. U at 108:13-111:23 (Luethy Dep.) Accordingly, Plaintiffs

26

27

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 15
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

1   rely on the expert testimony of both corrections nurse Rebecca Luethy and psychiatrist Jennifer

2   Piel, MD.

3          Based on MHP Whitney's own testimony (and that of ARNP Whitman and RN

4   Villacorta), there is no doubt Damaris had a serious medical need and should have been provided

5   treatment. However, MHP Whitney's failure to properly advise a doctor or nurse practitioner of

6   Damaris's condition foreclosed any medical diagnosis or treatment from occurring. This failure

7   to secure treatment violated the standard of care. Dkt. 82, ¶19-21 (Piel Decl.); Dkt. 83 ¶18- 22.

8          This failure to secure treatment also proximately caused Damaris's death. Had Damaris

9   been seen by a qualified doctor or nurse practitioner—either at SCORE or in a hospital setting—

10  the underlying causes could have been treated. Patients with behavioral disturbances should first

11  undergo a process of medical evaluation to identify the potential medical etiologies of the

12  condition and comorbidities requiring care. *Id.* at ¶20.5. The underlying causes of delirium, such

13  as ketosis and hyponatremia, are generally detectable and treatable. *Id.* at ¶20-20.8. Had Damaris

14  seen a qualified medical professional, treatment would have been effective. *Id.* at 21.

15                              VI.     CONCLUSION

16         For the aforementioned reasons, Plaintiffs respectfully request that this Court issue an

17  order granting partial summary judgment finding that NaphCare is liable in tort for Plaintiffs'

18  damages.

19

20

21

22

23

24

25

26         Respectfully submitted this 20th day of July, 2021.

27

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 16
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

KRUTCH LINDELL BINGHAM JONES, P.S.

By: /s/ J. Nathan Bingham, WSBA #46325
    J. Nathan Bingham, WSBA #46325
    Jeffrey C. Jones, WSBA #7670
    James T. Anderson, WSBA #40494
    3316 Fuhrman Ave E, Suite 250
    Seattle, Washington 98102
    Telephone: (206) 682-1505
    Facsimile: (206) 467-1823
    Email: jnb@krutchlindell.com
    jcj@krutchlindell.com
    jta@krutchlindell.com


TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Toby J. Marshall, WSBA #32726
    Toby J. Marshall, WSBA #32726
    936 North 34th Street, Suite 300
    Seattle, Washington 98103-8869
    Telephone: (206) 816-6603
    Facsimile: (206) 319-5450
    Email: tmarshall@terrellmarshall.com

*Attorneys for Plaintiffs*

PLAINTIFFS' PARTIAL MOTION FOR SUMMARY
JUDGMENT ON TORT LIABILITY, VICARIOUS
LIABILITY, AND COMPARATIVE FAULT - 17
2:19-cv-01987-RSM