The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RUSSELL H. DAWSON, et al

                Plaintiffs,

vs.

SOUTH CORRECTIONAL ENTITY
("SCORE"), et al;

                Defendants.

NO. 2:19-cv-01987-RSM

**PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION FOR PARTIAL SUMMARY JUDGEMENT**

**NOTED ON CALENDAR:**

**Krutch Lindell Bingham Jones, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

## I.     RELIEF REQUESTED

Plaintiffs respectfully request that the Court deny NaphCare's motion.

## II.     STATEMENT OF FACTS

Plaintiffs strongly disagree with NaphCare's recitation of facts. Each of the NaphCare defendants ignored signs of Damaris's serious medical needs. NaphCare generally argues that Damaris was monitored by its employees, who were unable to determine what medical assistance to provide. A more accurate description of the fact pattern is that NaphCare's non-physician staff watched Damaris die without making any effort to provide or facilitate medical care because NaphCare's staff recklessly disregarded their professional duties and because NaphCare did not have adequate policies in place to treat mentally ill patients.

**A.  NaphCare never medically screened Damaris or developed a treatment plan, due to policy deficiencies relating to mentally ill inmates**

Damaris was booked into SCORE Jail on the afternoon of December 30, 2017. When she arrived at the jail, she was unable to walk and was not responsive to corrections officers. Declaration of J. Nathan Bingham ("Bingham Decl."), Exh. V-1.[1] Despite Damaris's obvious mental illness, NaphCare never conducted an intake screen or created a treatment plan. Dkt. 154-2 at 3 ("NaphCare Chart Notes") (chart note by Mental Health Professional ("MHP") Jessica Lothrop explaining that Damaris did not go through booking process). As an internal investigation would later reveal, NaphCare's failure to conduct an intake resulted from a loophole in its policies and procedures.

At the time of Damaris's incarceration, NaphCare's policies and procedures did not properly account for inmates that were unable to cooperate in the booking process due to mental illness. NaphCare technically has a written initial screening policy that requires an intake screen

---

[1] Video exhibits are indicated by the preface of "V-…" and were filed under seal. *See* Dkt. #171.

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

upon admission and for all "mentally unstable" inmates to receive appropriate treatment and then written clearance *before* entering the facility. Dkt. 82-12 (Initial Screening Policy at ¶2). However, in practice NaphCare's custom was to simply place mentally ill inmates in isolation without medically screening them until their psychological symptoms subsided on their own. Bingham Decl., ¶3, Exh. 8, Deposition of Henry Tambe ("Tambe Dep.") at 78:6-18; *Id.* at ¶4, Exh. 9, Deposition of Brittany Martin ("Martin Dep.") at 107:2-3; *Id.* at ¶5, Exh. 10, Deposition of Rebecca Villacorta ("Villacorta Dep.") at 111:7-112:1; 130:1-135:13; *see also* Dkt. 82-9 (NaphCare's answer to Interrogatory No. 7: "Assuming the inmate is cooperative…"); *id.,* Dkt. 82-10, Exh. J (Martin answer to Interrogatory No 6: intake screen not completed because Damaris was deemed "uncooperative.").

Here, numerous NaphCare employees were aware that Damaris had not been medically screened and defended their decisions to not attempt a screen or send her for clearance at a hospital. Tambe Dep. at 82:1-8; Martin Dep. at 37:17-38:9; 41:25-43:1; Bingham Decl., ¶6, Exh. 11, Deposition of Sally Mukwana ("Mukwana Dep.") at 12:14-15:24. Plaintiffs do not anticipate that NaphCare will contest the existence of this custom because NaphCare's brief acknowledges it: "If an inmate is combative or otherwise unwilling or unable to participate in the booking screen, custody will not bring them to the booking nurse and the screening cannot take place until the inmate calms down or reaches a state that is amenable to participating in the intake screening process." Dkt. 148 at 4:10-13. Notably absent in the above passage from NaphCare's brief is any consideration of inmates who are "otherwise unwilling" because they are *unable* to participate in the screening process for mental health reasons.

Ms. Lothrop, a NaphCare MHP, described this problem as an inmate getting "stuck in booking." Bingham Decl., ¶7, Exh. 12, Deposition of Jessica Lothrop ("Lothrop Dep.") at 16:24-

17:5. Inmates with legitimate mental health problems were treated the same as inmates with discipline problems. Although NaphCare changed its policies after Damaris's death, at the time of Damaris's incarceration there were no policies addressing inmates that were uncooperative due to mental illness, Tambe Dep. at 79:15-22, and there was no maximum amount of time that a mentally ill inmate could spend "stuck in booking." Tambe Dep. at 67:8-87:14 (repeatedly acknowledging that there are no limits to how long an inmate can go without being booked); Villacorta Dep. at 111:7-112:1.

When an inmate becomes "stuck in booking," it causes two major problems. First, the conditions in booking are not appropriate for habitation. In booking there are no beds, the lights are left on 24 hours a day, and the temperature is cold. Dkt. 154-5 (SCORE Amended Responses to Plaintiffs First RFA); Bingham Decl., ¶8, Exh. 13, Deposition of Brenda Scott ("Scott Dep.") at 42:2-23. And second, according to NaphCare's director of nursing, if an inmate is never fully screened, a "treatment plan" is never created. Tambe Dep. at 169:25-170:8. A treatment plan can only be created by a doctor or nurse practitioner. *Id.* at 169:19-24. Treatment plans are vital to assuring an inmate's access to appropriate care, as they determine the frequency and nature of monitoring, *Id*. at 90:17-20, and medical rounds, *Id*. at 90:17-20; 93:3-7; 97:5. In other words, without an intake screen and treatment plan, there is no way to assure at-risk inmates are properly treated or even monitored for medical emergencies.

Plaintiffs' correctional nursing expert Rebecca Luethy also explains how the failure to send Damaris to the hospital when she was unable to engage in an intake screen constitutes a deliberately indifferent breach of the standard of care. Dkt. 83, ¶10, 10(a). Not surprisingly, because Damaris was never screened and a treatment plan was never created, NaphCare's monitoring over the next few days continued to be substandard. No vital signs were ever

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 4
2:19-cv-01987-RSM

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

properly taken and recorded.[2] Dkt. 83, ¶10(b)(1) (Luethly Decl.); Dkt. 84, ¶19.7.5 (Piel Decl.)

Long periods of time—17 hours, 14 hours, and 12 hours—elapsed between clinical notations

about Damaris's condition. Dkt. 83, ¶15 (Luethy Decl.) The fact that there was almost no

objective monitoring in the following days increased the danger to Damaris. *Id.* at ¶10(b),

10(b)(i-viii). Had the nurses conducted basic diagnostic testing, they would have observed

abnormal vital signs and other physiological evidence of her ketoacidosis and hyponatremia. *Id.*

at (b)(i). And if these problems were identified and addressed, they were easily treatable. Dkt. 85

(Wigren Decl.) at ¶18 ("…Ketoacidosis…can be corrected with medical treatment."); ¶19

("…Hyponatremia…can be corrected with medical treatment.") (Wigren Decl.); Dkt. 84 at ¶20.8

("…ketosis and hyponatremia are reversable and treatable causes of delirium.") (Piel Decl.).

Accordingly, NaphCare's policy to not screen and create treatment plans for mentally ill inmates

directly caused Damaris's death.

　　　　NaphCare was also on notice of the dangers of its policy. In the two years before

Damaris's death, Disability Rights Washington ("DRW"), an independent protection and

advocacy organization with a federal mandate to monitor and advocate for the conditions of

people with disabilities, conducted an extensive research project at SCORE ("the AVID

Project"). Bingham Decl., ¶9, Exh. 6 (AVID Report). There, DRW used the authority derived

from its federal mandate to investigate systemic deficiencies affecting people with mental illness

at SCORE. NaphCare's personnel are well aware of the AVID Project and have spoken with the

DRW staff. *See, e.g.,* Bingham Decl., ¶10, Exh. 14, Deposition of Nancy Whitney ("Whitney

Dep.") at 141:16-142:15.

---

[2] Although a factual dispute exists regarding the specifics, one NaphCare nurse claims to have taken a partial set of vital signs but never recorded them.

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

The AVID Project revealed numerous deficiencies in how mentally ill inmates were treated at SCORE. Many inmates did not receive timely mental health screenings or have documentation of individualized mental health treatment plans in their health records. In addition, SCORE's mental health system consisted primarily of psychiatric medication management, weekly MHP rounds in segregated units, and quick cell-front assessments. There was little or no individual counseling or group therapeutic programming available for inmates with mental illnesses, and a significant portion of inmates with serious mental illnesses and functional impairments were simply kept in solitary confinement without access to care. The AVID Project provided SCORE and NaphCare with clear notice of how their deficient policies and practices were harming—and would continue to harm—mentally ill inmates.

As a result of the AVID Project, SCORE committed to reducing delays in wait times to see psychiatric providers, AVID Report at 6, improve the creation and documentation of individualized treatment plans, *Id.* at 8, decrease the use of discipline against mentally ill inmates, *Id.* at 11, and decrease the use of solitary confinement for mentally ill inmates, *Id.* at 9. Unfortunately, NaphCare's policies were inconsistent with the promised reforms.

A 2017 NCCHC audit of NaphCare's services at the Washoe County jail also put NaphCare on notice that its form policies were insufficient. Bingham Decl., ¶11, Exh. 7 (NCCHC Audit). The NCCHC auditor noted deficiencies in the manner in which NaphCare's booking personnel conducted the pre-screening process, which determines whether an inmate was to be accepted into the facility. NCCHC Audit at 7. Additionally, the audit found that a "high percentage of the screening forms appearing to be incomplete." *Id*. Health assessments in the booking area were also deficient. Inmates were held in the booking area before assessment for too long, inadequate involvement by MHPs in the assessments led to insufficient assessment

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

of mentally ill inmates, and full mental health assessments were not occurring as required. In particular, the assessor wrote that the policies and training were "not sufficient for adequately assessing the complex mental health problems and mental illnesses that a substantial number of people who are incarcerated experience. Adequate and accurate assessment ensures accurate diagnosis and the development of an effective treatment plan." *Id.* at 9-10. To summarize, shortly before Damaris's death, the NCCHC warned NaphCare that its inadequate policies relating to mentally ill inmates were compromising the effectiveness of its treatment plans for those inmates.

The AVID Project and NCCHC audit put NaphCare on notice that without better policies and procedures to screen and provide care for mentally ill inmates, adverse medical and mental health outcomes were sure to occur.

**B. NaphCare's individual employees were deliberately indifferent to Damaris's medical needs**

1. <u>MHP Billie Stockton.</u> Due to the clear symptoms of mental illness that were observable even to a layperson. SCORE's booking sergeant, Sgt. Scott, reviewed the probable cause statement for information about Damaris's condition. There, she discovered that Damaris's husband told the arresting officers that Damaris had a mental health problem. Sgt. Scott contacted NaphCare MHP Billie Stockton and advised her as such. Scott Dep. at 31:4-21; 33:4-14. Sgt. Scott contemporaneously noted in SCORE's custody notes that she advised NaphCare about the reported mental health problem and requested an assessment.

Ms. Stockton denies that Sgt. Scott notified her about Damaris or provided any information about Damaris's known mental health issues. Bingham Decl., ¶12, Exh. 15, Deposition of Billie Stockton ("Stockton Dep.") at 95:1-21. The discrepancy between Sgt. Scott's recollection and Ms. Stockton's recollection was the subject of a SCORE internal

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

investigation even before this lawsuit began. Scott Dep. at 18:24-21:7; 32:7-18; Stockton Dep. at 60:22-64:11; Bingham Decl., ¶13, Exh. 1 (Emails between Stockton and DiCroce). This disagreement presents a classic material dispute of fact. If a juror were to believe Sgt. Scott, and not Ms. Stockton, they could certainly find that Ms. Stockton acted with deliberate indifference by not following up on Sgt. Scott's phone call requesting a mental health evaluation. NaphCare's claims that it is not "standard procedure" for SCORE corrections staff to provide medical or mental health information, Dkt. 148 at 7-9, highlights the gravity of Damaris's situation. It means Damaris was visibly unwell enough that Sgt. Scott took extraordinary measures to convey mental health information to NaphCare.

Even when Ms. Stockton eventually *did* see Damaris, her care was recklessly deficient. Ms. Stockton briefly glanced into Damaris's cell, where Damaris was naked and lying on her back, flailing her arms and legs in the air, while yelling. Bingham Decl., ¶14, V-2; ¶15, V-3; ¶16, V-4; Stockton Dep. at 21:14-22:21. Although Ms. Stockton initially claimed in her deposition that she spent three to five minutes trying to get Damaris's attention, the video proves that it was in fact less than 30 seconds. Bingham Decl., V-2.

Ms. Stockton justified her inaction by simply writing Damaris off as intoxicated. Bingham Decl., ¶17, Exh. 2 (Stockton Interrogatory Responses 1, 5, 7). However, Ms. Stockton's intoxication rationalization is nonsensical. Ms. Stockton first claimed she thought Damaris was intoxicated because Damaris was pacing and yelling, but then Ms. Stockton acknowledged that she was not close enough to see Damaris's eyes or note any other signs. Stockton Dep. at 23:20-25. Ms. Stockton then claimed that it is impossible to tell the difference between intoxication and mental illness unless you let a patient dry out for *five days*. *Id.* at 25:15-20; 52:18-53:24. In Ms. Stockton's opinion, even urines tests, social history, and medical history

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 8
2:19-cv-01987-RSM

Krutch Lindell Bingham Jones, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

are not helpful in determining the difference between intoxication and mental illness. *Id.* at 26:10-27:18. Accordingly, she chose to not even attempt to access SCORE's records because she was "positive" there would be nothing relevant—even though, in reality, these records would have included Sgt. Scott's note and the information from the arresting officers about her reported mental illness. *Id.* at 31:6-33:4. Ms. Stockton also chose not to speak with corrections officers in booking but offered no coherent reason why. *Id.* at 33:5-9. Ms. Stockton even went as far as claiming that if somebody told her that Damaris had a diagnosed mental health condition that she would not have done anything about it because she assumes everyone in jail is intoxicated. *Id.* 35:25-42:3. Assuming that literally every person booked into jail is intoxicated and providing no treatment for five days—regardless of information to the contrary—is not sound medical practice. Rather, it is an offensive display of Ms. Stockton's prejudices, and a reasonable juror could certainly find these opinions and practices to be recklessly indifferent.

Ms. Stockton's practice of assuming every inmate is intoxicated also violates the standard of care. Because medical conditions may mimic and confound psychiatric symptoms (and intoxication), medical evaluation should occur before psychiatric management to identify medical etiologies of a patient's condition and possible comorbidities requiring care. Dkt. 184 at ¶20.5 (Piel Decl.); Bingham Decl., ¶18, Exh. 16, Deposition of Dr. Jennifer Piel ("Piel Dep.") at 26:9-24; 46:13-21. In other words, physical causes need to be ruled out first.

2.    Booking Nurse Brittany Martin. NaphCare implies that Damaris was acting combatively when she was booked, but no testimony or other evidence supports this theory. Ms. Martin first saw Damaris as Damaris's limp body was dragged into a booking cell. Martin Dep. at 24:5-17; Bingham Decl., Exh V-1. Neither at that point nor any other time during Ms. Martin's

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 9
2:19-cv-01987-RSM

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

interactions with Damaris was Damaris combative. *Id.* at 24:21-22; 27:1-3; 58:16-19; 60:2-5; 67:18-19. There is also no evidence that corrections officers prevented a medical exam.

When Ms. Martin next saw Damaris at 3:55pm on December 30, 2017, she looked in Damaris's cell for approximately nine seconds and does not recall asking any questions. *Id.* at 57:19-58:15. Ms. Martin walked past Damaris's doorway two more times that afternoon, but she barely glanced in and made no effort to speak to Damaris. Damaris was sitting on the bench, not moving or saying anything. *Id.* at 66:6-67:17. *See also* Bingham Decl., ¶19, Exh. V-5; ¶20, V-6. The last time Ms. Martin saw Damaris was on December 30, 2017, Ms. Martin glanced in Damaris's window with another nurse, Joan Kosanke. Neither Ms. Martin nor Ms. Kosanke have any recollection of actually trying to communicate with Damaris. Martin Dep. at 67:20-68:20; Bingham Decl., ¶21, Exh. 17, Deposition of Joan Kosanke ("Kosanke Dep.") at 57:6-12. *See also Id*. at ¶22, Exh. V-7; ¶23, V-8.

It was not until the morning of December 31, 2021—after Damaris spent the night awake in a cold cell without bedding or a blanket and with the lights on—that Ms. Martin actually made any effort to speak to Damaris with the help of a Spanish speaking corrections officer. Despite Ms. Martin's insistence that she charted this information, Martin Dep. at 75:18-20, no such charting has been produced. As such, there is no reliable way to determine exactly what happened. However, the surveillance video shows that Damaris was naked, stumbling around her cell, and talking to her own imagination while the Spanish-speaking officer was at the door. Bingham Decl., ¶24, Exh. V-9.

Ms. Martin walked by Ms. Rodriguez's cell three more times on December 31, 2017, without any meaningful attempts at communication. At approximately 10:21am, Damaris was naked and moving around her cell, but Ms. Martin did not even break her stride as she walked

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 10
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

by. *Id.*, ¶25, Exh. V-10; ¶26, V-11. At 4:51pm, Damaris was clothed in a jail uniform but sitting down and apparently crying in a cell that was littered with discarded food. Martin briefly looked through the window and left. *Id.* at ¶27, Exh. V-12; ¶28, V-13. At 8:10pm, Damaris was kneeling over the toilet and then stumbling around the cell with a pained expression on her face. Ms. Martin briefly looked through the window but did not speak to Damaris. *Id.* at at ¶29, Exh. V-14; ¶30, V-15.

Despite Ms. Martin's belief that she needed an interpreter to communicate with Damaris, she never made another attempt to bring one—evidencing the fact that she had no intention of actually speaking with her. Further, there is no evidence that Ms. Martin ever made any effort to take vital signs, complete an intake screen, or assess Damaris's mental or physical health in any way. Although Ms. Martin claimed in her deposition that she was not aware of any mental health issues, Martin Dep. at 75:14-17; 77:12-85:6, a reasonable factfinder could find that Ms. Martin's testimony is not credible. Even to a layperson, it is obvious that Damaris was having mental health issues.

NaphCare states that "…based on her presentation, Nurse Martin believed Rodriguez was under the influence of a stimulant." Dkt. #148, at 11:13-15. Presumably NaphCare makes this factual assertion because it believes Ms. Martin had a more limited duty to care for an intoxicated inmate. Plaintiff need not address any legal disagreement with that argument because it is contradicted by the facts. Ms. Martin has not provided a declaration and *nothing* in NaphCare's citation to the record (Dkt. #148 cites Martin Dep. at 29:5-22) states that Ms. Martin thought Damaris was under the influence of a stimulant. In fact, counsel inquired multiple times as to whether and what particular drug (or alcohol) Ms. Martin thought Damaris was impaired by

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 11
2:19-cv-01987-RSM

**Krutch Lindell Bingham Jones, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

and was met with continual and repeated "I don't know" answers. Martin Dep., at 31:11-15; 37:11; 43:2-19; 77:22; 78:3; 89:25.

NaphCare also claims that, "[o]ther than monitoring and ensuring they are safe, there is not much the booking nurse can do other than wait for the inmate to calm down." Dkt. #148 at 11:15-17. This is incorrect. Nurse Martin specifically testified that she had the ability to direct that an inmate be sent to the hospital. "Q. Okay. And then it would be your decision, would it not, whether an arrested person was booked into SCORE or whether they would be sent to the hospital? A. Correct." Martin Dep. at 22:10-14.

Furthermore, Nurse Martin *did* believe that Damaris should be moved to the medical unit for closer examination due to her behavior. However, she also *knew* that Damaris would not be moved, because she was not "changed at the time." *Id.* at 35:5-11. A reasonable interpretation of these facts is that Ms. Martin believed that Damaris needed more frequent monitoring, knew that she was not going to get that more frequent monitoring, and had the power to send her to the hospital, but did nothing—she just handed her off to the next shift and let Damaris become someone else's problem.

According to Plaintiffs' nursing expert, Ms. Luethy, Ms. Martin's actions and failures to act were inadequate, reckless, and failed to meet the standard of care. Bingham Decl., ¶31, Exh. 18, Deposition of Rebecca Luethy ("Luethy Dep.") at 49:24-53:25 ("…she is required to initiate the nursing process…and she just didn't do it…She said she'd continue to…monitor; but she didn't say what she was monitoring for."); 57:15-61:20 ("She's to initiate the nursing process…she's describing travail, but all she wants to do is continue to monitor…standard of care is to communicate the status of the patient and changes…to appropriate team members, and

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 12
2:19-cv-01987-RSM

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

she just didn't do it. None of them did it."); 67:6-76:1[3] ("…the minimum standards advise nurses to initiate a nursing process…delegate, supervise, to be a patient advocate, communicate the status of a patient in the appropriate time to the appropriate person…and deliberate indifference is just consciously not doing that."); 82:1-18 (lack of charting further evidences indifference towards Damaris).

3.    <u>Henry Tambe</u>. Mr. Tambe had both administrative and clinical roles at SCORE. As a clinical nurse, Mr. Tambe was charged with the safety and well-being of those under his care. As NaphCare implicitly concedes in its brief, Mr. Tambe has a responsibility to escalate an inmate's care if the inmate presents any "risk factors" or "urgent medical needs. Dkt. #148 at 13:14-16.

Mr. Tambe visited Damaris's cell twice. The first time was at approximately 4:22am on December 31, 2021. Damaris was naked and talking to herself in her cell. Mr. Tambe literally threw his hands up in the air and immediately walked away. Bingham Decl., ¶32, Exh. V-16; ¶33, V-17. The second time Mr. Tambe walked by, he did not even look inside. *Id.* at ¶34, Exh. V-18.  Although NaphCare creatively frames this refusal to even look in the cell and check on her as a "verbal wellness check," a juror could view it as a nurse who abrogated his professional duties because he was embarrassed to look at a naked woman. Further, screaming *is* a sign of distress. Especially where a welfare check is purely verbal, what sound could be worse than screaming?[4]

Plaintiffs' expert Ms. Luethy also addresses Mr. Tambe's failure to provide access to care. Luethy Dep. at 75:2-76:1.[5] ("[Tambe] refers to a note on Damaris's door saying that she's

---

[3] In response to this citation, Plaintiff anticipates that NaphCare may argue it was not bound by SCORE's policies. This argument is contradicted by the Health Services Agreement, which requires NaphCare to follow SCORE's policies. Dkt. 82-11 at ¶11.2 (Health Services Agreement) ("contractors…and their employees are required to comply with….SCORE policies and procedures.").

[4] As discussed below, NaphCare is also defending its employees' visual welfare checks in which Damaris was writhing in pain, gagging, and vomiting.

[5] Note that Mr. Tambe's name is inaccurately spelled "Camby" in the deposition transcript.

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 13
2:19-cv-01987-RSM

naked, and then [Tambe] says: the inmate did not respond to my verbal wellness check, screaming in her cell with no signs of distress…how can a person scream with no signs of distress?...without a documented intake screen…screaming in her cell and increasing her tone with no referral to a provider is troublesome. Particularly by the Director of Nursing."); 76:9-80:14 (Describing reckless indifference by Mr. Tambe based on his supervisory role and lack of action responding to Damaris's inability to engage with him.).

The manner in which NaphCare attempts to frame the facts relating to Mr. Tambe reveals the same mindset that caused Damaris's death. NaphCare's brief claims Damaris raised her voice in "defiance" and was "safe and not causing herself harm." This attitude is callous. She was not being "defiant." She was mentally and physically ill. And surely NaphCare must now acknowledge that she was not "safe."

As Director of Nursing, Mr. Tambe was responsible for supervising "leading, directing, managing, and evaluating all clinical nursing operations" and "assuring all operations are in compliance with contract requirements, NCCHC, ACA, and professional nursing standards" at SCORE. Bingham Decl., ¶36, Exh. 3 (Director of Nursing job description). By allowing Damaris to remain unscreened, Mr. Tambe conveyed to the nurses below him that ignoring her was an acceptable practice. A reasonable jury could find that it was not.

4.      <u>Sally Mukwana</u>. Ms. Mukwana observed Damaris a number of times on the evening of December 31, 2017, taking over as booking nurse after Ms. Martin signed out. However, Ms. Mukwana did not ask any information about Damaris in the passdown meeting from Ms. Martin. Mukwana Dep. at 20:13-16. She made no effort to understand whether Damaris had slept. *Id.* at 24:19-23. She made no effort to understand why Damaris had not been screened, even though she had been there for a day. *Id.* at 14:2-4. She made no effort to secure an interpreter, even

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 14
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

though Damaris was communicating in Spanish. *Id.* at 26:24-27:24. Further, she allowed Damaris to continue her stay in custody without an intake screen.

Plaintiffs' nursing expert Ms. Luethy opines that Ms. Mukwana acted in a deliberately indifferent manner by declining to conduct a booking screen due to Damaris's mental status. Luethy Dep. at 86:16-89:19 (…notes she's unable to do the booking screening due to the patient's mental status. That's almost like saying I can't take care of you, you're too sick. It just doesn't make sense…").

Plaintiffs acknowledge that a jury could find that Ms. Mukwana was simply following an accepted NaphCare practice—placing mentally inmates in solitary confinement rather than conducting an intake screen. If so, Ms. Mukwana's interests may become adverse to NaphCare's interests because a jury may find that Ms. Mukwana was following the practices set forth by her supervisors (i.e., Mr. Tambe and Ms. Villacorta). However, if NaphCare attempts to deny its failures at a policy level, then it will be up to a jury to decide between Ms. Mukwana and NaphCare. Further, Ms. Mukwana still has professional obligations to provide competent care, regardless of NaphCare's policies.

5.      <u>Brooke Wallace.</u> Ms. Wallace observed Damaris a number of times on January 1 and January 2, 2018. Ms. Wallace observed Damaris in varying states of lucidity. At points, Damaris was naked and yelling at the voices in her head. At other points, Damaris was cooperative enough to provide a urine sample. However, Ms. Wallace did not take advantage of Damaris's brief periods of lucidity to gather any information, take vitals, or do any other objective tests. Ms. Wallace acknowledges the reason she could not assess much of Damaris' behavior: "I think the issue was the language barrier. You know, if you can understand what someone is saying clearly, that can give you a much greater insight to what their mental processes are. And I didn't

**Krutch Lindell Bingham Jones, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

have that opportunity with her." Bingham Decl., ¶37, Exh. 19, Deposition of Brooke Wallace ("Wallace Dep.") at 21:6-10. Ms. Wallace was also working after the urine sample confirmed that Damaris was not under the influence of intoxicants and should have been *certain* that her behavior was caused by mental and/or physical illness but Ms. Wallace still failed to escalate treatment. *Id.* at 58:8-59:21.

NaphCare attempts to justify Ms. Wallace's inaction by claiming that Damaris was psychologically improving and did not display any physically concerning symptoms on January 2, 2018. Both of these assertions are inconsistent with the facts. On January 2, 2018, Ms. Wallace observed Damaris numerous times slouched over with her head down. Bingham Decl., ¶38, V-20; ¶39, V-21 (12:49pm on 1/2/18); ¶40, V-22; ¶41, V-23 (3:12pm on 1/2/18); ¶42, V-24; ¶43, V-25 (4:02pm on 1/2/18); ¶44, V-26; ¶45, V-27 (4:04pm on 1/2/18). Ms. Wallace then observed Damaris running to the toilet and gagging into it. *Id.* at ¶46, V-28; ¶47, V-29 (4:51 on 1/2/18); *see also* Dkt. 154-2 at 2 (NaphCare Chart notes) (Wallace states: "Seen leaning over toilet, apparently gaging [sic].). And the final time Ms. Wallace walked past Damaris's cell, Damaris was kneeling on the floor in her underwear rocking her head up and down in obvious distress. Bingham Decl., ¶48, Exh. V-30; ¶49, V-31. Based on the video evidence, a reasonable juror could certainly disagree with NaphCare's interpretation of the facts.

Ms. Wallace, who monitored Damaris for two consecutive days, also failed to thoroughly document that Damaris was not eating. Not eating is considered a form of self-harm. Piel Dep. at 27:14-28:23. Although Ms. Wallace thought this was the corrections officers' responsibility and not her own, Wallace Dep. at 61:5-9; 62:19-22, Dr. Piel disagrees because in the medical unit food consumption should be monitored by medical staff. Piel Dep. at 48:16-24.

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

6.     <u>Joan Kosanke</u>. Joan Kosanke was on duty on December 30, 2017, and January 3, 2018, and was the last nurse to see Damaris alive. It was under Ms. Kosanke's watch that Damaris excessively consumed and vomited water and then lost consciousness and died. NaphCare's motion implies that Ms. Kosanke did nothing because Damaris was combative or otherwise uncooperative.[6]  However, Ms. Kosanke's testimony tells a different story: When directly asked, Ms. Kosanke was unable to state that she felt threatened by Damaris. Kosanke Dep. at 74:16-75:19. Ms. Kosanke also conceded that Damaris was not combative. *Id.* at 57:10-12.

Ms. Kosanke first saw Damaris on December 30, 2017, when she was working in booking. Ms. Kosanke believes the reason Damaris was never medically assessed was because she spoke Spanish. Kosanke Dep. at 57:6 to 58:4. Ms. Kosanke next saw Damaris on January 3, 2018. NaphCare's recitation of the facts relating to Ms. Kosanke suggests that Ms. Kosanke never saw anything concerning about Ms. Rodriguez. Dkt. 148 at 16:11-17:7. However, Ms. Kosanke's own chart note from January 3, 2018 completely contradicts NaphCare's factual argument: "IM attempting to induce vomiting several times today, yelling in spanish and defecating on floor. MH observed her vomiting large quantity of water, so moved to dry cell." Dkt. 154-2 at 1.[7] This chart note shows proves that while Damaris was still alive, Ms. Kosanke knew she was vomiting, in distress, and acting extremely abnormally.

---

[6] Plaintiffs also acknowledge that Ms. Kosanke's interrogatory answers describe Damaris as uncooperative and generally claim ignorance about Damaris's condition, but when asked to explain her discovery responses at her deposition, Ms. Kosanke had no recollection of ever writing the interrogatory answers and was unable to defend the assertions she made in the interrogatory answers. In her deposition, she acknowledges that she did not know whether Damaris was unwilling or unable to cooperate, but that she did not believe she was intoxicated. She also acknowledged—albeit circuitously and self-contradictorily—that she believed Damaris had mental health problems. Kosanke Dep. at 38:13-46:5.
[7] Although Ms. Kosanke attempted during her deposition to deny that Damaris was self-inducing vomiting, she did indicate as such in her chart notes and attempted to acknowledged that it was apparent in the videos before her attorney suggested that she change her answer. *Id.* at 45:13-46:5.

**Krutch Lindell Bingham Jones, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

The videos also contradict Ms. Kosanke's arguments. Bingham Decl., ¶52, Exh. V-32; ¶53, V-33. The videos show Damaris standing over the toilet with her hands around her throat and leaning forward to gag before she put her face in her hands and slightly swayed back and forth. Ms. Kosanke claim that Damaris "could have been scratching [her throat]" rather than choking herself. Kosanke Dep. at 67:16-25. This is not credible testimony. It is also not consistent with the observations that other NaphCare employees made around the same time. *See, e.g.,* Villacorta Dep. 203:22-204:2; Dkt. 154-2 at 1 (NaphCare chart notes) (3:16pm Nancy Whitney chart note: "…self-inducing vomiting by choking herself…").[8]

Despite these obvious mental and physical symptoms, Ms. Kosanke never tried to conduct an intake screen, communicate with Damaris, or make any real effort at diagnosis or procuring treatment. NaphCare argues that a half-hearted attempt at taking partial vital signs exonerates Ms. Kosanke. However, NaphCare and Ms. Kosanke both acknowledge that Ms. Kosanke failed to chart the vital signs. Dkt. 148, at 17:22 (n. 92). NaphCare also neglects to mention that Ms. Kosanke does not claim to have taken a complete set of vital signs, which includes temperature, heart rate, blood pressure, and respiratory status. Bingham Decl., ¶50, Exh. 20, Deposition of Rita Whitman, ARNP ("Whitman Dep.") at 13-16; *Id.* at ¶51, Exh. 21, Deposition of Gary Vilke, MD ("Vilke Dep.") at 37:14-20. At most, Ms. Kosanke measured Damaris's blood pressure and pulse. Further, Ms. Kosanke acknowledged that she had no understanding of water intoxication, and therefore would have had no idea what vital readings were relevant for a patient at risk of water intoxication. Kosanke Dep. at 30:4-32:2.

---

[8] These citations do not refer to the exact moment that Ms. Kosanke was in front of the cell. Rather, the citations are meant to show that when other NaphCare employees saw Damaris acting in a similar fashion they did not have any difficulty determining that she was choking herself. Certainly, nobody other than Ms. Kosanke has tried to claim that she repeatedly put her hands around her throat in a choking motion because she wanted to scratch her neck.

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

It is also worth mentioning that Ms. Kosanke has no independent recollection of taking any vital signs and "can't be sure" about the results because she failed to record them. Kosanke Dep. at 71:19-73:19. NaphCare's argument is based, not on Ms. Kosanke's recollection, but on an assumption that she would have written the results down if they were abnormal. This is an illogical assumption to make because everyone agrees that Ms. Kosanke's recordkeeping was improper. It would be entirely reasonable for a juror to not assume she would have recorded an abnormal reading properly when she admits other recordkeeping mistakes.

7.    <u>Nancy Whitney</u>. Nancy Whitney was NaphCare's Director of Mental Health and was coincidentally working at the time Damaris took a turn for the worst. Ms. Whitney, a social worker, acknowledged during her deposition that she witnessed Damaris in physical distress on the afternoon of January 3, 2018:

> So I came to the door and she was, as I recall, on the floor and she was clutching her neck and coughing, and then she started to vomit. And it looked to me like someone had turned on a garden hose. There was just a very full force of water that she vomited and it took her a few seconds to get it all out.

Whitney Dep. at 48:15-21; see also Bingham Decl., ¶54, Exh. V-34 (video of Whitney watching Damaris vomit).

Ms. Whitney explained that the excessive vomiting was a physical concern because it evidenced excessive water consumption, which leads to chemical imbalances Ms. Whitney refers to as water intoxication (a colloquial term for hyponatremia). *Id.* at 54:16-55:25. Ms. Whitney understood the severity of the situation in part because of previous patients suffering from excessive thirst and water consumption (psychogenic polydipsia). *Id.* at 56:1-59:10.

Ms. Whitney made a chart note stating that the ARNPs were notified, but there is no other record consistent with the notification occurring. NaphCare Chart Notes at 1 (Ms. Whitney at 1/3/2018 3:16pm). Ms. Whitney claims to have told ARNP Whitman that:

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 19
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

…I saw the patient vomiting up a lot of water, that it was too much water for a person, and that I didn't know if that was because she was obsessively compulsively drinking a lot of water.

I was concerned that she was at risk for water intoxication. I let them know that she had been moved to the dry cell and that there would be monitoring going forward.

Whitney Dep. at 62:21-63:8.

ARNP Whitman initially denied that the conversation took place at all. Dkt. 154-13 (Whitman Responses to Plaintiff's First Discovery Requests, signed March 3, 2020) ("…defendant Whitman responds that she has not discussed Ms. Rodriguez with anyone other than her attorney"). However, over the last year ARNP Whitney had multiple suggestive conversations with ARNP Whitman to make sure ARNP Whitman "remembered" the conversation. Whitman Dep. at 44:24-45:25. And then after Ms. Whitney's deposition, ARNP Whitman reversed course and amended her discovery responses to say that a conversation between Ms. Whitney and ARNP Whitman did occur on January 3, 2018. Dkt. 154-14 (Whitman Second Supplements Responses to Plaintiff's First Discovery Requests signed May 28, 2021) ("…As I reflect further on the information provided by Ms. Whitney, at this time, I can state that I have a very vague recollection of Nancy Whitney stopping me in the medical unit…I am not confident that I was specifically told the inmate's name.")

Even with Ms. Whitney's request that ARNP Whitman change her testimony to remember the January 3, 2018, conversation, ARNP Whitman denied being advised the level of detail that Ms. Whitney claims to have provided. Whitman Dep. at 43:14-44:23. And of course, if that level of detail had actually been provided, ARNP Whitman would have conducted an immediate physical examination. Whitman Dep. at 7:15-8:22. In a refreshing display of honesty, ARNP Whitman acknowledged that she would not have been able to recall the January 3, 2018,

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 20
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

conversation at all without Ms. Whitney's recent suggestive inquiries. Whitman Dep., at 45:22-25; 47:3-48:12.

A juror could reasonably believe that Ms. Whitney never properly notified ARNP Whitman—despite her understanding of the potential severity of water intoxication—and then lied about it after the fact so she did not get in trouble.

8.   <u>Rebecca Villacorta</u>. As Health Services Administrator, Ms. Villacorta had "overall administrative responsibility within the facility."  These responsibilities included ensuring that all operations are in compliance with contract requirements, NCCHC, ACA, and professional nursing standards. Bingham Decl., ¶55, Exh. 4 (HSA job description). In other words, Ms. Villacorta was personally responsible for assuring that NaphCare's policies, procedures, practices, and training were adequate. Accordingly, Ms. Villacorta was personally responsible for the lack of any policies and procedures to account for mentally ill inmates that are "stuck in booking" (i.e., not screened due to mental illness).

Ms. Villacorta also made clinical errors. Ms. Villacorta signed off on Ms. Whitney's plan to put Damaris' in a dry cell even though she never actually saw Damaris or made any effort to assess her physical symptoms. Villacorta Dep. at 156:12-14. Plaintiffs' nursing expert Ms. Luethy explained that Ms. Villacorta should not have relied on Ms. Whitney's unqualified assessment in the first place because Ms. Whitney was a social worker and not a somatic provider. Dkt. 83, ¶17.

Additionally, Ms. Villacorta never notified a provider even though she acknowledges that Damaris needed elevated care. Villacorta Dep. at 205:2-11. Ms. Villacorta explains this omission by stating that she was relying on Ms. Whitney to make the notification. *Id.* at 175:3-176:2; 205:2-11. Ms. Whitney denies any recollection of a conversation with Ms. Villacorta. Whitney Dep.

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 21
2:19-cv-01987-RSM

**Krutch Lindell Bingham Jones, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

at 71:13-19. A juror could reasonably believe Ms. Whitney's side of the story and find that Ms. Villacorta never made the provider notification that she knew was necessary.

Furthermore, once a urine test ruled out the possibility of drugs causing Damaris' symptoms, Ms. Villacorta instructed that she wanted Damaris "continuously monitored in medical" but did not call a provider and did nothing to communicate to her staff that continuous monitoring occur. Villacorta Dep. at 174:23-175:9. The continuous monitoring never happened. Ms. Kosanke, the nurse responsible for monitoring Damaris, walked past Damaris's cell only a few times on January 3, 2018, and there is no evidence that she made any effort to monitor her after moving her to a dry cell. Further, Ms. Kosanke did not disclose having any conversations with Ms. Villacorta or anyone else about continuous monitoring. Bingham Decl., ¶56, Exh. 5 (Kosanke discovery responses) (no conversation about continuous monitoring disclosed in response to Interrogatory No. 8). Accordingly, there are two possible scenarios here—that Ms. Villacorta never actually ordered continuous monitoring, or Ms. Kosanke ignored the order. Because Ms. Villacorta never made a chart note about heightened monitoring, a juror could reasonably believe Ms. Kosanke that no conversations or orders regarding continuous monitoring ever occurred.

9.    Rita Whitman. ARNP Whitman was the on-site medical provider on the afternoon of January 3, 2018. ARNP Whitman never actually saw Damaris, but after reviewing the surveillance video of the time period when Ms. Whitney was watching Damaris, she unequivocally agreed that the continuous vomiting constituted an immediate medical concern. Whitman Dep. at 7:15-8:1. Because of her state of physical distress, ARNP Whitman also agreed that Damaris needed an immediate physical assessment. Whitman Dep. at 8:2-8:22. Despite the undisputed need for medical care, no ARNP or doctor ever saw Damaris.

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

Plaintiffs strongly suspect that Ms. Whitney never actually had the January 3, 2018, conversation with ARNP Whitman, but it is impossible to rule out the other potential factual scenarios. If the conversation did take place, then either Ms. Whitney recklessly failed to provide sufficient information to ARNP Whitman or ARNP Whitman failed to act after being provided with information related to Damaris's admittedly serious medical need. Plaintiffs believe it is more likely that a jury will blame Ms. Whitney than ARNP Whitman, but because there are two potentially adverse defendants giving contradictory testimony, this decision should be left to the jury to decide.

### III.   ISSUES PRESENTED

A(1).   Whether Plaintiffs demonstrate material issues of fact related to whether each individual defendant was deliberately indifferent to Damaris's medical needs?

A(2).   Whether Plaintiffs demonstrate a material issue of fact related to whether NaphCare's policy of placing mentally unstable inmates in solitary confinement—rather than obtaining medical clearance or conducting an intake screen—was a moving force behind the constitutional violation?

B.   Whether Plaintiffs demonstrate a material issue of fact related to whether Damaris had a mental impairment that substantially limited major life activities and she was excluded from medical treatment due to symptoms of her disability?

C.   Whether the Court should strike the declaration of Elliott Wade, MD, who was not disclosed as a witness until August 6, 2021, and did not author a report.

### IV.   EVIDENCE RELIED UPON

Plaintiffs rely on the Declaration of J. Nathan Bingham in Support of Plaintiffs' Opposition to NaphCare's Motion for Summary Judgment and the Court file. All deposition transcripts cited herein are exhibits to Mr. Bingham's declaration.

### V.   AUTHORITY

**A. NaphCare and its employees were deliberately indifferent to Damaris's medical needs**

1. The objective deliberate indifference standard applies to Plaintiffs' Fourteenth Amendment claims

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 23
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

"[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an *objective* deliberate indifference standard." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-1125 (9th Cir. 2018) (citing *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (internal quotations omitted)). Under this objective deliberate indifference standard, the elements of a pretrial detainee's medical care claims against an individual defendant are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. Under the third element, a defendant's conduct must be objectively unreasonable, "a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* at 1125 (citing *Castro*, 833 F.3d at 1071) (internal quotations omitted). "Thus, [in a Fourteenth Amendment claim] the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989)). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (citing *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 24
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

Cir.1998)). "The requisite causal connection can be established ... by setting in motion a series of acts by others or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08 (citing *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir.2001)) (internal quotations omitted).

2.  NaphCare can be independently liable for its deficient policies and the omissions of its final policy makers

Entities may also be directly liable for constitutional violations related to their policies. Policies may include written policies, unwritten customs and practices, failure to train employees on avoiding certain obvious constitutional violations, and single constitutional violations so inconsistent with constitutional rights that even such a single instance indicates deliberate indifference of the entity. *Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). "[W]hen execution of a government's[9] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).[10]  Both affirmative actions and omissions may qualify as policies under *Monell*. *Canton*, 489 U.S. at 396 ("Where a Section 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is

---

[9] Here, NaphCare is not literally a government entity, but is still subject to *Monell* liability as a private entity acting under the color of state law. *See, e.g., Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1139 (9th Cir. 2012); Woodward v. Correctional Med. Serv. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir.2004); *Sanders v. Glanz*, 138 F.Supp.3d 1248 (N.D. Okla. 2015).

[10] Plaintiffs disagree with NaphCare that *Monell*'s *respondeat superior* preclusion applies to §1983 claims against private entities acting under the color of state law, as the *respondeat superior* preclusion has never been extended to private entities in the Ninth Circuit, as discussed *Oyenik*, 696 Fed.Appx. at n. 1. However, because Plaintiffs are able to satisfy the *Monell* standard, no further argument is offered on the applicability of *respondeat superior* preclusion.

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 25
2:19-cv-01987-RSM

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.")

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy," *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), holding modified by *Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). While one or two incidents are insufficient to establish a custom or policy, *see Davis v. City of Ellensburg*, 869 F.2d 1230, 1234 (9th Cir. 1989), the Ninth Circuit has not established exactly what number of similar incidents would be sufficient to constitute a custom or policy. However, the "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Oyenik v. Corizon* Health Inc., 696 F. App'x 792, 794 (9th Cir. 2017) (unpublished) (holding that a pattern of behavior toward a single individual amounted to a custom or practice). A single decision may also subject an entity to constitutional liability when it is made by an official with "final policymaking authority" when the decision represents official policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

3. Each of the individual NaphCare defendants was aware of but deliberately indifferent to Damaris's serious medical needs

*MHP Billie Stockton:* A reasonable juror could determine that Sgt. Scott notified Ms. Stockton about Damaris's known mental health conditions and that Ms. Stockton was deliberately indifferent to Damaris's medical needs by disregarding the notification. A reasonable juror could also determine that Ms. Stockton observed Damaris for only 30 seconds, rather than Ms. Stockton's claimed three to five minutes, due to Ms. Stockton's misguided belief that all inmates should be presumed intoxicated and not provided with other treatment for five days, and that such treatment was deliberately indifferent towards Damaris's condition (not to

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 26
2:19-cv-01987-RSM

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

mention intoxicated inmates that may also need medical or mental health attention). Had Ms. Stockton properly diagnosed Damaris with a mental health disorder rather than intoxication and facilitated treatment, Damaris would have survived.

*Brittany Martin, RN:* A reasonable juror could find that Ms. Martin made no legitimate effort to evaluate or communicate with Damaris until the morning of December 31, 2018, and that Ms. Martin did not have a valid reason for the delay because there is no evidence that Damaris was combative or threatening towards Ms. Martin. A reasonable juror could also find that Ms. Martin's claim that she believed Damaris was not experiencing any mental health or other medical issues is not credible and that Ms. Martin should have made a more legitimate effort at a facilitating treatment, conducting physical screening, or at least more carefully observing Damaris. Further, there is no evidence, whatsoever, that Ms. Martin believed Damaris was under the influence of a stimulant and therefore this excuse cannot justify Ms. Martin's inaction. Had Ms. Martin facilitated treatment, Damaris would have survived.

*Director of Nursing Henry Tambe, RN:* A reasonable juror could find that Mr. Tambe could not have reasonably determined that screaming was not a sign of distress and that Mr. Tambe's refusal to look at Damaris or attend to her distress was deliberately indifferent. Furthermore, as a supervisor, Mr. Tambe acquiesced in Damaris's constitutional deprivation by knowing that she had not been medically screened but not doing anything about it. Mr. Tambe's chart notes which took no action—which would have been visible to all future nurses— implicitly ratified that lack of medical screening. *See Hansen*, 885 F.2d at 646. Had Mr. Tambe either facilitated treatment or properly instructed nurses under his supervision to facilitate treatment, Damaris would have survived.

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

***Sally Mukwana, RN:*** A reasonable juror could find that Ms. Mukwana was deliberately indifferent to Damaris's medical needs by failing to conduct an intake screen or make any real efforts to evaluate Damaris's condition. Had Ms. Mukwana facilitated treatment, Damaris would have survived.

***Brooke Wallace, RN:*** Ms. Wallace failed to gather information or conduct an intake screen on Damaris due to the language barrier, and also failed to make any efforts to obtain an interpreter. Ms. Wallace also *confirmed* that Damaris was not intoxicated and therefore must be suffering from a mental or physical illness, but still failed to act. Ms. Wallace's excuse for her inaction—that she thought Damaris was improving—is not credible in light of Ms. Wallace's observations of Damaris on January 2, 2018, during which she saw Damaris gagging into the toilet and otherwise in obvious distress. As such, a reasonable juror could find that Ms. Wallace was deliberately indifferent to Damaris's medical needs.

Ms. Wallace also tried to hedge her argument by claiming she could not be *certain* Damaris was gagging (even though she said so in her chart note) because she could not see Damaris's whole face. Wallace Dep. at 15:10-18:22. A nurse is not allowed to "see no evil and hear no evil." If a nurse suspects a patient is in distress, they cannot avert their eyes to avoid responsibility. If they are on notice of a potential problem, it is their job to investigate it. Further, a reasonable juror could determine based on the videos and Ms. Wallace's contemporaneous chart notes that Damaris was in fact gaging. Had Ms. Wallace facilitated treatment, Damaris would have survived.

***Joan Kosanke, RN:*** Ms. Kosanke also declined to medically assess Damaris due to the language barrier, but also did not even try to obtain an interpreter. Although Ms. Kosanke claims she had no reason to believe Damaris needed medical attention, the evidence does not support

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

this claim. Ms. Kosanke was aware that Damaris was excessively vomiting, defecating on the floor, engaging in self-harm, and generally in physical distress. Although Ms. Kosanke claims Damaris may have been "scratching her neck," rather than choking herself, this claim is not credible in light of the video evidence and other witnesses who believe that Damaris was choking herself. Further, Ms. Kosanke admitted that she had no reason to believe that Damaris was combative or uncooperative. A reasonable juror could find that Ms. Kosanke's failure to take any affirmative action to assist Damaris was deliberately indifferent to Damaris's medical needs. Had Ms. Kosanke facilitated treatment, Damaris would have survived.

*MHP Nancy Whitney:* Ms. Whitney observed Damaris vomiting "like someone had turned on a garden hose" and was aware that Damaris was in imminent danger of water intoxication. Further, a material factual dispute exists as to whether Ms. Whitney even made an effort to notify a medical provider. NaphCare attempts to frame cutting off Damaris's water and then leaving her alone without medical attention as *action*, but a reasonable juror could also perceive that as recklessly indifferent *inaction*. Had Ms. Whitney facilitated treatment—or at least not interfered with the duties of the somatic providers—Damaris would have survived.

*Health Services Administrator Rebecca Villacorta, RN:* A factual dispute exists as to whether Ms. Whitney, Ms. Villacorta, or ARNP Whitman was at fault for the fact that no nurse practitioner or doctor ever saw Damaris. Although Plaintiffs tend to believe Ms. Whitney was at fault, this is a conflict between defendants that a reasonable juror could resolve adversely to any combination of those three defendants. Amongst those possibilities, a reasonable juror could find that Ms. Villacorta was deliberately indifferent to Damaris's medical needs by failing to communicate her need for medical attention to ARNP Whitman and failing to assure that Damaris was continuously monitored.

Further, Ms. Villacorta was the top administrator for NaphCare at SCORE and has supervisor liability for acquiescing in Damaris's lack of a medical screen. During her deposition, Ms. Villacorta explicitly endorsed the lack of a medical screen, which evidences her ratification of this policy. *See Hansen*, 885 F.2d at 646. Had Ms. Villacorta either facilitated treatment or properly instructed nurses under her supervision to facilitate treatment, Damaris would have survived.

***Rita Whitman, ARNP:*** ARNP Whitman is also a party to the factual dispute with Ms. Whitney and Ms. Villacorta regarding whose fault it was that Damaris never saw a medical provider after her profuse vomiting. Although Plaintiffs admittedly believe ARNP Whitman is the least likely of those three defendants for a jury to find a fault for the failed communication, it is still possible that a reasonable juror could find Ms. Villacorta and Ms. Whitney more credible. Where a factual dispute exists between three defendants, the Court should not interfere with the province of the jury. If the jury finds that ARNP Whitman received the information Ms. Whitney claims to have provided, then ARNP Whitman's failure to conduct a physical exam and provide treatment contributed to Damaris's death.

4. <u>NaphCare is liable under §1983 because its practice of not screening mentally ill inmates caused the individual defendants' failure to facilitate treatment</u>

NaphCare's custom of not screening mentally ill inmates or providing them with treatment plans is what enabled the inactions of NaphCare's nurses and MHPs. The independent audits warned NaphCare of the risks of delayed intake screens and allowing mentally ill inmates to become stuck in booking. However, the risks of placing unscreened and mentally ill inmates in solitary confinement without treatment plans are obvious—and NaphCare's lack of action to correct it before Damaris's death was deliberately indifferent to these obvious risks. *Canton*, 489 U.S. at 388.

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 30
2:19-cv-01987-RSM

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

NaphCare's custom of not screening mentally inmates can also be framed as a training deficiency. Although the NaphCare policy manual and NCCHC guidelines require mentally unstable inmates to be cleared by a medical professional before being booked into a facility, none of NaphCare's employees (even their administrators Ms. Villacorta and Mr. Tambe) were properly trained to follow the requirement that mentally unstable be cleared before entering the facility, or at least medically screened in the facility.

And finally, NaphCare is subject to *Monell* liability for the actions and omissions of Rebecca Villacorta and Henry Tambe, the final policymakers at SCORE. In *Thompson v. Ackal,* the Western District of Louisiana addressed a similar situation. *Thompson v. Ackal*, No. CV 15-02288, 2016 WL 1394352, (W.D. La. Mar. 9, 2016), report and recommendation adopted, No. CV 15-02288, 2016 WL 1391047 (W.D. La. Apr. 6, 2016). In *Thompson*, a private contractor similar to NaphCare, provided medical services in a public jail. The Medical Director and Health Services Administrator/Director of Nursing were considered to be the final policymaker regarding the contractor's policies and practices where there existed a Health Services Agreement delegating the contractor responsibility for providing health services, designing policies and procedures, and staffing and controlling the clinical and administrative aspect of the health services program. *Id*. at *6.

Here, Ms. Villacorta and Mr. Tambe had final policymaking authority, which was delegated from SCORE to NaphCare in the Health Services agreement, Dkt. 82-11 at Art. 1 (Health Services Agreement), and then from NaphCare to Ms. Villacorta and Mr. Tambe in their job descriptions/employment contracts. Bingham Decl., Exh 3, 4. In their roles as final policymakers, Ms. Villacorta and Mr. Tambe were responsible for establishing and then

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

acquiescing to, on an ongoing basis, the custom of allowing mentally unstable inmates into the facility without an intake screen or any other sufficient safety precautions.

**B.  The Court should deny NaphCare's motion to dismiss Plaintiffs' ADA claims**

Damaris had a mental impairment that substantially limited major life activities, and she was excluded from medical treatment due to symptoms of her disability.

**C.  Request to strike declaration of Elliot Wade, M.D.**

NaphCare relies on Dr. Wade's testimony even though Dr. Wade was not disclosed as a witness until August 6, 2021, and has never provided a Rule 26(a) expert report. Bingham, Decl. at ¶57.  As such, his declaration should be excluded under Rule 37(c)(1). *See Hargrave v. Univ. of Washington*, 113 F. Supp. 3d 1085, 1107 (W.D. Wash. 2015) (striking declaration of witness filed in support of summary judgment motion where witness was not properly disclosed).

VI.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny NaphCare's motion in its entirety.

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 32
2:19-cv-01987-RSM

1

Respectfully submitted this 9th day of August, 2021.

2

KRUTCH LINDELL BINGHAM JONES, P.S.

3

By: /s/ J. Nathan Bingham, WSBA 46325

4

/s/ James T. Anderson, WSBA 40494

/s/ Jeffrey C. Jones, WSBA 7670

5

/s/ Matthew K. Clarke, *pro hac vice*

J. Nathan Bingham, WSBA 46325

6

James T. Anderson, WSBA 40494

7

Jeffrey C. Jones, WSBA 7670

Matthew K. Clarke, *pro hac vice*

8

3316 Fuhrman Ave E, Suite 250

Seattle, Washington 98102

9

Telephone: (206) 682-1505

10

Facsimile: (206) 467-1823

Email: jnb@krutchlindell.com

11

jta@krutchlindell.com

jcj@krutchlindell.com

12

mkc@krutchlindell.com

13

14

TERRELL MARSHALL LAW GROUP PLLC

15

By: /s/ Toby J. Marshall, WSBA 32726

Toby J. Marshall, WSBA 32726

16

936 North 34th Street, Suite 300

Seattle, Washington 98103-8869

17

Telephone: (206) 816-6603

18

Facsimile: (206) 319-5450

Email: tmarshall@terrellmarshall.com

19

20

*Attorneys for Plaintiffs*

21

22

23

24

25

26

27

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 33
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury under the laws of the State of

Washington that on this date I caused to be served in the manner indicated a copy of the

foregoing document upon the following persons:

| | |
|---|---|
| Stewart Andrew Estes<br>KEATING BUCKLIN McCORMACK INC. PS<br>sestes@kbmlawyers.com<br>lwalker@kbmlawyers.com<br>tcaceres@kbmlawyers.com<br><br>John E. Justice<br>LAW LYMAN DANIEL KAMERRER &<br>BOGDANOVICH<br>jjustice@lldkb.com<br>lisa@lldkb.com<br>tam@lldkb.com<br><br>*Attorneys for Defendant South Correctional Entity* | [ ]   Via First Class Mail, postage<br>      prepaid<br>[ ]   Via Facsimile<br>[ ]   Via Messenger<br>[X]   Via E-Mail/E-Service |
| Heidi Mandt<br>WILLIAMS KASTNER<br>hmandt@williamskastner.com<br>lpavey@williamskastner.com<br><br>*Attorneys for Defendants NaphCare, Inc., Rebecca Villacorta, Henry Tambe, Nancy Whitney, Billie Stockton, Brittany Martin, Jessica Lothrop, Brooke Wallace, Sally Mukwana, Joan Kosanke, Rita Whitman and Virginia Richardson* | [ ]   Via First Class Mail, postage<br>      prepaid<br>[ ]   Via Facsimile<br>[ ]   Via Messenger<br>[X]   Via E-Mail/E-Service |
| Daniel L. Kinerk<br>Raam Wong<br>KING COUNTY PROSECUTOR'S OFFICE<br>dan.kinerk@kingcounty.gov<br>raam.wong@kingcounty.gov<br>jennifer.klein@kingcounty.gov<br>alindsey@kingcounty.gov<br>rmunozcintron@kingcounty.gov | [ ]   Via First Class Mail, postage<br>      prepaid<br>[ ]   Via Facsimile<br>[ ]   Via Messenger<br>[X]   Via E-Mail/E-Service |

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 34
2:19-cv-01987-RSM

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823

| *Attorneys for Defendants King County, Leland Adams, Raul Adams and Alan Tag* | |

Signed in Seattle, Washington on the 9th day of August, 2021.

*Pia Kim*
Pia Kim, Paralegal

PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 35
2:19-cv-01987-RSM

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E
Suite 250
Seattle, Washington 98102
TEL. 206.682.1505 • FAX 206.467.1823