UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RUSSEL H. DAWSON, Personal Representative of the Estate of Damaris Rodriguez, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SOUTH CORRECTIONAL ENTITY ("SCORE"), a Governmental Administrative Agency, et al., <br><br> Defendants. | CASE NO. C19-1987RSM <br><br> ORDER GRANTING IN PART AND DENYING IN PART NAPHCARE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## I.  INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment filed by Defendants NaphCare, Inc., Rebecca Villacorta, Henry Tambe, Nancy Whitney, Billie Stockton, Brittany Martin, Brooke Wallace, Sally Mukwana, Joan Kosanke, and Rita Whitman (collectively "the NaphCare Defendants"). Dkt. #148. Plaintiffs oppose. Dkt. #177.

## II.  BACKGROUND

This is a fact-intensive case concerning the death of an inmate suffering from multiple severe health issues. For clarity, the Court will focus on the facts necessary to address the limited issues raised in this Motion, primarily the actions of NaphCare medical personnel.

Plaintiffs in this case are Russel Dawson, personal representative of the estate of Damaris Rodriguez, Ms. Rodriguez's husband Reynaldo Gil, and their children. Dkt. #49. Defendants

are South Correctional Entity Jail ("SCORE"), NaphCare, Inc., and roughly two dozen individuals associated with SCORE and/or NaphCare. *Id*.

On December 30, 2017, Ms. Rodriguez had a mental health emergency while at her home in SeaTac. *Id*. Her husband, Reynaldo Gil, called 911. Dkt. #149-1 ("Gil Dep.") at 14:12-21. Deputies from the King County Sheriff's Office arrived and arrested Ms. Rodriguez. Dkt. #149-2 at 4. Reynaldo Gil has stated in deposition that he told the deputies his wife had "a psychiatric problem" and "needs to see the doctor." Dkt. #149-1 ("Gil Dep.") at 19:5-7.

The actions of the deputies are not at issue. Ms. Rodriguez was taken directly to the SCORE jail. SCORE's medical personnel were provided by NaphCare, a for-profit, in-custody medical contractor.

Plaintiffs allege Ms. Rodriguez was severely mistreated and denied adequate medical care. Ms. Rodriguez developed ketoacidosis and hyponatremia and died in custody four days later. Dkt. #83 at 4. The level of medical care, or lack thereof, is the issue facing the Court on this Motion.

This is a motion for partial summary judgment. The NaphCare Defendants move to dismiss Plaintiffs' Fifth Claim for Relief (Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay, and Withholding of Medical Care), Plaintiffs' Sixth Claim for Relief (Civil Rights Claim for Cruel and Unusual Punishment and Denial, Delay, and Withholding of Medical Care), and Plaintiffs' Tenth Claim for Relief (Civil Rights Claim for Failure to Provide Reasonable Accommodations). *See* Dkt. #148-1 at 2. The Motion also addresses Plaintiff's Seventh Claim for Relief, a substantive due process claim for deprivation of their liberty interest in the companionship and society of Ms. Rodriquez. Dkt. # 148 at 27. Plaintiffs' other claims against these Defendants (and claims against other Defendants) are not addressed at this time.

Ms. Rodriguez was admitted to the SCORE jail on the afternoon of December 30, 2017. When she arrived, video evidence appears to show she was unable to walk and not responsive to corrections officers. Dkt. #178, Exh. V-1 (filed under seal, *see* Dkt. #171). Plaintiffs argue it was therefore obvious, even to a layperson, that Ms. Rodriguez needed some level of medical care. This material fact, barely addressed by Defendants, appears to be under dispute.

NaphCare has a written policy requiring an intake screen and for all "mentally unstable" inmates to receive appropriate treatment and "medical clearance" before entering the facility. Dkt. #82-12 at 2. This involves a series of questions. According to NaphCare, "completion of the booking screening requires the inmate to be able to answer questions prudently and cooperatively," and "[i]f an inmate is combative or otherwise unwilling or unable to participate in the booking screen, custody will not bring them to the booking nurse and the screening cannot take place until the inmate calms down or reaches a state that is amenable to participating in the intake screening process." Dkt. #148 at 4 (citing depositions).

Due to Ms. Rodriguez's condition, NaphCare personnel did not complete the intake screen or create at treatment plan, and instead placed her in a cell and waited for Ms. Rodriguez to become cooperative.

Many if not all of the NaphCare Defendants were aware that Ms. Rodriguez had not been medically screened and have attempted to explain this lack of screening as someone else's problem. *See* Dkt. #178-8 ("Tambe Dep. II") at 82:1-8; Dkt. #178-9 ("Martin Dep. II") at 37:17-38:9; 41:25-43:1; Dkt. #178-11 ("Mukwana Dep. II") at 12:14-15:24. Of course, the original reason Ms. Rodriguez was arrested was for a mental health incident. NaphCare points the finger at co-defendant SCORE for failing to share this critical information. *See* Dkt. #148 at 5 ("to the extent SCORE had information concerning Rodriguez's medical or mental health history, such information was not shared with NaphCare staff."). However, this conflicts with the testimony

of SCORE's booking sergeant who says the reason for the arrest was shared with NaphCare staff. *See* Dkt. #177 at 7 (citing deposition of Sgt. Scott). This is a dispute of material fact.

Ms. Rodriguez stayed in this booking cell for over a day. Jessica Lothrop, a NaphCare MHP, described what happened to Ms. Rodriguez as getting "stuck in booking," saying it "wasn't unusual." Dkt. #178-12 ("Lothrop Dep.") at 16:24- 17:5.

After Ms. Rodriguez was transferred to the medical unit, a urine test was administered, which Plaintiffs argue ruled out any reasonable possibility of drugs causing her symptoms. This fact may be in dispute. Conflicting deposition testimony from the NaphCare Defendants appears to indicate different levels of monitoring. By all accounts, Ms. Rodriguez was uncooperative, not eating, and naked or underdressed for many days. After vomiting copious amounts of water, she was placed in a dry cell. She stopped breathing and died in SCORE's custody on January 3, 2018, four days after her arrival. Further specific details of her declining health are briefed by the parties but unnecessary for ruling on this Motion.

Plaintiffs' expert witness will present evidence that Ms. Rodriguez's vital signs were never taken or recorded, Dkt. #83, ¶ 10(b)(1) ("Luethly Decl."); Dkt. #84, ¶ 19.7.5 ("Piel Decl."), and that long periods of time—17 hours, 14 hours, and 12 hours—elapsed between clinical notations about her condition, Luethy Decl. at ¶ 15.

Plaintiffs include evidence that NaphCare was on notice of the dangers of its intake policy, referring to a research project conducted at SCORE by Disability Rights Washington. *See* Dkt. #177 at 5–6. The Court need not reach a conclusion on the merits of this evidence to conclude that it raises a genuine dispute of material fact.

Much of the briefing on this Motion relates to the role each named NaphCare defendant played in providing care for Ms. Rodriguez, discussed in greater detail below. While the total information presented by the parties is voluminous, the Court finds it can rule on this Motion by

simply pointing to certain critical, genuine disputes of fact. The Court will first briefly summarize the role each Defendant played in administering care to Ms. Rodriguez:

- Rebecca Villacorta, RN, was the Health Services Administrator, overseeing the entire staff. She was consulted about Ms. Rodriguez's care on January 3, 2018.

- Brittany Martin was working as a booking nurse at SCORE who observed and tried to interact with Ms. Rodriguez in booking.

- Henry Tambe, RN, was the Director of Nursing at SCORE when Ms. Rodriguez was booked into the facility.

- Sally Mukwana worked as a night shift booking nurse. She first came in contact with Rodriguez during the shift "pass down" from Nurse Martin on the afternoon of December 31, 2017.

- Brooke Wallace was the first nurse who was responsible for observing Ms. Rodriguez after she was transferred to the medical unit.

- Nurse Joan Kosanke was responsible for observing Ms. Rodriguez for part of her time at SCORE.

- Rita Whitman, ARNP, interacted with Ms. Rodriguez and determined she was not in need of any immediate medical care.

- Billie Stockton, MHP was one of the first mental health professionals to see Rodriguez when she entered SCORE. She observed Ms. Rodriguez's behavior briefly, attempted to get a response, found her unresponsive, and kept her under observation.

- Nancy Whitney was the Mental Health Director for SCORE, was responsible for overseeing the day-to-day operations of the mental health team and had at least two interactions with Ms. Rodriguez.

## III. DISCUSSION

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Individual Defendants

The NaphCare Defendants first move to dismiss Plaintiffs' Fifth Cause of Action for a violation of Ms. Rodriguez's constitutional rights (denial of medical treatment) arising out of the Due Process Clause of the Fourteenth Amendment. Dkt. #148 at 7. "[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective

deliberate indifference standard." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-1125 (9th Cir. 2018). In order to establish such a claim pursuant to Section 1983, Plaintiffs must establish for Ms. Rodriguez that:

> (i) the defendant[s] made an intentional decision with respect to the conditions under which [she] was confined; (ii) those conditions put [her] at substantial risk of suffering serious harm; (iii) the defendant[s] did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved— making the consequences of the defendant[s'] conduct obvious; and (iv) by not taking such measures, the defendant[s] caused [her] injuries.

*Id*. at 1125. With respect to the third element, the standard for the defendants' conduct is objective, "a test that will necessarily turn on the facts and circumstances of each particular case." *Gordon*, 888 F.3d at 1125 (9th Cir. 2018) (quoting *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)). The "mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id*. (internal quotations and citations removed). Plaintiffs must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id*. (internal quotations and citations removed).

Defendants argue that each of them individually cannot be liable under Section 1983. According to Defendants, "Ms. Villacorta was consulted about Ms. Rodriguez on January 3, 2018," but "never provided or aided in the provision of care to Rodriguez." Dkt. #148 at 10. However, she testified in deposition that she was provided specifics about her care ("they had been able to communicate with her, that they had been able to get a urine sample, that they were able to do the drug screening and the pregnancy test") and that "it was explained to Ms. Villacorta, [that] Rodriguez [was] vomiting water and [it was] decided to move her to a dry cell

due to concerns about the overconsumption of water" and that "Ms. Villacorta agreed that was the appropriate step to take." *Id*.

With regard to Nurse Brittany Martin, the Motion states "[o]ther than monitoring and ensuring they are safe, there is not much the booking nurse can do other than wait for the inmate to calm down." *Id*. at 11.

For Nurse Tambe, the Motion states "Nurse Tambe recalls Rodriguez being naked in her cell when he checked on her, which limited his wellness check to a verbal one only;" "[a]lthough naked, Ms. Rodriguez was up, moving in her cell, and making noise – all signs that Rodriguez was not physically impaired or in need of medical intervention;" "[d]espite her behavior, Rodriguez was safe and not causing herself harm;" and "[t]here was no obvious risk of harm to keep Rodriguez under observation." *Id*. at 14.

For Nurse Mukwana, the Motion argues she "quickly realized the difficulty in getting a booking screening completed based on Rodriguez's behavior and recommended that she be moved to the medical unit where she could be more closely monitored." *Id*. at 15.

For Nurse Wallace, the Motion admits she was in charge of Ms. Rodriguez's care after she was transferred to the medical unit. *Id*. The Motion focuses on the fact that Ms. Wallace was able to obtain a urine sample and that Ms. Rodriguez appeared to be less agitated. *Id*.

For Nurse Kosanke, the Motion argues she checked Ms. Rodriguez's vital signs and that "[w]hile she does not recall the specific results, and failed to record the vitals, Nurse Kosanke knows that if Ms. Rodriguez's vital signs were abnormal she 'would have addressed that.'" *Id*. at 17 (citing deposition). Whether vital signs were properly checked is in dispute.

For ARNP Whitman, she interacted with Rodriguez on January 2 and concluded that she was not in need of any immediate medical care. *Id*. at 17. The Motion states "if ARNP

Whitman had been made aware that Rodriguez was in an immediate medical danger, '[she] would have acted.'" *Id*. at 18 (citing deposition).

For Nurse Stockton, the Motion contends "[t]here was no obvious risk of harm to keep Rodriguez under observation," and "[b]ecause Ms. Rodriguez did not respond to Ms. Stockton's attempts to engage her, as a mental health provider, the only option available to Ms. Stockton was to keep Rodriguez in medical observation and to continue attempts to assess her." *Id*. at 19.

For Director Whitney, Defendants argue that her actions, including checking on Ms. Rodriguez on January 3, observing her vomiting water, and notifying nurses of her concerns, and making sure that Ms. Rodriguez moved to a dry cell was "the antithesis of deliberate indifference" and therefore the Court can dismiss this claim as a matter of law. *Id*. at 20.

The Court has reviewed the record and finds numerous genuine disputes of material fact. The first and perhaps most critical dispute is whether or not SCORE personnel communicated to the NaphCare Defendants that Ms. Rodriguez was being brought to the jail for a mental health crisis, with the request from her husband that she see a doctor. This dispute shapes how the jury could interpret nearly every subsequent action by all NaphCare Defendants. Even if this were not disputed, the Court cannot act as a fact-finder and, *e.g.*, determine that a nurse who was consulted and who agreed to a course of action did not "aid in the provision of care," or determine whether the many other nursing actions and observations undertaken were sufficient as a matter of law. What the Motion deems responsible actions, such as placing Ms. Rodriguez in a dry cell, a jury could just as easily deem reckless inaction. Issues of causation are best left to the jury. There is substantial evidence for the jury to find that each of these Defendants disregarded known or obvious risks to Ms. Rodriguez's health. Viewing all evidence and drawing all inferences in the light most favorable to Plaintiffs, the Court finds that Defendants have failed to demonstrate that dismissal of this claim is warranted for any of these individuals.

### C. *Monell* claim against NaphCare

Defendants next move to dismiss claims against NaphCare directly. "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Both affirmative actions and omissions may qualify as policies under *Monell*. *City of Canton v. Harris*, 489 U.S. 378, 396 (1989) ("Where a Section 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.") Policies may include written policies, unwritten customs and practices, failure to train employees on avoiding certain obvious constitutional violations, and single constitutional violations so inconsistent with constitutional rights that even such a single instance indicates deliberate indifference of the entity. *Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Canton*, 489 U.S. at 387). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy," *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), holding modified by *Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001).

Plaintiffs argue:

> NaphCare's custom of not screening mentally ill inmates or providing them with treatment plans is what enabled the inactions of NaphCare's nurses and MHPs. The independent audits warned NaphCare of the risks of delayed intake screens and allowing mentally ill inmates to become stuck in booking. However, the risks of placing unscreened and mentally ill inmates in solitary confinement without treatment plans are obvious—and NaphCare's lack of action to correct it before Damaris's death was deliberately indifferent to these obvious risks.

> NaphCare's custom of not screening mentally inmates can also be framed as a training deficiency. Although the NaphCare policy manual and NCCHC guidelines require mentally unstable inmates to be cleared by a medical professional before being booked into a facility, none of NaphCare's employees (even their administrators Ms. Villacorta and Mr. Tambe) were properly trained to follow the requirement that mentally unstable be cleared before entering the facility, or at least medically screened in the facility.

Dkt. #177 at 30–31.

The Court agrees. Viewing all evidence and drawing all inferences in the light most favorable to Plaintiffs, they have pointed to witness testimony indicating a custom or training deficiency of not properly screening mentally ill inmates pursuant to a NaphCare policy. If a jury finds that what occurred here amounts to either a custom or a training deficiency, and that it led to injury or the death of Ms. Rodriguez, NaphCare could be liable under *Monell*. Dismissal of this claim is not warranted on summary judgment.

### D. ADA Claim against NaphCare

NaphCare argues it did not deny Rodriguez access to any services, programs or activities because of a disability. In any event, Plaintiffs are really complaining about NaphCare's failure to institute adequate policies and procedure or train its employees. It is unclear to the Court why such claims would be cognizable under the ADA's plain language. The record appears to demonstrate that Ms. Rodriguez's care was not shaped by a discriminatory reaction to her mental health disability, but rather a failure to recognize the disability in the first place. Plaintiffs' argument on this issue is razor thin and fails to satisfy the elements of this cause of action. *See* Dkt. #177 at 32 ("Damaris had a mental impairment that substantially limited major life activities, and she was excluded from medical treatment due to symptoms of her disability"). The Court finds that summary judgment dismissal of this claim is warranted.

### E. Fourteenth Amendment Deprivation of Liberty and Companionship Claims

In their Seventh Claim for Relief, plaintiffs assert a Fourteenth Amendment substantive due process claim for deprivation of their liberty interest in the companionship and society of Rodriquez. Dkt. #49 at ¶ 248. The NaphCare Defendants move to dismiss this claim, arguing that their conduct did not deprive Plaintiffs of their familial interest in a manner that "shocks the conscience." Dkt. #148 at 27 (citing *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013)). Plaintiffs completely fail to respond to this argument. The Court finds that dismissal of this due process claim is appropriate as it appears duplicative of other claims and because Plaintiffs have failed to make a sufficient showing on an element of this claim to which they bear the burden of proof. *See Celotex Corp., supra*.

**F. NaphCare's Motion to Strike**

The Court notes that NaphCare has moved to strike certain portions of Plaintiffs' brief and attached exhibits. *See* Dkt. #183 at 2. The Court finds that it has not relied on those portions of briefing or exhibits to reach the above conclusions, and that therefore this Motion can be DENIED as MOOT. Any evidentiary issues with the exhibits can be addressed at or before trial.

### IV.   CONCLUSION

Having reviewed the relevant briefing and the remainder of the record, the Court hereby finds and ORDERS that Defendant NaphCare's Motion for Summary Judgment, Dkt. #148, is GRANTED IN PART AND DENIED IN PART as stated above. Plaintiffs' Seventh and Tenth Claims for Relief are DISMISSED as to the NaphCare Defendants only.

DATED this 17th day of September, 2021.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE